**EXHIBIT "2"**

THE DISTRICT COURT
OF EL PASO COUNTY, TEXAS
327TH JUDICIAL DISTRICT COURT

| | | |
|---|---|---|
| ALBERT FLORES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2020DCV2997 |
| | § | |
| KEYVAN PARSA, and | § | |
| MONTOYA PARK PLACE, INC., | § | |
| | § | |
| Defendants, | § | |
| | | |
| WESTSTAR TITLE, LLC, LLC, | § | |
| FIDELITY NATIONAL TITLE | § | |
| INSURANCE COMPANY,   and | § | |
| | § | |
| Intervenors/Third Party Plaintiffs, | § | |
| | | |
| KEYVAN PARSA, | § | |
| MONTOYA PARK PLACE, INC., | § | |
| DEBORAH JORDAN, and | § | |
| ALBERT FLORES, | § | |
| | § | |
| Third Party Defendants, and | § | |
| | | |
| WESTMOUNT GROUP, INC., | § | |
| | § | |
| Intervenor-Third Party Defendant. | § | |

## PLAINTIFF'S THIRD AMENDED PETITION
## (SUIT FOR RESCISSION OF CONTRACT, FOR FRAUD IN A STOCK TRANSACTION, FOR UNJUST ENRICHMENT, FOR COMMON LAW FRAUD, FOR INJUNCTIVE RELIEF, AND TO APPOINT A RECEIVER)

TO THE HONORABLE LINDA Y. CHEW, JUDGE OF THE DISTRICT COURT:

Now comes the Plaintiff ALBERT FLORES and through his attorney undersigned files

this Third Amended Petition (Suit for Rescission of Contract, for Fraud in a Stock Transaction,

for Unjust Enrichment, for Common Law Fraud, for Injunctive Relief, and To Appoint A Receiver), and for cause of action would respectfully show as follows:

1.

Defendant KEYVAN PARSA, M.D. is an individual resident of El Paso County, Texas, who may be served with process at his usual place of residence, 7604 Plaza Redonda., El Paso, Texas 79912.

2.

Defendant MONTOYA PARK PLACE, INC. is a Texas corporation, and it may be served upon its registered agent ALBERT FLORES at 3605 Arcadia, El Paso, TX 79902. Since Mr. FLORES is the Plaintiff, however, an attorney ad litem, should answer for the corporation. An Answer for MONTOYA PARK PLACE, INC. has, however, been filed by attorney JEFF RAGO, who also represents Defendant KEYVAN PARSA, M.D.

3.

Intervenor-Third Party Defendant WESTMOUNT GROUP, INC. is a Texas corporation, and it may be served upon its registered agent GEORGE LARA at 220 Thunderbird, Ste. R, El Paso, TX 79912.

4.

Plaintiff desires to have discovery conducted at level 2 of the Texas Rules of Civil Procedure.

5.

All of the transactions complained of took place in El Paso County, Texas, where all parties reside or have their domicile. Venue is therefore proper in this County and Court.

## I. BACKGROUND, FORMATION OF MOTOYA PARK PLACE, INC.

6.

The Plaintiff and the Defendant KEYVAN PARSA, M.D. came to form a Texas for-profit corporation whose only asset, up until July 1, 2020, was a parcel of land known as Tract 3, JOHANNSEN SUBDIVISION in the City of El Paso, Texas. MONTOYA PARK PLACE, INC. applied for and received from the Texas Secretary of State a Certificate of Incorporation, hereto attached in copy as Exhibit "A," on February 5, 2020. Under article 3.04 of the Texas Business Corporations Act, the issuance of a Certificate of Incorporation brings the corporation into existence, even if other corporate formalities, such as an organizational meeting, taking charge of the meeting by the initial directors, election of officers, adoption of by-laws, approval of a seal and a form of shares certificates, and issuance of stock, have not taken place yet.

7.

The organizer or incorporator applying for and named in the Certificate of Incorporation, was Defendant KEYVAN PARSA, M.D. (sometimes hereinafter "Dr. PARSA" or "PARSA"). The Initial Directors named in the Certificate of Incorporation were ALBERT FLORES and KEYVAN PARSA, M.D.  ALBERT FLORES was named as the Registered Agent for the corporation.

3

8.

Neither Dr. PARSA nor Mr. FLORES had called for an organizational meeting, prior to the commission by Dr. PARSA of the oppressive, inequitable, and fraudulent acts described below, on June 30 and July 1 and in early July of 2020. Those acts, done by Dr. PARSA, came about in the background that is described in chronological sequence below in paragraphs 8-14 of this Amended Petition.

9.

The contemplated capital contributions of FLORES and Dr. PARSA to MONTOYA PARK PLACE, INC. were markedly different. ALBERT FLORES contributed a parcel of real estate known as TRACT 3, JOHANNSEN SUBDIVISION, an Addition to The City of El Paso, by warranty deed on February 11, 2020. A copy of that deed is hereto attached as Exhibit "B." FLORES acquired TRACT 3, JOHANNSEN SUBDIVISION (hereinafter "TRACT 3") through a foreclosure sale on February 4, 2020 for the high bid of $450,980.19. A copy of the Trustee's Deed to FLORES is hereto attached as Exhibit "C." FLORES had held a second-lien deed of trust note on TRACT 3 ever since September of 2017, when he sold his interest in TRACT 3 to JOHANNSEN DEVELOPMENT GROUP, INC. FLORES' note started out at $437,500.00, due in a lump sum in six months. JOHANNSEN DEVELOPMENT GROUP, INC. defaulted (made no payment), and FLORES extended a forebearance agreement to them. Again JOHANSSEN DEVELOPMENT GROUP defaulted, and this time FLORES posted his real estate note for foreclosure. JOHANNSEN DEVELOPMENT GROUP fought the foreclosure with a temporary restraining order and other delaying tactics, until JOHANNSEN DEVELOPMENT GROUP, INC. told FLORES they had sufficient refinancing to pay him off, in May, 2019.

4

10.

FLORES awaited closing of the refinancing. It turned out that the new lender, RIGHT IMMIX CAPITAL, INC., was willing to loan JOHANSSEN DEVELOPMENT GROUP, INC. only enough money to pay off the first lien, held by Dr. PARSA, and about a fourth of what was owed to FLORES on his accelerated note. FLORES agreed to subordinate his lien to RIGHT IMMIX's lien. FLORES came away from the refinancing with only about $150,000.00 (or 27%) of the $547,000.00 he had been owed. Most of RIGHT IMMIX CAPITAL's $800,000.00 loan went to pay off Dr. PARSA, who had held the first lien on TRACT 3 up until then. At the refinancing, Dr. PARSA and DEBORAH JORDAN, the President of JOHANNSEN DEVELOPMENT GROUP, INC., both gave unconditional personal guarantees to RIGHT IMMIX CAPITAL on its refinancing note, and Dr. PARSA became a co-shareholder in JOHANNSEN DEVELOPMENT GROUP, INC.

11.

JOHANNSEN DEVELOPMENT GROUP, INC. continued on thereafter with the upgrades it had been making to TRACT 3. The Subdivision needed City approval, re-zoning, roadway access, and environmental remediation. (The site had been a wrecking yard for decades.) JOHANNSEN DEVELOPMENT GROUP, INC. kept current on its payments to RIGHT IMMIX CAPITAL up through August, 2019, but had no funds to pay FLORES. Friction developed between Ms. JORDAN and Dr. PARSA, and she transferred all of her stock to him in September, 2019.

12.

FLORES eventually foreclosed on Tract 3 in February, 2020.  His high bid at foreclosure was $450, 980.19, and he bought "subject to" RIGHT IMMIX CAPITAL's first lien note.  *See* Exhibit "C."  During the months in Fall, 2019, leading up to foreclosure, FLORES and PARSA had agreed they would each pay half of the $8,000.00 monthly note payment to RIGHT IMMIX CAPITAL, but it was FLORES who ponied up the money.  After FLORES foreclosed, PARSA contributed only a small fraction to the RIGHT IMMIX CAPITAL monthly payments, up to and including the month of June, 2020.

13.

FLORES and Dr. PARSA had discussed forming a corporation, that would eventually sell TRACT 3, and sharing the profit on a 50-50 basis.  FLORES put title to TRACT 3 into that corporation, MONTOYA PARK PLACE, INC., on February 11, 2020.  However, no stock was ever issued to FLORES and no organizational meeting of the corporation ever took place;  *see* paragraphs 5 through 8 of this Petition.  Dr. PARSA paid nothing into the corporation;  he orally promised he would pay for more subdivision improvements in the future, but he never did, and no promissory note was ever drawn up.

## II. THE CLOSING, AND THE UNJUST ENRICHMENT

14.

By mid-Spring of 2020, the neighborhood for TRACT 3 was changing.  The City of El Paso completed an improvement of Montoya Drive, extending it all the way to Interstate

Highway 10. Then a charter school came looking for a suitable campus location. IDEA CHARTER SCHOOLS made FLORES an offer for TRACT 3, of $1.95 million.

15.

The closing of the sale of TRACT 3 to IDEA PUBLIC SCHOOLS took place at WESTSTAR TITLE COMPANY in El Paso on July 1 and 2, 2020. WESTSTAR TITLE COMMPANY apparently did not understand the effect of the Subordination Agreement ALBERT FLORES had given to RIGHT IMMIX CAPITAL a year earlier, filed for record on August 27, 2019 as El Paso County Clerk's document No. 20190065558. A copy is hereto attached as Exhibit "D." FLORES' deed of trust dated back to September of 2017; RIGHT IMMIX CAPITAL's deed of trust dated back only to June of 2019. So the title commitment was issued as though the RIGHT IMMIX CAPITAL lien had been "cut off" by ALBERT FLORES' foreclosure on February 4, 2020.

16.

The HUD-1 closing statement presented to MONTOYA PARK PLACE, INC. thus had a windfall of an extra $700,000.00 in it for MONTOYA PARK PLACE, INC. Dr. PARSA, who signed the closing papers one afternoon before ALBERT FLORES did, said nothing to the closer about the windfall. FLORES, signing the closing papers hurriedly the next morning as the closing agent rapidly presented them to him, noticed the excessive payment to Seller and went to see Dr. PARSA the next day to say WESTSTAR TITLE had surely made a mistake in the closing statement, and that he and PARSA should correct it. FLORES had by then surmised that

7

the overpayment matched what was owed to RIGHT IMMIX CAPITAL, and that WESTSTAR TITLE had missed their lien.

17.

PARSA, however, took the position that the title company's mistake was MONTOYA PARK PLACE, INC.'s good fortune.  PARSA told FLORES that they had paid WESTSTAR $10,000 for a title policy, and that covering errors was what title insurance was for.  He added that he had lost too much money to Deborah Jordan, to give back the $700,000.00.  PARSA had instructed WESTSTAR TITLE to pay the closing proceeds to MONTOYA PARK PLACE, INC. by direct deposit into an account PARSA had opened in MONTOYA PARK PLACE, INC.'s name, at WESTERN HERITAGE BANK in El Paso.  If ALBERT FLORES was given withdrawal or check-writing privileges on that bank account, he was never told of any.

## III. THE AFTERMATH OF THE UNJUST ENRICHMENT

18.

FLORES told PARSA that he wanted no part of keeping the $700,000 that should have been paid to RIGHT IMMIX CAPITAL, and he just wanted his share of the $1.2 million in sale proceeds that would have been left, had RIGHT IMMIX CAPITAL been properly paid off.  PARSA asked FLORES how much of the proceeds he needed for the time being, and said FLORES would get the rest "in a little while.  Give me some time."  FLORES asked for $280,000.00, which he had badly needed for months, to pay some delinquent long-term loans.  PARSA promptly told FLORES he would get him a cashier's check for $280,000.00; *see* Exhibit "E" hereto attached.  Then FLORES said that he no longer wanted to be in a corporation

8

with PARSA and that if PARSA wanted the corporation without the sale proceeds, he would sell his stock in the corporation to him, just to get out, and leave PARSA to have to deal with the RIGHT IMMIX CAPITAL debt, and FLORES and PARSA would treat the sale proceeds as separate from the corporation. PARSA a day or two later called FLORES to his office, where on his laptop he had drawn up an agreement under which PARSA paid FLORES $50.00 for his half of the (never-issued) stock in MONTOYA PARK PLACE, INC. *See* Exhibit "F" hereto attached.

19.

FLORES promptly applied the $280,000.00 to long-term debts he had been struggling to service, and FLORES thereafter kept after PARSA to try to get the RIGHT IMMIX note paid and to get the rest of his share of the sale proceeds. PARSA, however, told FLORES he had spoken to a San Antonio attorney who advised him that the title company would have to pay for its mistake. But a few weeks later WESTSTAR TITLE was making demands on FLORES and PARSA to refund the $700,000, because they had signed at the closing an affidavit that they were aware of no other liens on Tract 3, and had thus committed fraud.

20.

FLORES then turned to his own attorney, undersigned, who has worked on FLORES' investment in TRACT 3 for many years now. FLORES did not explain to his attorney there had been a Stock Purchase Agreement, so his attorney first set about trying to have an Organizational Meeting for MONTOYA PARK PLACE, INC. FLORES meanwhile again requested the rest of "his share" of the sale proceeds, and was informed by PARSA that PARSA had withdrawn all of

the remaining closing proceeds from WESTERN HERITAGE BANK, and placed them into safekeeping into Mexico, and it would take "a little time" to gather FLORES' share. PARSA also said, "Don't worry, I'll take care of it." In a hearing before this Court on July 8, 2021, PARSA denied ever telling FLORES the funds were moved into Mexico, but the story, if made up, served PARSA's illicit purposes of keeping FLORES from learning where the funds were, and having a ready excuse as to why the funds could not be paid over to FLORS at once.

21.

FLORES' attorney then wrote to Dr. PARSA to explain how, under the doctrine of unjust enrichment, the $700,000 would eventually have to be paid back, either to WESTSTAR TITLE COMPANY or to RIGHT IMMIX CAPITAL. PARSA never replied.

22.

As of the date of the commencement of this action, and since then as well, Dr. PARSA has not paid over, despite FLORES' demand, any more of the remaining closing proceeds to FLORES, to WESTSTAR TITLE, or to RIGHT IMMIX CAPITAL. Both WESTSTAR TITLE's underwriter and RIGHT IMMIX CAPITAL have now made demand upon Dr. PARSA, to no avail*. They have also made demand on FLORES, threatening a suit for fraud over the closing affidavit that there were no other liens.

---

* Their demands on PARSA include demands that he honor the personal guarantee he gave to RIGHT IMMIX CAPITAL when they loaned $800,000 to JOHANNSEN DEVELOPMENT GROUP in June of 2019. PARSA must have been only too happy to give that guaranty, since about $650,000 of the loan went to pay off PARSA's loan to JOHANNSEN DEVELOPMENT GROUP, INC. Dr. PARSA's personal guaranty has now passed to WESTSTAR TITLE by assignment and/or subrogation, when WESTSTAR TITLE paid off RIGHT IMMIX CAPITAL prior to September 4, 2020 to head off a foreclosure that would have divested its insured, IDEA PUBLIC SCHOOLS, of its purchase.

## IV. WHY THE STOCK PURCHASE AGREEMENT
## SHOULD BE ORDERED RESCINDED

23.

The Stock Purchase Agreement should be ordered rescinded by this Court, for the following reasons:

a) Impossibility. FLORES owned no issued stock, because there had never been an organizational meeting. This failure to issue stock, to *anyone*, makes impossible a "stock purchase" agreement.

b) The $50.00 check was written on the bank account of Dr. PARSA. It is a grossly inadequate consideration, if Dr. PARSA takes the position that the stock purchase agreement makes him now the owner of all the money that remained in the Western Heritage Bank account at the time, and the subsequent mutations of that money.

c) $50.00 is more akin to the value of an empty corporate shell, *i.e.*, MONTOYA PARK PLACE, INC. without any assets (the sale proceeds). But FLORES' intention, in asking for a stock purchase agreement, was to separate the stock from the sale proceeds.

d) The Stock Purchase Agreement was fraudulent. FLORES, reasonably relying on Dr. PARSA's promise to pay him the last $338,000 of the sale proceeds, signed the Stock Purchase Agreement expecting he would get the rest of his share of the sale proceeds, and that PARSA would use the rest of the money to settle with WESTSTAR TITLE. But Dr. PARSA has not paid FLORES anything more of the proceeds, either through a MONTOYA PARK PLACE, INC. account or through a PARSA account.

11

e) The $280,000 check was not consideration for the stock transfer. The check was written on MONTOYA PARK PLACE, INC.'s money in WESTERN HERITAGE BANK. MONTOYA PARK PLACE, INC. could not acquire shares in itself. Further, FLORES was already entitled to his 50% share of the $1.2 million in the proceeds that properly were left had the RIGHT IMMIX CAPITAL first lien been paid at the closing. (Plus $18,000 for overpaying RIGHT IMMIX CAPITAL's monthly installments.) All that FLORES really wanted out of the stock purchase, and his intention in signing it, was to end the unlawful hoarding of FLORES' share of the proceeds of TRACT 3, and to get PARSA to return the $700,000 windfall.

f) PARSA knew that payment of the last $338,000 to FLORES was necessary to complete the deal, even though he left that detail out of his drafting of the Stock Purchase Agreement. For that reason PARSA continued to keep FLORES informed of the disposition of the rest of the proceeds; of placing them into Mexico; of the "little while" he would need to "take care of it," and of an opportunity to invest the remaining funds in a Mexican medical practice carried on by a Jamaican physician friend of Dr. PARSA's. And as recently as late September, 2020, PARSA had FLORES sign a document that is now Exhibit "G" hereto appended, stating that he (FLORES) was not entitled personally to "any portion of the disputed amount of $700,000, due to [sic] the sale of real estate known as TRACT 3, Johannsen Subdivision "5980 Johannsen Road" claimed by Right immix capital." Dr. PARSA presented that paper to FLORES undated, promising FLORES an e-mail copy. But FLORES got no copy until attorney

JEFF RAGO sent one to FLORES' attorney E.P. BUD KIRK. By then Dr. PARSA had back-dated FLORES' copy to July 2, 2020. But the facts depicted in the document did not exist yet on July 2, 2020, because RIGHT IMMIX CAPITAL made no demands on FLORES and PARSA until July 17 and July 24, 2020. *See* Exhibits "H" and "I" hereto appended. And no demands for the money to pay RIGHT IMMIX CAPITAL came from WESTSTAR TITLE until July 23, 2020 or FIDELITY NATIONAL TITLE INSURANCE until August 20, 2020, respectively. *See* Exhibits "J" and "K" hereto appended. Exhibit "G" does, however, establish a shared understanding with Dr. PARSA that FLORES did not renounce his interest in the rest of the sale proceeds.

g) Dr. PARSA still has not paid FLORES the $338,000.00, and apparently will not pay him. That conclusion is also based on the remarks made by Dr. PARSA's attorney JEFF RAGO in his Motion to Dismiss the initial version of this suit.

h) Implicit in the leaving of the $700,000.00 with PARSA, was that PARSA, rather than FLORES, had the money and the means to pay back a demand for it, if and when one came. But PARSA had no intention of doing so, and to this day has not done so, despite his unconditional personal guaranty of the RIGHT IMMIX CAPITAL loan, despite the affidavit of no other liens he signed at the closing, falsely denying his debt to RIGHT IMMIX CAPITAL, and despite the general warranty deed he signed in favor of IDEA PUBLIC SCHOOLS at the closing, which general warranty meant RIGHT IMMIX CAPITAL had to be paid. And while the parsimonious DR. PARSA maintains that MONTOYA PARK PLACE, INC. is the insured and is covered for errors at the closing because it paid

$10,000.00 for the title policy, the insured is not the seller but the buyer, IDEA PUBLIC SCHOOLS. A title policy was requested by the buyer in the earnest money contract, a copy of which is here to attached as Exhibit "L." In Article III the seller buys the policy to insure the buyer. That is the prevailing, and nearly universal practice, as a cost of selling.

24.

The law applicable to setting aside a stock purchase agreement in this situation is as follows:

    a)  For fraud in a stock sale, the remedy of rescission is permitted by courts applying Texas Business & Commerce Code § 27.01. Instead of actual damages for the fraud, the party defrauded may have the alternate remedy of rescission of the contract. *See TIG Specialties Ins. Co. v. Pinkmonkey.com Inc.*, 375 F.3d 365 (5th Cir. 2004), *reh'g denied*. The plaintiff electing rescission may also recover reasonable attorney's fees and costs including deposition expenses. Tex. Bus. & Comm. Code § 27.01(e). The undersigned attorney's regular hourly rate is $300.00, and to date he has put in at least 105 hours on this matter.

    b)  For fraud in the inducement, or for failure of consideration, or for breach (failure to perform), a stock purchase agreement may be rescinded under contract law. "The terms 'rescission' and 'cancellation' are virtually synonymous; if there is a distinction, it is that 'rescission' is the general undoing of the agreement, while 'cancellation' is more formal annulment or rendering the instrument ineffective as a legal obligation." *Ferguson v. DRGI Colony North, Ltd.*, 764 S.W.2d 874, at

14

887 (Tex. App.—Austin 1989, *writ denied*). Rescission requires a contract to begin with, here the Stock Purchase Agreement, Exhibit "F." That contract is also informed by the material oral representation that accompanied it, that FLORES would receive the rest of his interest in the sale proceeds, in "a little while," which promise proved to be false and fraudulent. *See Freyer v. Michels*, 360 S.W.2d 559, at 561 (Tex. App.—Dallas 1962) (*held*, party damaged by breach can rescind the contract if there was fraud). *Accord, Crabtree v. Burkett*, 433 S.W.2d 728 (Tex. App.—Beaumont 1968). Rescission is also available for simple breach, if rescission can put the parties back where they were. *See Bovier v. MCR Const. Co.*, 673 S.W.2d 938 (Tex. App.—Dallas 1984; *writ ref'd n.r.e.*); *Allen v. Allen*, 751 S.W.2d 567 (Tex. App.—Houston [14th Dist.] 1988, *writ ref'd*). Here it is simple to put Dr. PARSA back where he was, by refunding his $50.00. FLORES need not return the $280,000.00, for it was his to begin with.

c) Failure of consideration. Contracts can be ordered rescinded if the consideration is so grossly inadequate as to shock the conscience, that being tantamount to fraud. That was the holding in *Martin v. Martin, Martin & Richards, Inc.*, 12 S.W. 3d 120 (Tex. App.—Fort Worth 1999). This surely is the case, if Dr. PARSA claims $1.62 million is his to keep, without having to pay another $338,000 to FLORES and $700,000 to the Title Company, by virtue of paying ALBERT FLORES $50.00. In *accord* is *Neely v. Intercity Management Corp.*, 623 S.W.2d 942 (Tex. App.—Houston [1st Dist.] 1981), *holding* that a court of law normally will not inquire into the adequacy of consideration, but that the court in its equitable role may inquire when there is such gross disparity in the

relative values exchanged as to show unconscionability or when inadequate price is coupled with in equitable incidents showing bad faith such as undue advantage or pecuniary necessity. *Id.* at 953. All of those circumstances are present here. If Dr. PARSA concedes that FLORES' 50% share of the proceeds is still intact, and will pay it over, and face his responsibilities to RIGHT IMMIX CAPITAL and its successor the title companies, then all is well except for $27,000.00 in attorney's fees FLORES has had to incur to try to get PARSA to act honestly. But Dr. PARSA has shown no willingness to do that. Dr. PARSA comports himself as if the $1.62 million is all his to keep, to the exclusion of FLORES and the first lien debt.

## V. BREAKING THE CORPORATE DEADLOCK

### 25.

Once the stock purchase agreement is ordered rescinded, as it should be, then FLORES asks this Court to break the deadlock of Initial Directors, and end his oppression as to his rights as a shareholder, by ordering the appointment of a receiver for the corporation, under Texas Business Corporations Act 7.05.

### 26.

MONTOYA PARK PLACE, INC. is deadlocked. The two Initial Directors do not agree the windfall should be put back. (Once the Stock Purchase Agreement is set aside, FLORES should be recognized as still an Initial Director, restored to the rights he had beforehand.) There never was an organizational meeting, to issue shares or adopt by-laws. Dr. PARSA will not share

access to or information about the Mexican whereabouts of the remaining sale proceeds. There is also deadlock over paying FLORES his remaining share of the TRACT 3 proceeds. Deadlock is a required element for appointment of a receiver under Tex. Bus. Corp. Act. § 7.05(A)(1)(a) and (b). Irreparable injury to the corporation is being suffered, and there is no way to break the deadlock, short of appointing a receiver. *Id.*

### 27.

There is an imminent danger of insolvency. The corporation has no other assets than the sale proceeds, which are now concealed in Mexico, and the corporation is faced with demands for $700,000 from both RIGHT IMMIX CAPITAL and WESTSTAR TITLE COMPANY'S underwriter, FIDELITY NATIONAL TITLE INSURANCE. An imminent danger of corporate insolvency is a sufficient ground for appointment of a receiver. Tex. Bus. Corps. Act, Art. 7.05(A)(1)(a), (b). There are also other, alternative, sufficient grounds to appoint a receiver, described below.

### 28.

Largely due to the circumstance that Dr. PARSA has contrived to achieve control of the corporation's money by telling WESTSTAR TITLE COMPANY and WESTERN HERITAGE BANK that he is the corporate representative to whom the closing money should be paid, Dr. PARSA is in control of all of the corporation's assets and is using that control to commit acts that are illegal, oppressive, and fraudulent, with respect to FLORES as well as with respect to the creditors of the corporation. That is another discrete, sufficient, alternative ground for appointment of a receiver. Tex. Bus. Corp. Act Art. 7.05(A)(1)(c).

29.

The assets of MONTOYA PARK PLACE, INC. are being misapplied or wasted. That is another discrete, sufficient, alternative ground for appointment of a receiver. Tex. Bus. Corp. Act § 7.05(A)(1)(d). Until a receiver is appointed, ALBERT FLORES is requesting a Temporary Restraining Order and a Temporary Injunction, so that Defendants cannot alienate, spend, or transfer any more proceeds or mutation of proceeds of Tract 3 JOHANNSEN SUBDIVISION.

30.

A receiver may be appointed, in the Court's discretion, for any one of the foregoing reasons. Tex. Bus. Corp. Act Art. 7.05(A)(1). A receiver may also be appointed upon any recognized ground of equity. Tex. Bus. Corp. Act Art. 7.05(A)(3). Equitable grounds include the combination of controversies as to control, ownership, and improper management of the corporation. *Faulk v. Futch*, 214 S.W. 2d 64 (Tex. Sup. 1948). All of those circumstances are present here.

31.

A receiver may also be appointed in equity when dissention is so great that the corporation cannot carry on its functions, when there is imminent danger of loss of assets, and when no other effective remedy for the shareholder (here ALBERT FLORES) exists. *Hammond v. Hammond*, 216 S.W. 2d 630 (Tex. Civ. App.—Fort Worth 1948).

32.

A receiver's appointment is the only effective remedy in this instance. A receiver will have the power to order and enforce immediate turnover by Dr. PARSA of the corporation's assets, before they can be further dissipated. Obviously, the spiriting away of the sale proceeds into Mexico, was an attempt to place them beyond the reach of other U.S. civil process, and it will be essential for the receiver to have turnover powers against Dr. PARSA and access to this Court for contempt orders as necessary to make him comply.

## VI. PARSA'S PATTERN OF UNJUST ENRICHMENT

33.

A common pattern that runs through the transactions giving rise to this suit, is the uncanny way in which Dr. PARSA has been presented with undeserved windfalls, and the unjust enrichment he has shrewdly and silently kept for himself (or his insider transferees; *see below*) at each turn. The pattern goes back to asking FLORES to join him 50-50 in servicing the RIGHT IMMIX CAPITAL note, in Fall of 2019, so that RIGHT IMMIX CAPITAL would not foreclose against JOHANNSEN DEVELOPMENT GROUP, INC. But PARSA (the guarantor) chipped in nothing, while FLORES made the payments. Then there was PARSA's idea to form a 50-50 corporation with FLORES, after FLORES had foreclosed on Tract 3. FLORES went along with that, though PARSA has put no consideration into the corporation, has spent nothing on any new improvement to TRACT 3, and has yet to sign a promissory note to do that. And FLORES still would agree to 50-50 shareholding, if PARSA would behave fairly, though the only value ever put into the corporation, was from FLORES, that being Tract 3. Then after FLORES put title into MONTOYA PARK PLACE, INC., PARSA paid very little of the RIGHT

IMMIX CAPITAL monthly note payments, up to the closing at WESTSTAR TITLE COMPANY. Altogether, FLORES paid $36,000 to RIGHT IMMIX in monthly installments, though he was not liable on the note as PARSA was. The next windfall came when WESTSTAR TITLE paid $1.829 million to MONTOYA PARK PLACE, INC. at the closing of Tract 3, including an extra $700,000 that should have gone to RIGHT IMMIX CAPITAL, into the bank account Dr. PARSA had total control of, at WESTERN HERITAGE BANK. The best remedy for that windfall is the doctrine of unjust enrichment. Unjust enrichment is more fully covered in Paragraph 35 of this Amended Petition *below*. WESTSTAR and/or FIDELITY have had to pay PARSA's debt to RIGHT IMMIX CAPITAL, so that IDEA PUBLIC SCHOOLS could get the clear title that MONTOYA PARK PLACE, INC. had, through PARSA, warranted to them. (The elements of subrogation for an unjust enrichment are, that one who pays a debtor's obligation to a creditor, steps into the rights and remedies the creditor had, against the debtor. The payor is WESTSTAR TITLE; the creditor is RIGHT IMMIX CAPITAL; and the Debtor is Dr. PARSA/MONTOYA PARK PLACE, INC. The final unjust enrichment Dr. PARSA apparently believes he has now lastingly captured, is ALBERT FLORES' interest in the remaining proceeds of Tract 3, through the above-discussed Stock Purchase Agreement, which should be rescinded. The cases on rescission also recognize the ground of unjust enrichment as a reason to set aside the contract. *See United Teacher's Associates Ins. Co. v. MacKeen & Bailey, Inc.*, 547 F. Supp. 521, *aff'd in part* 99 F.3d 645. FLORES is the innocent party, and PARSA and/or MONTOYA PARK PLACE, INC. has received benefits that should have been FLORES'.

34.

The receiver, once appointed, should get instructions from this Court, to make demand on Dr. PARSA to turn over the remaining proceeds of the sale of Tract 3, and/or the mutations of those proceeds, so that the receiver can use what is left of those proceeds and their mutations to pay the lawful demand of WESTSTAR TITLE and its underwriter FIDELITY NATIONAL TITLE against MONTOYA PARK PLACE, INC. MONTOYA PARK PLACE, INC. owes that debt to the title companies, for each of the following reasons:

a) MONTOYA PARK PLACE, INC. warranted to IDEA SCHOOLS that it had good title to Tract 3. IDEA PUBLIC SCHOOLS made claim upon that warranty, and WESTSTAR TITLE paid off RIGHT IMMIX CAPITAL to satisfy the claim.

b) WESTSTAR TITLE is therefore subrogated to the claims of RIGHT IMMIX CAPITAL upon Dr. PARSA's personal guaranty. Upon information and belief, that personal guaranty was also assigned to WESTSTAR TITLE and its underwriter FIDELITY NATIONAL TITLE INSURANCE.

c) Subrogation rights arise whenever a third party, here WESTSTAR TITLE, pays a creditor (here RIGHT IMMIX CAPITAL) who is owed by the debtor (here Dr. PARSA) because of the guaranty; and the debt also is owed by MONTOYA PARK PLACE, INC. because of its general warranties of clear title in its deed; and also because of its principals' affidavits that Tract 3 had no other liens upon it). "'Equitable subrogation' is a legal fiction through which a person who pays a debt for which another is primarily responsible is substituted or subrogated to all rights and remedies of the creditor." *National Union Fire Ins. Co. of Pittsburgh, Pa. v. CAN Insurance Companies*, 28 F.3d 29 (5th Cir. 1994), *reh'g denied, cert.*

*denied* 513 U.S. 1190, 115 S. Ct. 1252, 131 L.Ed.2d 133;  *accord, Texas Co. v. Miller*, 165 F.2d 111 (5th Cir. 1947) (*held*, subrogation arises by operation of law where a person has been compelled to pay off a prior encumbrance in order to protect himself, or where he has paid the debt of another in such circumstances that equity will afford him the security or obligation held by the creditor whose claim has been paid). *See also Farm Credit Bank of Texas v. Ogden*, 886 S.W.2d 305 (Tex. App.—Houston [1[st] Dist. 1994]: "In general, the purpose of equitable subrogation is to prevent the unjust enrichment of the debtor who owed the debt that is paid."

d) The title policy did not insure the seller MONTOYA PARK PLACE, INC. against the outstanding liens and interests it insured;  it insured the buyer IDEA PUBLIC SCHOOLS.  As *held* in *Chicago Title Insurance Co. v. McDaniel*, 875 S.W.2d 310, 318 (Tex. Sup. 1994), a title company has no duty to research title accurately;  its only duty is "to indeminify its insured against losses caused by defects in title." *Accord, Martinka v. CommonWealth Land Title Insurance Co.*, 836 S.W.2d 773, 777 (Tex. App. Houston [1[st] Dist.] 1992, *writ denied*), (*held*, title company is not abstractor and owes no duty to examine title. . . only duty is to indemnify insured against loss. . . and does not include duty to point out outstanding encumbrances).   In this case the title companies have indemnified their insured, IDEA PUBLIC SCHOOLS, by paying off the RIGHT IMMIX CAPITAL lien which MONTOYA PARK PLACE, INC. should have disclosed and paid, unjustly enriching the guarantor PARSA and the vendor MONTOYA PARK PLACE, INC.; and they must return the windfall.

35.

Clearly, the windfall of $700,000 to MONTOYA PARK PLACE, INC. was an unjust enrichment, and the Receiver once appointed should be ordered to recover it accordingly. The elements of unjust enrichment are, that through mistake or otherwise, one party receives benefits that should have been received by an innocent other person. The innocent other person has an equitable right to the benefits. *See Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919 (Tex. App.—Fort Worth 1994) (*held*, action for unjust enrichment is based on the equitable principle that a person receiving benefits which were unjust for him to retain ought to make restitution to the innocent party who was deprived of them). A lucid, short statement of the doctrine appears in *In re Coral Petroleum, Inc.*, 60 B.R. 377 (Bankr. S.D. Tex. 1986), at 391: "Unjust enrichment requires a finding that one party has received a benefit at the expense of an innocent party, under circumstances which make it unjust to retain the benefit," *citing Harris v. Sentry Title Co., Inc.*, 715 F.2d 941, 949 (5th Cir. 1983), applying Texas law). The innocent party here was RIGHT IMMIX CAPITAL, and WESTSTAR TITLE stands in their shoes by virtue of paying their loss and becoming subrogated to their claim.

36.

The Affidavit of ALBERT FLORES is hereto attached as Exhibit "M" in support of this Amended Complaint.

## VII. FRAUDULENT TRANSFER

### 37.

It has come to light since this Court granted Agreed Orders for a Temporary Restraining Order and a Temporary Injunction, that some or all of the proceeds of the closing at WESTSTAR TITLE, other than the $280,000 that was paid to ALBERT FLORES on July 6, 2020, have been transferred by Dr. PARSA and/or MONTOYA PARK PLACE, INC. out of MONTOYA PARK PLACE, INC. and into PARSA's closely-held corporation WESTMOUNT GROUP, INC., in hopes of defeating the rightful claims of FLORES, WESTSTAR, and FIDELITY against MONTOYA PARK PLACE, INC. and/or PARSA, and/or those funds. FLORES alleges that such transfers were fraudulent, within the meaning of Texas Business & Commerce Code § 24.005(a)(1), and made with actual intent to hinder, delay, or defeat recovery by FLORES and WESTSTAR and FIDELITY, when the money was owed to them. FLORES also requests exemplary damages of two times the amount fraudulently transferred, under Tex. Bus. & Commerce Code § 24.008, because of the intentional nature of the transfer, and the certainty that it would harm FLORES' interests; such exemplary damages to be assessed against PARSA and/or MONTOYA PARK PLACE, INC. as transferor, as provided for by Tex. Bus. & Comm. Code §§ 24.008 and 24.011. *See Dennis v. Dial Finance & Thrift & Co.*, 401 S.W. 2d 803, 805 (Tex. Sup. 1966); also *Airflow Houston Inc. v. Theriot*, 8499 S.W.2d 928, 934 (Tex. App.—Houston [1st Dist.] 1993).

38.

Texas Business & Commerce Code § 24.005(b) offers eleven "badges of fraud" for determining when a transfer is made with actual intent to defraud creditors under § 24.005(a)(1). The badges of fraud are:

1) <u>The transfer was made to an insider</u>. Here WESTMOUNT GROUP, INC.. was an insider of KEYVAN PARSA, its sold shareholder.

2) <u>The debtor retained possession or control of the property transferred after the transfer</u>. Here PARSA retained control as WESTMOUNT's principal.

3) <u>The transfer was concealed</u>. PARSA concealed the transfer, telling FLORES the money was in Mexico, and PARSA said nothing about the transfer, to WESTSTAR or FIDELITY, until it came to light in this case in July, 2021, that the money PARSA claimed to have on deposit himself, to serve as security for the temporary restraining order and temporary injunction in this cause, was not his. PARSA showed the funds were in money market accounts owned by WESTMONT—hoping thereby not to have to place them in the Court's registry.

4) <u>The debtor was threatened with suit before the transfer was made</u>. Here PARSA made the transfer to WESTMOUNT on July 20, 2020, shortly after he was sent the demand from RIGHT IMMIX CAPITAL on July 17, 2020, wanting to know why its lien had not been paid off at the closing. *See* Exhibit "H," hereto attached. FLORES told PARSA, on or about July15, 2020, that he should expect to get soon a demand from his attorney KIRK.

5) <u>The transfer was of substantially all of the debtor's assets</u>. Here the sale proceeds from Tract 3, Johannsen Subdivision, were all of the assets of MONTOYA PARK PLACE, INC.

6) <u>The debtor absconded</u>. Worse than absconding, PARSA gave FLORES a false report of removing the funds into Mexico.

7) <u>The debtor removed or concealed the assets</u>. Dr. PARSA secretly placed the funds into WESTMOUNT GROUP, INC. Money Markey accounts.

8) <u>The value received by the debtor for the transfer was not reasonably equivalent to the value of the asset transferred</u>. Here WESTMOUNT gave no value for the $1.038 million (at least) in proceeds from the sale of Tract 3, JOHANNSEN SUBVIDISION.

9) <u>The debtor was insolvent or became insolvent shortly after the transfer was made</u>. Here MONTOYA PARK PLACE, INC. had no other assets, and owed at least $338,000 to FLORES and $700,000 to WESTSTAR and FIDELITY, as of July 20, 2020.

10) <u>The transfer occurred shortly before or shortly after a substantial debt was incurred</u>. Here the debt to ALBERT FLORES was incurred on July 6, 2020. The debt to WESTSTAR and FIDELITY was incurred on July 1, 2020 when WESTSTAR TITLE overpaid MONTOYA PARK PLACE, INC. at the closing.

11) <u>The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor</u>. Here this badge does not apply.

Of the 11 badges of fraud, a full TEN are glaringly present. The eleventh badge is such a bizarre fact pattern, that it is rarely encountered.

a) Falsely representing to FLORES that he would get the balance of his interest in Tract 3, Johannsen Subdivision, "In a little while. Just give me some time," on July 2, 2020 and at repeated intervals thereafter.

b) Falsely representing to FLORES in October 2019 that PARSA would contribute 50% of each monthly payment owed on Tract 3 to RIGHT IMMIX CAPITAL, LLC.

c) Obtaining FLORES' signature on the undated memorandum obtained in mid-September, 2020, and promising FLORES a copy, and then backdating to July 1, 2020 the copy that was eventually furnished to Mr. KIRK by PARSA's former attorney JEFF RAGO in October, 2020.

d) Falsely representing to FLORES, in order to get FLORES to deed Tract 3 into MONTOYA PARK PLACE, INC. on February 11th, 2020, that their interest in MONTOYA PARK PLACE, INC. would be 50-50, and that PARSA would contribute capital to upgrade Tract 3, Johannsen Subdivision.

e) Drafting and presenting to FLORES, and getting FLORES' signature on, and then backdating, the "Stock Purchase Agreement" which FLORES signed on or about July 10, 2020, and representing to FLORES at the time that the agreement, for which PARSA paid only $50.00, was only for the empty shell of MONTOYA PARK PLACE, INC. and was not for FLORES' share of the proceeds from the closing of Tract 3, JOHANNSEN SUBDIVISION. PARSA would afterwards backdate the document to July 2, 2020 and insist that the Stock Purchase Agreement was a voluntary and fully informed relinquishing by FLORES of all

39.

In the alternative, the transfer of the proceeds of the Tract 3 closing by PARSA and/or MONTOYA PARK PLACE, INC. to WESTMOUNT GROUP, INC. was in fraud of creditors (WESTSTAR, FIDELITY, and FLORES) under Tex. Bus. & Comm. Code § 24.005(a)(2), because WESTMOUNT GROUP, INC. did not pay a reasonably equivalent value for the funds, and MONTOYA PARK PLACE, INC. was left with no assets to deal with its debts.

40.

FLORES has asked above for a receiver to be appointed for the assets of MONTOYA PARK PLACE, INC. under Tex. Bus. Corps. Act. Art 7.05. That may not be an ideal remedy, as it could entail a lengthy and expensive attempt to liquidate the corporation. A more fitting receivership could be the receivership awardable under § 24.008(a)(3)(B) of the Texas Fraudulent Transfer Act, Bus. & Bus. & Comm. Code § 21.008(a)(3)(B), to pursue the fraudulently transferred funds, or their value when transferred, against whoever transferred or received them.

41.

The fraudulent representations made to ALBERT FLORES by KEYVAN PARSA, on which FLORES reasonably relied because he did not know yet of reasons not to trust PARSA, are several, including these:

his interest in MONTOYA PARK PLACE, INC., its assets, and the remaining closing proceeds from Tract 3, Johannsen Subdivision.

f) An inadequacy of consideration—here the $50.00 paid for FLORES' alleged transfer of his remaining interest in the proceeds of Tract 3 (or his remaining interest in MONTOYA PARK PLACE, INC.)—"will stamp the transaction with fraud." *Branton v. Inks*, 149 S.W. 2d 667, 671 (Tex. App.--Austin 1941, *error dism'd, judgment correct*).

42.

At common law, a defendant found liable for fraud can be found liable to the plaintiff for actual damages, as well as exemplary damages, usually of twice that amount, if the fraud was intentional and known to be injurious to the Plaintiff's interest. In those two circumstances the fraud is wanton and malicious as a matter of law, authorizing an award of exemplary damages. *See Dennis v. Dial Finance & Thrift Co.*, 401 S.W. 2d 803 (Tex. Sup. 1971). The consummate perfidy of PARSA's promises and representations, establishes that wantoness and malice. Also, under § 24.011 of the Texas Uniform Fraudulent Transfer Act, the principles of fraud and misrepresentation supplement the remedies afforded by Chapter 24. FLORES' claim for common law fraud and exemplary damages against KEYVAN PARSA is also made independently of his claim under the fraudulent transfer Chapter, as well as his claim for fraud in a stock transaction under Business and Commerce Code Chapter 27.

WHEREFORE, PREMISES CONSIDERED, ALBERT FLORES prays for relief as follows:

a) That the Stock Purchase Agreement be ordered rescinded, either at common law or under Tex. Bus. Comm. Code § 27.001, on account of fraud.

b) That the Stock Purchase Agreement be ordered rescinded at common law, on grounds of inadequate consideration, unconscionability, undue advantage, unjust enrichment and/or breach of promise to perform.

c) That FLORES be awarded actual damages of at least $338,000 for the stock fraud under Tex. Bus. & Comm. Code § 27.001.

d) That FLORES recover against Dr. PARSA, reasonable attorney's fees of at least $35,000 under Bus. & Comm. Code § 27.001, and all costs in this suit, under any of the enabling causes of action on account of the fraud in the obtaining of the Stock Purchase Agreement.

e) That FLORES recover exemplary damages against PARSA for fraud in the amount of twice his actual damages whether under common law, or Tex. Bus. & Comm. Code § 27.01, on the Texas Fraudulent Transfer Act, or the law of rescission for a fraudulently inadequate consideration.

f) Alternatively, if it is possible to put Humpty Dumpty (*i.e.*, the corporation) together again, that FLORES and PARSA be restored to all of the corporate positions they had before the Stock Purchase Agreement was obtained by PARSA. (FLORES and PARSA as Initial Directors, and FLORES as Registered Agent).

g) Alternatively, that all consideration that was legitimately received by MONTOYA PARK PLACE, INC. from the closing of Tract 3, JOHANSSEN SUBDIVISION, and not yet paid to FLORES, be paid to FLORES, since no capital contribution to MONTOYA PARK PLACE, Inc. was ever made by PARSA.

h) That PARSA be ordered under the grounds of unjust enrichment as well as his personal guaranty of the RIGHT IMMIX CAPITAL note, to pay to FIDELITY and WESTSTAR, as their interests appear, all sums they had to pay to RIGHT IMMIX CAPITAL to clear the title to Tract 3, JOHANNSEN SUBDIVISION of RIGHT IMMIX CAPITAL's lien and indemnify their insured, IDEA PUBLIC SCHOOLS.

i) That permanent injunctive relief be granted, forbidding PARSA and MONTOYA PARK PLACE, INC. and WESTMOUNT GROUP, INC. from spending, transferring, or otherwise alienating any proceeds or mutations of proceeds of Tract 3, JOHANNSEN SUBDIVISION.

j) That all funds transferred to WESTMOUNT GROUP, INC. by PARSA or by MONTOYA PARK PLACE, INC. be found to have been fraudulently transferred under Business & Commerce Code § 24.005, that damages be assessed against the transferors PARSA and/or MONTOYA PARK PLACE, INC., and that they be ordered to pay first with those funds and second with their own funds, the sums transferred as the actual damages of FLORES, FIDELITY, and WESTSTAR in this action, and after that FLORES' exemplary damages and attorney's fees.

k) That PARSA and WESTMOUNT GROUP, INC. be ordered jointly and severally to pay any remaining exemplary damages to FLORES from any other resources they have.

l) Alternatively that a Receiver who resides in El Paso County and is a licensed attorney with experience in receivership cases be appointed for MONTOYA PARK PLACE, INC. (if it makes sense to do so in light of the circumstances and other relief that may be granted) upon the grounds set forth in the Texas Business Corporations Act art. 7.05(a)(1)(a), (b),(c), and (d), or upon the grounds of equity set forth in Paragraphs 29 and 30, above.

m) That the Receiver's bond, if appointment is made under Business Corporations Act art. 7.05, be set at $5,000.00, the condition of the bond to be that the Receiver well and truly follows the Orders of this Court.

n) That the Receiver, if appointment is made under Business Corporations Act art. 7.05, be directed to demand turnover by Dr. PARSA of all remaining proceeds of Tract 3, and all their mutations, and all moneys Dr. PARSA has spent from those proceeds and mutations (all hereinafter referred to as "the proceeds of Tract 3").

o) That the Receiver, if appointed under Business Corporation Act art. 70.05, be ordered to pay from the proceeds of Tract 3 all amounts which WESTSTAR TITLE CO. or its underwriter FIDELITY NATIONAL TITLE INSURANCE paid to RIGHT IMMIX CAPITAL to satisfy its first lien on Tract 3.

p) That the Receiver, if appointed either under Tex. Bus. & Comm. Code § 24.008 or the Business Corporations Act, be compensated for her reasonable attorney's fees, services, and expenses out of the proceeds of Tract 3.

q) Alternatively, if it appears the corporation can be rehabilitated, that Dr. PARSA and ALBERT FLORES be ordered to hold an Organizational Meeting for MONTOYA PARK PLACE, INC. and issue shares on a 50-50 basis between them.

r) Alternatively, if it appears the corporation can be rehabilitated, that the Receiver be ordered to ensure that all past and future distribution to the shareholders of MONTOYA PARK PLACE, INC. reflect a 50-50 ownership of the corporate stock, with an adjustment of $18,000.00 for the $36,000 ALBERT FLORES alone paid in monthly installments to RIGHT IMMIX CAPITAL from September 2019 up to and including June, 2020.

s) Alternatively, if it appears the corporation can be rehabilitated, that the Receiver ensure that stock in the corporation is issued not on a 50-50 basis but according to new consideration put in since the Certificate of Incorporation was issued.

t) That unless a recovery of damages herein is limited to a specific source or fund, all actual damages be in the amount wrongfully received by that Defendant, regardless of how it may have been since disposed of.

u) To the extent necessary for FLORES to have a full recovery, and to the extent there exists co-liability among Defendants PARSA, WESTMOUNT GROUP, INC., and/or MONTOYA PARK PLACE, INC. that damages be awarded jointly and severally.

v) That this Court further order under the laws of preclusive effect that except for relief ordered in these proceedings, FLORES on the one side and PARSA and WESTMOUNT GROUP, INC. on the other side shall bring no other claims

against the other, arising up to date of the final decree herein, that could have been raised in this action.

w) For all other and further relief deserved in the circumstances, general or special, at law or equity.

Respectfully submitted this *27th* day of July, 2021.

E.P. BUD KIRK
Texas State Bar No. 11508650
600 Sunland Park Dr.
Building Four, Suite 400
El Paso, TX 79912
(915) 584-3773
(915) 581-3452 facsimile
 budkirk@aol.com

Attorney for ALBERT FLORES

## CERTIFICATE OF SERVICE

I do hereby certify that on the *27th* day of July, 2021, I did cause a copy of the foregoing Plaintiff's Third Amended Petition (Suit for Rescission of Contract, for Fraud in a Stock Transaction, for Unjust Enrichment, for Common Law Fraud, for Injunctive Relief, and to Appoint a Receiver) to be mailed to Keyvan Parsa, M.D. and Montoya Park Place, Inc., c/o Troy Chandler Brown, P.O. Box 221588, El Paso, TX 79913; to Weststar Title, LLC, c/o James W. Brewer, 221 N. Kansas, Ste. 1700, El Paso, TX 79901; to Fidelity National Title Insurance Company, c/o Shakira Kelley, 6900 Dallas Parkway, Suite 610, Plano, Texas 75024; to Deborah Jordan, c/o Richard A. Roman, Esq., 1018 Brown Street, El Paso, Texas 79902; Westmount Group, Inc., c/o Stephen W. Sather, Barron & Newburger, PC, 7320 N. MoPac, Expressway, Suite 400, Austin, TX 78731 and to Albert Flores, 3605 Arcadia, El Paso, TX 79902.

E.P. BUD KIRK

4063.007-MC-071921

34

## EXHIBIT INDEX

Exhibit "A"    Texas Secretary of State Certificate of Incorporation.

Exhibit "B"    Warranty Deed

Exhibit "C"    Trustee's Deed

Exhibit "D"    Agreement of Subordination and Opportunity to Cure

Exhibit "E"    Cashier's check for $280,000.00

Exhibit "F"    Stock Purchase Agreement

Exhibit "G"    Document stating that FLORES was not entitled personally to "any portion of the disputed amount of $700,000, due to [sic] the sale of real estate known as TRACT 3, Johannsen Subdivision "5980 Johannsen Road" claimed by Right immix capital.

Exhibit "H"    RIGHT IMMIX CAPITAL, LLC demand, dated July 17, 2020

Exhibit "I"    RIGHT IMMIX CAPITAL, LLC demand, dated July 24, 2020

Exhibit "J"    Demand for the money to pay RIGHT IMMIX CAPITAL, LLC from WESTSTAR TITLE, dated July 23, 2020

Exhibit "K"    Demand for the money to pay RIGHT IMMIX CAPITAL, LLC from FIDELITY NATIONAL TITLE INSURANCE, dated August 20, 2020

Exhibit "L"    Title Policy

Exhibit "M"    Affidavit of ALBERT FLORES

# EXHIBIT "A"

**Form 201**

Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300



**Certificate of Formation
For-Profit Corporation**

Filed in the Office of the
Secretary of State of Texas
Filing #: 803537688 02/04/2020
Document #: 943589190002
Image Generated Electronically
for Web Filing

## Article 1 – Entity Name and Type

The filing entity being formed is a for-profit corporation. The name of the entity is:

### Montoya park place inc.

The name must contain the word "corporation," "company," "incorporated," "limited," or an abbreviation of one of these terms. The name must not be the same as, deceptively similar to or similar to that of an existing corporate, limited liability company, or limited partnership name on file with the secretary of state. A preliminary check for "name availability" is recommended.

## Article 2 – Registered Agent and Registered Office

☐ A. The initial registered agent is an organization (cannot be corporation named above) by the name of:

**OR**

☑ B. The initial registered agent is an individual resident of the state whose name is set forth below:

Name:

**Flores    Albert**

C. The business address of the registered agent and the registered office address is:

Street Address:

**3605 Arcadia pl    El Paso  TX  79902**

### Consent of Registered Agent

☐ A. A copy of the consent of registered agent is attached.

**OR**

☑ B. The consent of the registered agent is maintained by the entity.

## Article 3 – Directors

The number of directors constituting the initial board of directors and the names and addresses of the person or persons who are to serve as directors until the first annual meeting of shareholders or until their successors are elected and qualified are set forth below:

Director 1: **Parsa    Keyvan**

Address: **810 N Kansas St    El Paso  TX, USA  79902-79912**

Director 2: **Flores    Albert**

Address: **3605 Arcadia pl    El Paso  TX, USA  79902**

## Article 4 – Authorized Shares

The total number of shares the corporation is authorized to issue and the par value of each of such shares, or a statement that such shares are without par value, is set forth below.

| Number of Shares | Par Value (must choose and complete either A or B) | Class | Series |
|---|---|---|---|
| 1000 | ☑ A. has a par value of $1 ☐ B. without par value. | | |

If the shares are to be divided into classes, you must set forth the designation of each class, the number of shares of each class, and the par value (or statement of no par value), of each class. If shares of a class are to be issued in series, you must provide the designation of each series. The preferences, limitations, and relative rights of each class or series must be stated in space provided for supplemental information.

## Article 5 – Purpose

The purpose for which the corporation is organized is for the transaction of any and all lawful business for which corporations may be organized under the Texas Business Organizations Code.

**Supplemental Provisions / Information**

[The attached addendum, if any, is incorporated herein by reference.]

**Effectiveness of Filing**

☐ A. This document becomes effective when the document is filed by the secretary of state.

**OR**

☑ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is: **February 5, 2020**

**Organizer**

The name and address of the organizer is set forth below.

Keyvan Parsa          810 N Kansas St El Paso TX 79902

**Execution**

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Keyvan Parsa**

Signature of organizer

**FILING OFFICE COPY**

# EXHIBIT "B"

**Doc # 20200012109**

*Ctsy*

NOTICE OF CONFIDENTIALITY RIGHTS:  IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.

## WARRANTY DEED

STATE OF TEXAS )

COUNTY OF EL PASO )

ALBERT FLORES (*Grantor*), for an adequate consideration to Grantor in hand paid and agreed to be performed by MONTOYA PARK PLACE INC., a Texas corporation, 810 N. Kansas, El Paso, Texas 79902 (*Grantee*), has GRANTED, SOLD and CONVEYED and by these presents does hereby GRANT, SELL AND CONVEY unto Grantee, the following "Property in El Paso, Texas –

Tract 3 (containing 12.1644 acres, more or less), J. L. JOHANNSEN SURVEY NUMBER 185, in the City of El Paso, El Paso County, Texas, according to the resurvey of said J. L. JOHANNSEN SURVEY NUMBER 185 made by El Paso County, Texas or tax purposes.

This conveyance is subject to any and all easements, reservations, restrictions, conditions and matters of record that may affect the Property, taxes for the current year and rights of parties in possession.

TO HAVE AND TO HOLD the Property together with all and singular the rights and appurtenances thereto in any way belonging unto Grantee, Grantee's heirs, representatives, successors and assigns forever, and Grantor does hereby bind Grantor, Grantor's heirs, representatives, successors, and assigns to warrant and forever defend, all and singular, the property unto Grantee, Grantee's successors and assigns against every person whomsoever lawfully claiming or to claim the Property or any part thereof.

THIS INSTRUMENT WAS PREPARED BASED ON INFORMATION FURNISHED BY THE PARTIES. NO TITLE EXAMINATION WAS REQUESTED IN CONNECTION WITH THE PREPARATION OF THIS DOCUMENT NOR WAS ANY MADE. THE PREPARER EXPRESSES NO OPINION AS TO TITLE, OWNERSHIP, OCCUPANCY, ZONING, FEASIBILITY, LIEN ENCUMBRANCE AND/OR TAXES RELATING TO THIS PROPERTY.

Dated February 11, 2020.

Grantor:

ALBERT FLORES

STATE OF TEXAS )

COUNTY OF EL PASO )

The foregoing was acknowledged before me on February 11, 2020, by Albert Flores.

Notary Public
[Seal]

LAURA I MARQUEZ
NOTARY PUBLIC
in and for the State of Texas
My commission expires
05-18-2023

Doc # 20200012109
#Pages 1 #NFPages 1
 02/11/2020 12:15 PM
Filed & Recorded in
Official Records of
El Paso County
Delia Briones
County Clerk
Fees $26.00

eRecorded

I hereby certify that this instrument was filed on the date and time stamped hereon by me and was duly recorded by document number in the Official Public Records of real Property in El Paso County.



EL PASO COUNTY, TEXAS

# EXHIBIT "C"

Doc# 20200000170

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | **TRUSTEE'S DEED** |
| COUNTY OF EL PASO | § | |

WHEREAS, on June 28, 2019, JOHANNSEN DEVELOPMENT GROUP, INC. did execute a Renewed and Extended Promissory Note in the principal amount of $397,631.01, payable as therein described to the order of the holder ALBERT FLORES;

WHEREAS, the payment of said Note was secured by a Deed of Trust to E.P. BUD KIRK, Trustee, which was duly recorded as Document No. 20170066567 in the Real Property Records of El Paso County, Texas, covering the following property for which said Note, before being renewed and extended, was a part of the original purchase money:

> Tract 3 (containing 12.1644 acres, more or less), J.L. JOHANNSEN SURVEY NO. 185, in the City of El Paso, El Paso, Texas, according to the survey of said J.L. JOHANNSEN SURVEY NO. 185, made by El Paso County, Texas for tax purposes.

WHEREAS, default has occurred in the payment of said Note and in performance of the covenants of the Deed of Trust, and a reasonable period of notice has been given, to all persons liable on said Note, in writing, by certified mail, return receipt requested, that if such default was not cured within the time demanded, the Note would be accelerated and the Deed of Trust would be posted for foreclosure;

WHEREAS, such default was not cured within the time demanded;

WHEREAS, the holder of said Note accordingly declared the entire balance thereof to be accelerated, and has instructed the undersigned to enforce the Deed of Trust by foreclosing upon the above-described property;

AND WHEREAS, I, B.P. BUD KIRK, have accordingly proceeded as Trustee to sell the above-described property in the designated area of the El Paso County Courthouse lobby for trustees' sales, on the first Tuesday of February, 2020, being February 4, 2020, between the hours of 10:00 a.m. and 1:00 p.m., to _ALBERT FLORES_ hereinafter called Grantee (whether one or more), whose address is _9605 Arcadia, El Paso, Texas  79962_ and whose bid of $ _452,980.19_ was the highest bid for cash at said foreclosure sale;

NOW, THEREFORE, I, B.P. BUD KIRK, Trustee, do hereby GRANT and CONVEY to the Grantee the above-described property in fee simple, together with all improvements thereon;

Subject, however, to zoning ordinances, separating fences, easements, matters which a correct survey would show, restrictions and reservations affecting said property, and to all unpaid taxes thereon, which are assumed by the Grantee.

TO HAVE AND TO HOLD the above described premises, together with all and singular the rights and appurtenances thereto in anywise belonging unto the said Grantee and Grantee's heirs, successors, and assigns forever; and I do hereby bind myself, my heirs, executors, and administrators, to WARRANT and FOREVER DEFEND all and singular the said premises unto the said Grantee, the Grantee's successors and assigns forever, against any person whomsoever lawfully claiming or to claim the same or any part thereof by, through, or under me, but not otherwise.

WITNESS MY HAND AT EL PASO, TEXAS, this _4th_ day of February, 2020.

B.P. BUD KIRK
Texas State Bar No. 11508650
600 Sunland Park Dr.
Building Four, Suite 400
El Paso, TX 79912
(915) 584-3773
(915) 581-3452 facsimile
budkirk@aol.com

2

THE STATE OF TEXAS §
§
COUNTY OF EL PASO §

This instrument was acknowledged before me on the ___4ᵗʰ___ day of February, 2020, by E.P. BUD KIRK, as Trustee.



NOTARY PUBLIC, State of Texas
Notary's Name Typed or Printed:
Nancy J. Vargas

4063.007-KAM-011320

NANCY J. VARGAS
ID#131525079
NOTARY PUBLIC
in and for the State of Texas
My commission expires
11-30-2021

3



Doc# 20200080370
#Pages 3  #N-Pages 1
7/10/2020 12:18:02 PM
Filed & Recorded In
Official Records of
El Paso County
Delia Briones
County Clerk
Fees $24.00

I hereby certify that this instrument was filed on the date and time stamped hereon by me and was duly recorded by document number in the Recording Division of Real Property in El Paso County.

EL PASO COUNTY, TEXAS

# EXHIBIT "D"

240911 SE                            Doc # 20190065558

105
(8P94)

| STATE OF TEXAS | § | AGREEMENT OF SUBORDINATION |
| | § | AND OPPORTUNITY TO CURE |
| COUNTY OF EL PASO | § | |

This Agreement of Subordination and Opportunity to Cure ("the Agreement") concerns a real property in El Paso County, Texas, described as follows:

> Tract 3 (containing 12.1644 acres, more or less), J.L. JOHANNSEN SURVEY NUMBER 185, in the City of El Paso, El Paso County, Texas, according to the resurvey of said J.L. JOHANNSEN SURVEY NUMBER 185 made by El Paso County, Texas for tax purposes.

(Hereinafter referred to as "the Property).

This Agreement is between ALBERTO FLORES (hereinafter "FLORES") of 9065 Westside Road, Anthony, New Mexico 88021, in his individual capacity and as Independent Executor of the Estate of RAMON G. FLORES, Deceased, and RIGHT IMMIX CAPITAL, LLC (hereinafter referred to as "Facilitating Lender"):

WHEREAS, FLORES is the holder of a purchase-money Real Estate Lien note which he accepted as consideration for conveying his undivided interest in the Property, which is largely unimproved, to JOHANNSEN DEVELOPMENT GROUP, INC., a Texas corporation (hereinafter "the FLORES Note"):

WHEREAS, the Facilitating Lender, like FLORES, insists upon being secured for its own loan to JOHANNSEN DEVELOPMENT GROUP, INC. by, among other documents, a Vendor's Lien and Deed of Trust upon the Property (hereinafter the "Facilitating Lender's Liens"):

WHEREAS, JOHANNSEN DEVELOPMENT GROUP, INC. cannot qualify at the present time to borrow enough money to pay off both the existing first-lien Note secured by the Property, and the FLORES Note as well:

WHEREAS, to enable the refinancing of a portion of the existing indebtedness upon the Property by JOHANNSEN DEVELOPMENT GROUP, INC., so that the existing first lien Note can be fully retired and a portion of the FLORES Note can be paid, FLORES is willing to renew and extend part of the balance of his above-described Real Estate Lien Note and to subordinate his liens (Vendor's Lien and Deed of Trust lien) to the liens of the Facilitating Lender RIGHT

IMMIX CAPITAL, LLC to secure their loan of $700,000.00 to JOHANNSEN DEVELOPMENT GROUP, INC., provided FLORES has the additional protection of a reasonable opportunity to cure any future default(s) to the Facilitating Lender, in the event that JOHANNSEN DEVELOPMENT GROUP, INC. does not timely pay on its loan from the Facilitating Lender;

AND WHEREAS, Facilitating Lender wishes to engage in this transaction and is willing to accommodate FLORES' desire for a cure opportunity in light of FLORES' agreement to subordinate his liens;

NOW, THEREFORE, it is AGREED, for the good and valuable consideration of the mutual covenants herein exchanged, as follows:

a)    FLORES' Real Estate Lien Note, Deed of Trust, and Vendor's Lien shall be subordinate and inferior to Facilitating Lender's Liens;

b)    In the event of any default under the Facilitating Lender's loan, Facilitating Lender shall notify FLORES, c/o E.P. BUD KIRK, 600 Sunland Park Drive, Suite 4-400, El Paso, Texas 79912, in writing of the nature of the default (with no limit on the number of defaults to be noticed), and shall extend to FLORES the option and right to cure the stated default up until the hour of the foreclosure sale. FLORES shall also be given notice of the foreclosure sale in writing, c/o E.P. BUD KIRK, 600 Sunland Park Drive, Suite 4-400, El Paso, Texas 79912. Such written notices shall be effective upon deposit in a U.S. Postal Service depository enclosed in a stamped envelope addressed to FLORES by Certified Mail, return receipt requested, c/o E.P. BUD KIRK, 600 Sunland Park Drive, Suite 4-400, El Paso, Texas 79912, or such other place as FLORES designates in a subsequent writing to Facilitating Lender.

c)    The parties furthermore agree to do everything necessary and proper to effect the intention of this Agreement, which is, to incentivize adequately the reasons of Facilitating Lender to make its loan, and to safeguard reasonably the right of FLORES to recover his loan.

2

d) There being no accurately foreseeable way to quantify damages to FLORES if this Agreement is breached, it is agreed that FLORES may in that event ask for injunctive relief, but during any temporary restraining order or injunction, FLORES shall have to pay interest to Facilitating Lender on its full Note balance at the initial non-default Note rate specified to JOHANNSEN DEVELOPMENT GROUP, INC. and all expenses and costs incurred by Facilitating Lender.

In witness whereof, we set our hands hereto, this 28 day of June, 2019.

_____
ALBERTO FLORES
Individually and as Independent Executor of the Estate of RAMON G. FLORES, Deceased

**FACILITATING LENDER:**

**RIGHT IMMIX CAPITAL, LLC**

By: _____
Its: Manager

**STATE OF TEXAS** §
§
**COUNTY OF EL PASO** §

This instrument was acknowledged before me on June 28, 2019, by ALBERT FLORES, Individually and as Independent Executor of the Estate of Ramon G. Flores, Deceased.

_____
Notary Public in and for the State of Texas

**STATE OF TEXAS** §
§
**COUNTY OF EL PASO** §

This instrument was acknowledged before me on July 2, 2019, by Jamie Ricci, as manager of RIGHT IMMIX CAPITAL, LLC.



_____
Notary Public in and for the State of Texas

3

Doc # 20190085558
#Pages 3 #NFPages 1
  08/27/2019 10:31 AM
Filed & Recorded in
Official Records of
El Paso County
Delia Briones
County Clerk
Fees $34.00


eRecorded


I hereby certify that this instrument was filed on the date and time stamped hereon by me and was duly recorded by document number in the Official Public Records of Real Property in El Paso County.

EL PASO COUNTY, TEXAS

# EXHIBIT "E"

ALBERT FLORES

280,.

Two Hundred Eighty Thousand and 00·100

MONTOYA PARK PLACE INC.

# WESTERN HERITAGE BANK

Las Cruces, NM • Deming, NM • El Paso, TX

**CASHIER'S CHECK**

REMITTER: MONTOYA PARK PLACE INC.

Two Hundred Eighty Thousand and 00/100

US DOLLARS $280,000.00

THE
ORDER OF

**ALBERT FLORES**

TWO SIGNATURES REQUIRED

⑈411005⑈ ⑆112206763⑆ 1200000008⑈

# EXHIBIT "F"

## STOCK PURCHASE AGREEMENT

THIS AGREEMENT is made and entered into this First day of July 2020, by and between Albert Flores, ("Seller") and Keyvan Parsa, ("Purchaser");

WHEREAS, the Seller is the record 50% owner and holder of the issued and outstanding shares of the capital stock of MONTOYA PARK PLACE INC., ("Corporation"), a TEXAS corporation, which Corporation has issued capital stock of 1000 shares of $ 0.10 par value common stock;
WHEREAS, the Purchaser desires to purchase said stock "500"and the Seller desires to sell said stock "500", upon the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained in this Agreement, and in order to consummate the purchase and the sale of the Corporation's Stock aforementioned, it is hereby agreed as follows:

1. PURCHASE AND SALE: Subject to the terms and conditions hereinafter set forth, at the closing of the transaction contemplated hereby, the Seller shall sell, convey, transfer, and deliver to the Purchaser certificates representing such stock, and the Purchaser shall purchase from the Seller the Corporation's Stock in consideration of the purchase price set forth in this Agreement. The certificates representing the Corporation's Stock shall be duly endorsed for transfer or accompanied by appropriate stock transfer powers duly executed in blank, in either case with signatures guaranteed in the customary fashion, and shall have all the necessary documentary transfer tax stamps affixed thereto at the expense of the Seller. The closing of the transactions contemplated by this Agreement ("Closing"), shall be held at 810 N Kansas, on July first 2020.

2. AMOUNT AND PAYMENT OF PURCHASE PRICE. The total consideration and method of payment thereof are fully set out i n Exhibit "A" attached hereto and made a part hereof.

3. REPRESENTATIONS AND WARRANTIES OF SELLER. Seller hereby warrants and represents:
  (a) Organization and Standing. Corporation is a corporation duly organized, validly existing and in good standing under the laws of the State of TEXAS and has the corporate power and authority to carry on its business as it is now being conducted.
  (b) Restrictions on Stock.
    i. The Seller is not a party to any agreement, written or oral, creating rights in respect to the Corporation's Stock in any third person or relating to the voting of the Corporation's Stock.
    ii. Seller is the lawful owner of the Stock, free and clear of all security interests, liens, encumbrances, equities and other charges.

1

iii. There are no existing warrants, options, stock purchase agreements,redemption agreements, restrictions of any nature, calls or rights to subscribe of any character relating to the stock, nor are there any securities convertible into such stock.

(c) Responsibility and duty.

Seller after closing this document resign to all the duty, position and responsibility previously assigned and will be excluded from all present or future benefits or profits of the corporation.

4.  REPRESENTATIONS AND WARRANTIES OF SELLER AND PURCHASER.  Seller and Purchaser hereby represent and warrant that there has been no act or omission by Seller, Purchaser or the Corporation which would give rise to any valid claim against any of the parties hereto for a brokerage commission, finder's fee, or other like payment in connection with the transactions contemplated hereby.

5.  GENERAL PROVISIONS

(a) Entire Agreement. This Agreement (including the exhibits hereto and any written amendments thereof executed by the parties) constitutes the entire Agreement and supersedes all prior agreements and understandings, oral and written, between the parties hereto with respect to the subject matter hereof.

(b) Sections and Other Headings. The section and other headings contained in this Agreement are for reference  purposes only and shall not affect the meaning or interpretation of this Agreement.

(c) Governing Law. This agreement, and all transactions contemplated hereby, shall be governed by, construed and enforced in accordance with the laws of the State of TEXAS.  The parties herein waive trial by jury and agree to submit to the personal jurisdiction and venue of a court of subject matter jurisdiction located in EL PASO County, State of TEXAS.  In the event that litigation results from or arises out of this Agreement or the performance thereof, the parties agree to reimburse the prevailing party's reasonable attorney's fees, court costs, and all other expenses, whether or not taxable by the court as costs, in addition to any other relief to which the prevailing party may be entitled.

IN WITNESS WHEREOF, this Agreement has been executed by each of the individual parties hereto on the date first above written.

Signed, and delivered in the presence of:

By: "Seller"

By: " Buyer"

Witness:

2

## EXHIBIT "A"  AMOUNT AND PAYMENT OF PURCHASE PRICE

(a) Consideration. As total consideration for the purchase and sale of the Corporation's Stock, pursuant to this Agreement, the Purchaser shall pay to the Seller the sum of FIFTY Dollars ($ 50), such total consideration to be referred to in this Agreement as the "Purchase Price".

(b) Payment. The Purchase Price shall be paid as follows:

i. The sum of fifty Dollars ($ 50) to be delivered to Seller

ii. In addition as agreed  the "seller" will receive other compensation of two hundred eighty thousand Dollars."cashier check".

: 2020       Account Detail - Wells Fargo

# WELLS FARGO

## Check Details

Check Number       1041

Date Posted       08/26/20

Check Amount       $50.00



For your security, information like account numbers, signatures, and the ability to view the backs of checks
have been removed from the images.
You can see full or partial fronts and backs of the images by using the link at the top of the window.

⌂ Equal Housing Lender



Purchase of 500 stock of Montoya Park Place Inc. a Texas corporation from Albert Flores "The seller" by Keyvan Parsa "The buyer"

Albert Flores "Seller"

07/01/2020

Keyvan Parsa "buyer"

07-01- 2020

# EXHIBIT "G"

July 02, 2020

To whom it may concern:

My name is Albert Flores, I'm over 18 years of age, of sound mind and fully competent to make this statement, That I've resigned to all my positions at Montoya park place inc. a Texas corporation and I'm not entitled to receive any portion of the disputed amount of $700,000 due to the sale of real estate known as TRACT 3, Johannsen subdivision,"5980 Johannsen road" claimed by Right immix capital.

Regardless of any outcome I decline to have any legal responsibility nor any interest in this matter.

_____     N/M License 508613711

**Albert Flores**

_____

**Signed in presence of Keyvan Parsa**

# EXHIBIT "H"

5980 Johannsen - Albert Flores                                    https://mail.aol.com/webmail-std/en-us/PrintMessage

From: jamie@uprisinginvestments.com,
To: budkirk@aol.com,
Subject: 5980 Johannsen - Albert Flores
Date: Fri, Jul 17, 2020 2:37 pm
Attachments: winmail.dat (1500K), 5980 Johannsen not. Sub.pdf (187K), Demand for Payoff through 7-24-20.pdf (62K),
5980 Johansen Title Ins..pdf (1211K), image001.jpg (25K)

Hello Mr. Kirk,

I was told that this property closed with your client Albert Flores.  We did not receive a payoff from the
title company and I was wondering if you knew anything about the closing and why the 1st lien was not
paid with the sale?

I have reached out to Weststar Title and asked the same question and am pending a response.

Thank you,

[cid:image001.jpg@01D65C47.BD78C3D0]


1 Attached Images



**Jamie Ricci**
Vice President

5862 Cromo Dr. | Suite 180
El Paso, TX 79912
915-444-5818 Office
915-704-1454 Cell
915-317-1333 Fax
jamie@uprisinginvestments.com

Uprising Investments, LLC
Private Lending & Loan Servicing
NMLS ID 1191491

# EXHIBIT "I"

# Salloum Law Firm, PC

**Mark Salloum**

661 S. Mesa Hills Dr., Suite 10
El Paso, Texas 7991.
Phone: (915) 533-451
Fax: (915) 533-451:
email: mark@marksalloumlaw.con
web: www.marksalloumlaw.con

July 24, 2020

**CERTIFIED, RETURN RECEIPT REQUESTED 7019 1120 0000 4797 8659
AND REGULAR MAIL**
Johannsen Development Group, Inc., a Texas Corporation
601 Shadow Willow Drive
El Paso, Texas 79922

**CERTIFIED, RETURN RECEIPT REQUESTED 7019 1120 0000 4797 8666
AND REGULAR MAIL**
Albert Flores
3605 Arcadia Pl
El Paso, Texas 79902

**CERTIFIED, RETURN RECEIPT REQUESTED 7019 1120 0000 4797 8673
AND REGULAR MAIL**
Keyvan Parsa
7604 Plaza Redonda
El Paso, Texas 79912

Re:   $700,000.00 Real Estate Lien Note (the "Note") dated June 28, 2019 payable to Right Immix Capital, LLC secured by a First Lien on Tract 3 (containing 12.1644 acres, more or less), J.L. JOHANNSEN SURVEY NO. 185, in the City of El Paso, El Paso County, Texas, according to the resurvey of said J.L. Johannsen Survey No. 185, made by El Paso County Texas, for tax purposes.(the"Property").

Dear Mr. Flores and Parsa:

This office represents Right Immix Capital, LLC. Johannsen Development Group, Inc., a Texas Corporation obtained a loan secured with a lien on the Property located at 5980 Johannsen Road on June 28, 2019. Right Immix Capital, LLC financed $700,000.00 of the purchase price evidenced by a Real Estate Lien Note secured by a first lien on the Property. To secure payment of the Note, a Deed of Trust was executed in favor of Right Immix Capital, LLC in which it was agreed that they would have the right to foreclose on the Property if the Borrower failed to make payments on the Note or to comply with any of the terms or conditions of the Note or Deed of Trust.

Page 3
July 24, 2020

This Note is secured by a first vendor's lien and deed of trust lien on the Property being legally described as Tract 3 (containing 12.1644 acres, more or less), J.L. JOHANNSEN SURVEY NO. 185, in the City of El Paso, El Paso County, Texas, according to the resurvey of said J.L. Johannsen Survey No. 185, made by El Paso County Texas, for tax purposes.

Since then, Albert Flores and Keyvan Parsa have conspired to sell the Property without paying off Right Immix Capital, LLC and not notifying Weststar Title nor the end purchaser of the Property that the first lien was filed and valid against the Property.

Please be clear that all the money owed Right Immix Capital, LLC will be recovered from you one way or another. Right Immix Capital, LLC is prepared to exercise all available legal remedies as I am sure Weststar Title will too. Please be advised that the Property will be posted for the September 1, 2020 foreclosure sale. Additionally, litigation will be filed against you to collect all amounts owed if needed. Be advised for every day the loan is not paid off, interest, late charges and legal fees continue to accrue and not one penny will be discounted to collect all amounts rightfully owed Right Immix Capital, LLC. You can save yourselves considerable grief and expense by paying off Right Immix Capital, LLC.

I am attempting to collect a debt and I am acting as a debt collector in this matter. Any information obtained will be used for that purpose.

Very truly yours,

MARK SALLOUM

MS: kc

Enclosure:     Notice of Rights Under the Fair Debt Collection Practices Act

cc:     Client
        Via /email

G:\Marks Documents\FC\Ricci, Frank\5980 Johannsen\lr.1st demand.wpd

## NOTICE OF RIGHTS UNDER THE
## FAIR DEBT COLLECTIONS PRACTICES ACT

It is asserted that you owe the debt described in the enclosed letter.  If you do not dispute this debt in writing within thirty (30) days of the date of the enclosed letter, the debt will be assumed to be valid.  If you wish to dispute this debt, you must give written notice of your dispute to the address contained in the letter.   If you do dispute the debt in writing, your notice may include a request to be furnished with the name and address of the original creditor, if different from the current creditor.

We are attempting to collect a debt.  Any information obtained will be used for that purpose.

This Notice is furnished to you pursuant to the provisions of 15 U.S.C.A. §1692, The Fair Debt Collection Practices Act.

# EXHIBIT "J"

Montoya Park Place                                    https://mail.aol.com/webmail-std/en-us/PrintMessage

From: Jim.Brewer@kempsmith.com,
To: budkirk@aol.com,
Subject: Montoya Park Place
Date: Thu, Jul 23, 2020 2:54 pm
Attachments: 20190065558 08.27.19 AGR.PDF (102K).

Bud,

This is the recorded Subordination Agreement.

**James W. Brewer**

Partner

221 N. Kansas | Suite 1700

El Paso, Texas 79901

D: 915 546-5236 | O: 915 533-4424

james.brewer@kempsmith.com

 KEMP                                LAW

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast Ltd, an innovator in Software as a Service (SaaS) for business. Providing a safer and more useful place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT "K"



## Fidelity National Title
### Insurance Company

Writer's Direct Dial: (402) 970-3843
Writer's Email: matt.semple@fnf.com

August 20, 2020

<u>VIA EMAIL ONLY</u>
Keyvan Parsa
k1p000@gmail.com

Alberto Flores
c/o Bud Kirk
budkirk@aol.com

|       |             |                                          |
|-------|-------------|------------------------------------------|
| RE:   | Claim No.:  | 691468                                   |
|       | File No.:   | 200959-COM                               |
|       | Insured:    | Idea Public Schools                      |
|       | Property:   | 5980 Johannsen Road, El Paso, TX 79932   |

Dear Mr. Parsa and Mr. Flores:

By way of introduction, I am Senior Claims Counsel with Fidelity National Title Insurance Company (the "Company"). I am administering a title insurance claim regarding an unpaid prior Deed of Trust for $700,000 recorded July 8th, 2019 (the "Deed of Trust") against the above-referenced property (the "Property"). A copy of the Deed of Trust is enclosed for your reference. The Deed of Trust is posted for sale on Tuesday, September 1, 2020.

I also enclose a copy of the Commercial Affidavit as to Debts and Liens (the "Affidavit"). You executed the Affidavit which showed that no liens or other encumbrances exist. *See* Section 3(h) of the Affidavit.

On behalf of our Insured, the Company demands that you immediately pay off the Deed of Trust. Please confirm your receipt of this letter and agreement to pay off the Deed of Trust no later than end of business on Wednesday, August 26, 2020. Otherwise, to the extent the Company incurs expense and/or loss in respect of the Deed of Trust, the Company will take appropriate legal action.

If you have any questions or need additional information, please do not hesitate to contact me. Thank you for your prompt attention to this matter.

Sincerely,

Matt Semple, Esq.
VP/ Senior Claims Counsel

Enclosures

Cc: LRobles@weststar-title.com

2533 North 117th Avenue • Omaha, NE 68164-3679 • (402) 498-7000 • (888) 453-4095

109
(10pgs)                    240911 SE                        Doc # 20190051396

### Renewal and Extension Deed of Trust

**Notice of confidentiality rights:** If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your social security number or your driver's license number.

Terms

Date: June 28 , 2019

Grantor:                    JOHANNSEN DEVELOPMENT GROUP, INC., A TEXAS
                            CORPORATION

Grantor's Mailing Address:      601 Shadow Willow Drive
                                El Paso, Texas 79922

Trustee:                    MARK SALLOUM

Trustee's Mailing Address:      661 S. Mesa Hills Dr., Suite 100
                                El Paso, Texas 79912

Lender:                     RIGHT IMMIX CAPITAL, LLC

Lender's Mailing Address:       5862 Cromo Drive, Suite 100
                                El Paso, Texas 79912

Obligation:

  Note:

        Date:  Of even date.

        Original principal amount: $700,000.00

        Borrower:   JOHANNSEN DEVELOPMENT GROUP, INC., A TEXAS
                    CORPORATION

        Lender:     RIGHT IMMIX CAPITAL, LLC

Property:
    Tract 3 (containing 12.1644 acres, more or less), J.L. JOHANNSEN SURVEY NO.
    185, in the City of El Paso, El Paso County, Texas, according to the resurvey of said
    J.L. Johannsen Survey No. 185, made by El Paso County Texas, for tax purposes.

                            Page 1 of 10

**Prior Lien: None.**

**Other Exceptions to Conveyance and Warranty:**

This conveyance is subject to easements, restrictions and reservations of record or appearing upon the ground and accruing taxes.

For value received and to secure payment of the Note, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property, subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

### Clauses and Covenants

**A.     Grantor's Obligations**

Grantor agrees to—

1.    keep the Property in good repair and condition;

2.    pay all taxes and assessments on the Property before delinquency;

3.    defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

4.    maintain all insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender at least ten days before the expiration of the Required Insurance Coverages;

5.    obey all laws, ordinances, and restrictive covenants applicable to the Property;

6.    keep any buildings occupied as required by the Required Insurance Coverages;

7.    if the lien of this deed of trust is not a first lien, pay or cause to be paid all prior lien notes and abide by or cause to be abided by all prior lien instruments;

8.    notify Lender of any change of address.

Page 2 of 10

**B. Lender's Rights**

1. Lender or Lender's mortgage servicer may appoint in writing a substitute trustee, succeeding to all rights and responsibilities of Trustee.

2. If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

3. Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

4. Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

5. If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

6. If there is a default on the Obligation or if Grantor fails to perform any of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may—

    a. declare the unpaid principal balance and earned interest on the Obligation immediately due;

    b. direct Trustee to foreclose this lien, in which case Lender or Lender's agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

    c. purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

7. Lender may remedy any default without waiving it and may waive any default

without waiving any prior or subsequent default.

**C.    Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will—

1.    either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

2.    sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, subject to the Prior Lien and to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

3.    from the proceeds of the sale, pay, in this order—

a.    expenses of foreclosure, including a reasonable commission to Trustee;

b.    to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

c.    any amounts required by law to be paid before payment to Grantor; and

d.    to Grantor, any balance; and

4.    be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

5.    be entitled to a fee to be paid by Grantor of 4% of the entire amount owed by Grantor upon default by Grantor.

**D.    General Provisions**

1.    If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor fails to do so, Grantor will become a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

2.    Recitals in any trustee's deed conveying the Property will be presumed to be true.

3.    Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other

remedy will not constitute an election of remedies.

4. This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

5. If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

6. Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

7. Grantor assigns to Lender absolutely, not only as collateral, all present and future rent and other income and receipts from the Property. Grantor warrants the validity and enforceability of the assignment. Grantor may as Lender's licensee collect rent and other income and receipts as long as Grantor is not in default with respect to the Obligation or this deed of trust. Grantor will apply all rent and other income and receipts to payment of the Obligation and performance of this deed of trust, but if the rent and other income and receipts exceed the amount due with respect to the Obligation and the deed of trust, Grantor may retain the excess. If Grantor defaults in payment of the Obligation or performance of this deed of trust, Lender may terminate Grantor's license to collect rent and other income and then as Grantor's agent may rent the Property and collect all rent and other income and receipts. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent and other income and receipts collected under this paragraph first to expenses incurred in exercising Lender's rights and remedies and then to Grantor's obligations with respect to the Obligation and this deed of trust in the order determined by Lender. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies. If Grantor becomes a voluntary or involuntary debtor in bankruptcy, Lender's filing a proof of claim in bankruptcy will be deemed equivalent to the appointment of a receiver under Texas law.

8. Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged,

Page 5 of 10

or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

9. In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

10. When the context requires, singular nouns and pronouns include the plural.

11. The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

12. This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

13. If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

14. Grantor and each surety, endorser, and guarantor of the Obligation waive all demand for payment, presentation for payment, notice of intention to accelerate maturity, notice of acceleration of maturity, protest, and notice of protest, to the extent permitted by law.

15. Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if this deed of trust is placed in the hands of an attorney for enforcement.

16. If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

17. The term *Lender* includes any mortgage servicer for Lender.

18. Grantor represents that this deed of trust and the Note are given for the following purposes:

> The renewal and extension of a loan as evidenced by a A Vendor's lien retained in Deed dated September 7, 2017, filed for record on September 11, 2017 in the Office of the County Clerk of El Paso County, Texas, under Clerk's Document No. 20170066564, from

Alberto Flores, Individually and as Independent executor of the Estate of Ramon G. Flores, deceased to Johannsen Development Group, Inc., a Texas corporation, securing the payment of one certain promissory note of even date therewith in the principal amount of $400,000.00, payable to the order of MJ Real Properties, In., a Texas corporation; said note and lien being additionally secured by Deed of Trust of even date to Steve E. Anderson and/or William B Crout, Trustee, filed for record on September 11, 2017 in the Office of the County Clerk of El Paso County, Texas under Clerk's Document No. 20170066565. Notice of Trustee's Sale No. 149, filed on May 14, 2019, Official Records of El Paso County, Texas. A Vendor's lien retained in Deed dated September 7, 2017, filed for record on September 11, 2017 in the Office of the County Clerk of El Paso County, Texas, under Clerk's Document No. 20170066564, from Alberto Flores, Individually and as Independent executor of the Estate of Ramon G. Flores, deceased to Johannsen Development Group, Inc., a Texas corporation, securing the payment of one certain promissory note of even date therewith in the principal amount of $437,500.00, payable to the order of Alberto Flores, Individually as as Independent Executor of the Estate of Ramon G. Flores, deceased; said note and lien being additionally secured by Deed of Trust of even date to E.P. Bud Kirk, Trustee, filed for record on September 11, 2017 in the Office of the County Clerk of El Paso County, Texas under Clerk's Document No. 20170066567. Notice of Trustee's Sale No. 149, filed on May 14, 2019, Official Records of El Paso County, Texas. Same being affected by that certain Agreement of subordination and Opportunity to Cure dated September 7, 2017 executed by and between Alberto Flores, Individually and as Independent Executor of the Estate of Ramon G. Flores, deceased and MJ Real Properties, Inc., a Texas corporation, filed for record on September 11, 2017 in the Office of the County Clerk of El Paso County, Texas, under Clerk's Document No. 20170066568. Promissory Note dated September 7, 2017, filed for record on October 18, 2018 in the Office of the County Clerk of El Paso County, Texas, under Clerk's Document No. 20180080252, from Johannsen Development Group, Inc., a Texas corporation, securing the payment in the principal amount of $437,500.00, payable to the order of Alberto Flores, Individually and as Independent Executor of the estate of Ramon G. Flores, deceased. Notice of Ongoing Maturity of Real Estate Lien Note and Trustee's sale No. 15, filed on April 24, 2019, Official Records of El Paso County, Texas.

Page 7 of 10

19. This Deed of Trust together with the Note and all other documents executed substantially contemporaneously with this Deed of Trust represent the final agreement of the parties and may not be contradicted by any evidence of prior, contemporaneous, or subsequent oral agreement of the parties. There are no oral agreements between the parties.

20. Grantor agrees not to grant any lien or security interest in the Property or to permit any junior encumbrance to be recorded or any claim to otherwise become an encumbrance against the Property. If an involuntary encumbrance is filed against the Property, Grantor agrees within 30 days to either remove the involuntary encumbrance or provide a bond acceptable to Lender against the involuntary encumbrance. At Lender's sole and incontestable option and discretion, if Grantor grants any other junior or superior lien, security interest or encumbrance, Lender may declare all the sums secured by this Deed of Trust to be immediately due and payable.

21. Upon receipt of Grantor of notice that the Note has been placed for collection or processing by an escrow company, payment collection service or agent (collectively called "Agent"), Grantor agrees to pay any stated or published fee or fees required by Agent in connection with the collection of this debt per Agent's normal business practice.

22. Grantor agrees if requested by Lender, to fully cooperate, adjust and execute for clerical errors or other errors, any or all transaction documents, sales agreement(s), disclosure statements, notes, deeds, deeds of trust, or any other documents, if deemed necessary or desirable in the reasonable discretion of Lender. The Grantor agrees to comply with all above noted requests by the above referenced Lender within 30 days from the date of request. Grantor agrees to assume all costs including, but not limited to, actual expenses, legal fees and marketing losses for failing to comply with correction requests in the above noted time period.

23. If all or any part of the Property is sold, conveyed, leased for a period longer than three (3) years, leased with an option to purchase, or otherwise sold (including any contract for deed), without the prior written consent of the Lender, then the Lender may at Lender's option declare the outstanding principal balance of the note, plus accrued interest, to be immediately due and payable. The creation of a subordinate lien, any sale thereunder, any deed under threat or order of condemnation, any conveyance solely between Grantor, the passage of title by reason of the death of a Grantor or by operation of law shall not be construed as a sale or conveyance of the Property. However, notwithstanding the foregoing, Grantor shall have the right to convey the Property to a entity in which Grantor has established without obtaining

the prior written consent of Lender.

24. Upon receipt by Grantor of notice of the loss, destruction, theft or total or partial obliteration, mutilation, or inappropriate cancellation of the Note, or the placement of any inappropriate marking on the Note, Grantor shall execute and deliver in lieu thereof, a Replacement Note, identical in form and substance to the Note. Upon execution and delivery by Grantor of the Replacement Note, all references in the loan documents on this Deed of Trust to the Note, shall be deemed to refer to the Replacement Note.

25. Grantor shall, in addition to the principal and interest installments, deposit with the Lender a pro rata part of the estimated annual ad valorem taxes on the Property. These tax deposits are only estimates and may be insufficient to pay total taxes. Grantor shall pay any deficiency within 30 days after notice from Lender. Grantor's failure to pay the deficiency shall constitute a default under the Deed of Trust. In the event any superior lienholder on the Property is collecting escrow payments for taxes, this paragraph shall be inoperative so long as payments are being made to the superior lienholder.

26. This conveyance is given in the trust to secure the indebtedness, present and future, owing and to become owing, to Lender of the payment and performance of any and all other present and future indebtedness (and interest accrued on it) and obligations of every kind, nature or description, joint or several, now owing or which may in the future be owing by Grantor to Lender, whether advanced by Lender to or for the account of Grantor, direct or indirect, primary or secondary, fixed or contingent, joint, several or both, and regardless of how evidenced, incurred or arising, including, without limitation, indebtedness incurred or arising under any loan agreement, note, open account, guaranty, or otherwise, and regardless of how secured or the means by which the same accrued or shall accrue, and any judgment rendered with respect to the Note in favor of Lender by a Court of competent jurisdiction in the State of Texas.

27. *Grantor expressly represents that the Property herein above mentioned and conveyed to the Trustee forms no part of any property owned, used or claimed by Grantor as exempted from forced sale under the laws of the State of Texas, and Grantor renounces all and every claim thereto under any such law or laws and hereby expressly represents that this Property does not constitute Grantors' homestead but that this is merely an investment of Grantor and that Grantor has no present intent that the herein described Property constitutes its homestead or is exempt under any laws of the State of Texas.*

JOHANNSEN DEVELOPMENT
GROUP, INC., A TEXAS
CORPORATION

DEBORAH JORDAN

KEYVAN PARSA

THE STATE OF TEXAS §
                    §
COUNTY OF EL PASO   §

This instrument was acknowledged before me on the 2nd day of June 2019, by DEBORAH JORDAN and KEYVAN PARSA Directors of JOHANNSEN DEVELOPMENT GROUP, INC., A TEXAS CORPORATION.

SEAL:

Notary Public, State of Texas

Prepared by:
Salloum Law Firm, P.C.
661 S. Mesa Hills Dr., Suite 100
El Paso, Texas 79912
Phone: 915-533-4511
Fax: 915-533-4512
email:mark@marksalloumlaw.com
Web:www.marksalloumlaw.com

G:\Maria Documents\Loan Packages 2019\Ricci, Frank\6980 Johannsen Reafidavit of trust.wpd

Page 10 of 10

Doc # 20190051398
#Pages 10 #NFPages 1
07/08/2019 04:06 PM
Filed & Recorded In
Official Records of
El Paso County
Delia Briones
County Clerk
Fees $62.00

eRecorded

I hereby certify that this instrument was filed on the date and time stamped
hereon by me and was duly recorded by document number in the Official
Public Records of real Property in El Paso County.

EL PASO COUNTY, TEXAS

## COMMERCIAL AFFIDAVIT AS TO DEBTS AND LIENS

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | GF # 200959-COM |
| COUNTY OF El Paso | § | |

BEFORE ME, the undersigned authority, on this day, personally appeared the undersigned (hereinafter called Affiant) (whether one or more) and each on his oath, deposes and says, as follows:

1. Affiant is the owner or authorized signatory for the owner of the following described property, to-wit:

    Tract 3, J.L. JOHANNSEN SURVEY NUMBER 185, in the City of El Paso, El Paso County, Texas, according to the resurvey of said J.L. JOHANNSEN SURVEY NUMBER 185 made by El Paso County, Texas, for tax purposes, and containing 12.08 acres of land, more or less.

2. Affiant is desirous of selling the above described property and has requested WestStar Title, LLC, agent for Fidelity National Title Insurance Company, to issue a title policy guarantying the title of same to his purchaser.

3. In connection with the issuance of such policy, Affiant makes the following statement of facts:

    a. That Affiant owes no past due Federal or State taxes and that there are no delinquent Federal assessments presently existing against Affiant, and that no Federal or State Liens have been filed against Affiant.

    b. That there are no delinquent State, County, City, School District, Water District or other governmental agency taxes due or owing against said property and that no tax suit has been filed by any State, County, Municipal Water District or other governmental agency for taxes levied against said property.

    c. All labor and material used in the construction of improvements or repairs, if any, on the above described property have been paid for and there are now no unpaid labor or material claims against the improvements or repairs, if any, or the property upon which same are situated, and Affiant hereby declares that all sums of money due for the erection of improvements or repairs, if any, have been fully paid and satisfied and there are no Mechanic's or Materialmen's liens against the hereinabove property.

    d. That no paving assessments or lien has been filed against the hereinabove described property, and Affiant owes no paving charges.

    e. That there are no judgment liens filed against Affiant.

    f. That there are no suits pending against Affiant in Federal or State Court.

    g. That Affiant knows of no adverse claim to the hereinabove described property and that so far as Affiant knows there are no encroachments or boundary conflicts.

h. That there are no outstanding loans, recorded or unrecorded, except as follows:

_____

_____

i. That Affiant has not heretofore sold, granted an option to purchase, contracted to sell or conveyed any part of said property other than in connection with this sale. That Affiant has not entered into any leases, recorded or unrecorded, or vendor contracts in connection with said property, except as follows:

_____

_____

j. No unpaid debts for electric or plumbing fixtures, water heaters, floor furnaces, air conditioners, radio or television antennae, carpeting, rugs, lawn sprinkling systems, venetian blinds, window shades, draperies, electric appliances, fences street paving, or any personal property or fixtures that are located on the subject property described above, and that no such items have been purchased on time payment contracts, and there are no security interests on such property secured by financing statements, security agreement or otherwise except the following:

**Secured Party**                                    **Approximate Amount**

_____          _____

_____          _____

k. No loans of any kind on such property except the following:

**Creditor**                                          **Approximate Amount**

_____          _____

_____          _____

4. Affiant recognizes that but for the making of the hereinabove statements of fact relative the hereinabove described property WestStar Title, LLC would not issue a title policy on said property and that such statements have been made as a material inducement for the issuance of such policy.

**WITNESS** my hand this the July 1, 2020

Montoya Park Place Inc,
a Texas corporation

By: _____
Albert Flores, Shareholder, Director

By: _____
Keyvan Parsa, Shareholder, Director

**SWORN TO AND SUBSCRIBED BEFORE ME,** by Albert Flores and Keyvan Parsa, Shareholders and Directors of the said Montoya Park Place Inc., a Texas corporation, at El Paso, El Paso County, Texas, this ___ day of _____, 2020.

TRAVIS JOEL SMITH
Notary Public, State of Texas
Comm. Expires 11-13-2020
Notary ID 129202101

NOTARY PUBLIC STATE OF TEXAS

THE STATE OF TEXAS      §
                         §
COUNTY OF El Paso      §

This instrument was acknowledged before me on this ___ day of _____, 2020, by Albert Flores and Keyvan Parsa, Shareholders and Directors of the said Montoya Park Place Inc., a Texas corporation

TRAVIS JOEL SMITH
Notary Public, State of Texas
Comm. Expires 11-13-2020
Notary ID 129202101

NOTARY PUBLIC STATE OF TEXAS

# EXHIBIT "L"

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

## AGREEMENT OF PURCHASE AND SALE - UNIMPROVED PROPERTY

### Johannsen

## ARTICLE 1:  PROPERTY/PURCHASE PRICE

1.1    **Certain Basic Terms.**

    (a)    <u>Seller</u>:      Montoya park place Inc., a Texas corporation

    (b)    <u>Purchaser</u>:   IDEA Public Schools, a Texas non-profit corporation

    (c)    <u>Effective Date</u>:     The date of receipt by the Title Company, as indicated on the Title Company's Agreement and Receipt page.

    (d)    <u>Purchase Price</u>:    $1,950,000.00

    (e)    <u>Earnest Money</u>:    $5,000.00, plus any interest earned thereon.

    (f)    <u>Due Diligence Period</u>: Thirty (30) days after the Effective Date.

    (g)    <u>Closing Date</u>: Thirty (30) days after the Effective Date or on such earlier date as Purchaser designates by no less than three (3) days advance written notice to Seller and the Title Company.

    (h)    <u>Title Company</u>:    WestStar Title
                             641 N. Stanton, Ste 200
                             El Paso, Texas 79901
                             Attn: Travis Smith
                             Phone: (915) 747-4147
                             Email: tjsmith@weststar-title.com

    (i)    <u>Brokers</u>:

    (1)    <u>Seller's Broker</u>:    None

    (2)    <u>Purchaser's Broker</u>:  Dan Olivas
                             Dan Olivas & Associates
                             240 Thunderbird Drive Suite D
                             El Paso, TX 79912
                             Telephone: (915) 584-5430
                             Email: dwolivas@gmail.com

DocuSign Envelope ID: 48699B3D-A6D2-4456-8A80-2D3401B0714C

    1.2   **Property**. Subject to the terms and conditions of this Agreement of Purchase and Sale (this "**Agreement**"), Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, the following property (collectively, the "**Property**"):

    (a)    The "**Real Property**" located in El Paso County, Texas being approximately 12.1644 acres and being legally described as follows: J.L. JOHANNSEN SURVEY NO. 185, in the City of El Paso, El Paso County, Texas, according to the resurvey of said J.L. Johannsen Survey No. 185, made by El Paso County, Texas, for tax purposes, together with (i) all and singular the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances therein or in anywise appertaining to such real property, (ii) all right, title and interest of Seller to all minerals, oil, gas and other hydrocarbon substances thereon or thereunder, (iii) all air, water, riparian and solar rights of Seller related thereto and (iv) all right, title, and interest of Seller in and to all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such real property.

    The Deed and all other Closing documents to be delivered at Closing shall use the metes and bounds description or lot and block reflected in the final completed version of the Survey (as defined herein), as approved by Purchaser and Seller, such approval not to be unreasonably withheld or delayed. Seller and Purchaser acknowledge that the description of the Real Property set forth above may be legally insufficient for the purposes of supporting an action to enforce this Agreement. As such, Seller and Purchaser confirm unto one another that notwithstanding any insufficiency, the parties desire to be bound by their respective agreements to sell and purchase the Property as described herein. Therefore, since the parties are desirous of executing this Agreement and to provide for the right of Seller or Purchaser to demand and successfully enforce the terms hereof and to ensure such right is not precluded due to the legal description of the Property, Seller and Purchaser agree that (i) they are experienced in transactions of the nature provided for in this transaction, (ii) that, in fact, they specifically are familiar with the location of the Property, (iii) each party waives any and all claims of an insufficient legal description in a cause of action for enforcement hereof, and (iv) upon approval by Seller and Purchaser of the Survey, the metes and bounds description of the Property prepared by the Surveyor shall become the legal description of the Property hereunder. Upon approval of the metes and bounds description of the Property prepared by the Surveyor or the current lot and block description of the Property as created per plat, as applicable, Seller and Purchaser agree that such metes and bounds description or lot and block description, as applicable, of the Property shall automatically, without the necessity of further action, be substituted for the description of the Real Property set forth above; provided, however, that upon the request of either party hereto, Seller and Purchaser agree to amend this Agreement to evidence the substitution of such approved metes and bounds description or lot and block description, as applicable, for the description of the Real Property set forth above.

    (b)    Seller's interest in the "**Intangible Personal Property**" being all intangible personal property related to the Real Property, including, without limitation: (i) all trade names and trademarks associated with the Real Property including Seller's rights and interests in the name of the Real Property, (ii) warranties, contract rights related to the construction, operation, ownership, or management of the Real Property (but excluding

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

Seller's obligations thereunder), (iii) governmental permits, approvals and licenses (to the extent assignable) and (iv) telephone exchange numbers (to the extent assignable).

1.3 **Earnest Money**. Within three (3) business days after the Effective Date, Purchaser shall deposit the Earnest Money with the Title Company. The Title Company shall pay the Earnest Money to Seller at and upon the Closing (as hereinafter defined) or otherwise, to the party entitled to receive the Earnest Money in accordance with this Agreement. The Earnest Money shall be held and disbursed by the Title Company pursuant to this Agreement.

Seller and Purchaser agree and acknowledge that One Hundred Dollars ($100.00) of the Earnest Money shall be paid to Seller if this Agreement is terminated for any reason pursuant to the terms of Section 2.2 hereof (the "**Independent Contract Consideration**"). Moreover, Seller and Purchaser agree and acknowledge that the Independent Contract Consideration has been bargained for and agreed as additional consideration for Seller's execution and delivery of this Agreement. At Closing, the Independent Contract Consideration shall be applied to the Purchase Price with the rest of the Earnest Money.

## ARTICLE 2: INSPECTION

2.1 **Seller's Delivery of Specified Documents**. Within three (3) days after the Effective Date, Seller shall provide to Purchaser the following documents, all to the extent available (the "**Specified Documents**"):

(a) Operating Statements. Operating statements of the Property, if any, for the 36 months preceding the Effective Date;

(b) Tax Statements. Copies or a summary of ad valorem tax statements relating to the Property for the current year or other current tax period (if available) and for the 36 months preceding the Effective Date and all information regarding special assessments for the Property;

(c) Utilities. All utility availability letters, together with copies of all invoices for utilities incurred by Seller for the Property in the 24 months immediately preceding the Effective Date;

(d) Service Contracts. Copies of all management, service, supply, equipment rental, and other contracts related to the Property, if any (the "**Service Contracts**") together with a list of same;

(e) Maintenance Records. All available maintenance work orders, if any, for the 12 months preceding the Effective Date;

(f) Environmental Reports. Any environmental, soils, or geotechnical reports in Seller's possession or control related to the Property;

-3-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

(g)     Existing Title and Survey Documents.  Copy of Seller's existing title insurance policy, if any, and any existing surveys of the Property (including, without limitation, archaeological, boundary, topographic and tree surveys);

(h)     Certificates/Permits.  A copy of all governmental permits, approvals and licenses and certificates for occupancy related to the Property, if any (the "**Permits**");

(i)     Governmental Correspondence.  Any written notices, reports, citations, orders, decisions, correspondence, or memoranda from any governmental authority addressed to Seller relating to the Property (including, but not limited to, copies of any zoning letters) and applications by Seller to any governmental authority;

(j)     Warranties.  Any existing warranties currently in force with respect to the Property;

(k)     Litigation.  All available pleadings or documents relating to pending or threatened litigation with respect to the Property;

(l)     Appraisals.  Appraisals, if any; and

(m)     Plans and Specifications.  All construction plans and specifications relating to the development of the Property that are in Seller's possession.

Seller shall provide to Purchaser any documents described above and coming into Seller's possession or control or produced by Seller after the initial delivery above and to continue to provide same during the pendency of this Agreement.

2.2     **Due Diligence**.  Purchaser shall have through the last day of the Due Diligence Period in which to examine, inspect, and investigate the Property and, in Purchaser's sole and absolute judgment and discretion, to determine whether the Property is acceptable to Purchaser and to obtain all necessary internal approvals.  Notwithstanding anything to the contrary in this Agreement, Purchaser may terminate this Agreement for any reason whatsoever by giving notice of termination to Seller on or before the last day of the Due Diligence Period.  If Purchaser does not give the notice of termination, this Agreement shall continue in full force and effect.  If this Agreement terminates pursuant to this Section 2.2, the Earnest Money (less the Independent Contract Consideration) shall be refunded to Purchaser immediately upon request, and all further rights and obligations of the parties under this Agreement shall terminate except for all indemnity obligations of the parties hereto or other provisions of this Agreement that expressly survive the termination of this Agreement.

During the pendency of this Agreement, Purchaser shall have reasonable access to the Property for the purpose of conducting surveys, architectural, engineering, geotechnical, and environmental inspections and tests (including intrusive inspection and sampling) and any other inspections, studies, or tests reasonably required by Purchaser.  Seller shall cooperate with Purchaser in connection with Purchaser's due diligence as reasonably requested by Purchaser.  Prior to entry upon the Property, Purchaser and Purchaser's agents or representatives accessing the

-4-

DocuSign Envelope ID: 49899B3D-A6D2-4456-8A80-2D3401B0714C

Property shall obtain and deliver to Seller a certificate of insurance naming Seller as an additional insured, evidencing commercial general liability insurance coverage with combined single limits of not less than $1,000,000 from an underwriter reasonably acceptable to Seller. Purchaser agrees to indemnify Seller and to hold harmless and defend Seller from and against any and all claims, demands, causes of action, damages, liabilities, costs and expenses including, without limitation, reasonable attorneys' fees and court costs, which are asserted against, suffered or incurred by Seller as a result of any inspection, testing or examination of the Property by Purchaser or its agents or representatives; provided, however, that in no event shall such indemnity apply to either: (i) matters merely discovered by Purchaser or any of Purchaser's representatives or agents, but not originally caused or exacerbated by any of Purchaser or Purchaser's representatives or agents or (ii) to the extent caused by the gross negligence or willful misconduct of Seller or any of its representatives or agents. Purchaser further agrees that it shall be solely responsible for any and all costs associated with the inspections described in this <u>Section 2.2</u> and agrees to promptly discharge or contest (after first depositing adequate security therefor with Seller) any liens that are filed against the Property as a result of such inspections. Promptly following each such inspection, Purchaser shall restore the Property to substantially the same condition as existed prior to such inspections. In the course of its inspections Purchaser may make inquiries to third parties including, without limitation, lenders, contractors, parties to Service Contracts, and municipal, local, and other government officials and representatives, and Seller consents to such inquiries. The terms of this <u>Section 2.2</u> shall survive the Closing and any termination of this Agreement.

2.3 <u>Use Approvals</u>. Seller shall, at no cost to Seller, reasonably assist and cooperate with Purchaser in Purchaser's attempts to obtain all zoning and land use approvals, variances, amendments or other changes required by all applicable governmental authorities or private parties under any applicable deed restrictions to allow the Property to be used for Purchaser's intended use, without any conditions or contingencies (collectively, the "<u>Use Approvals</u>"). Such assistance and cooperation includes, without limitation, timely execution by Seller of any documents in connection therewith, provided such documents do not impose any liability or obligation on Seller or the Property, and provided further that in no event shall the Use Approvals become binding on the Property or Seller prior to the Closing Date. Seller shall notify Purchaser promptly of the receipt of comments, notices or requests from any governmental entities or private parties relating to the Use Approvals, and shall supply Purchaser with copies of all correspondence between Seller or any of its representatives and governmental entities with respect to the Use Approvals.

2.4 <u>CCRs</u>. If the Property is subject to or encumbered by any Covenants, Conditions and Restrictions or similar instrument ("<u>CCRs</u>") governing or affecting the use, operation, maintenance, management or improvement of the Property, then Purchaser may request during the Due Diligence Period that Seller request from the association or other entity having governing or approval rights under the CCRs an estoppel certificate from such association or other entity, in form and substance satisfactory to Purchaser. Seller shall request that such entity sign such estoppel certificate, and Seller shall deliver any response to Purchaser. In addition, Purchaser may request during the Due Diligence Period that Seller execute and deliver a recordable assignment, in form and substance satisfactory to Purchaser, assigning any and all developer, declarant or other related rights or interests of Seller in or under the CCRs, if Seller holds such rights or interests.

106354.0000010 EMF_US 78132740v3

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

2.5  <u>Plat</u>.  If required by any governmental authority in order for Seller to convey the Property to Purchaser, then during the Due Diligence Period, Purchaser shall initiate the process for a subdivision plat of the Property, subdividing the Property as a separate legal parcel from the larger tract of which it is a part (the "<u>Subdivision Plat</u>").  Purchaser shall promptly provide Seller with copies of preliminary and final drafts of the Subdivision Plat as they become available for Seller's review and approval.  The Subdivision Plat and all applications and submittals relative thereto shall be subject to the review and approval of Seller and Purchaser such approval not to be unreasonably withheld, conditioned or delayed.  Purchaser shall pay all fees, costs and expenses related to the preparation, processing and filing of the Subdivision Plat and all other expenses relating thereto. Neither Purchaser nor Seller shall unreasonably withhold or delay approval of the Subdivision Plat.  To the extent that the Subdivision Plat contains any development or other obligation, Purchaser shall indemnify and hold harmless Seller from and against all such obligations.  It shall be Purchaser's sole responsibility to obtain a Subdivision Plat; provided, however, that Seller shall cooperate with Purchaser in all aspects of the plat-approval process. The provisions of this <u>Section 2.6</u> shall survive Closing.

2.6  <u>Property Condition</u>.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT AND IN THE DOCUMENTS TO BE DELIVERED AT CLOSING, THE PROPERTY IS BEING CONVEYED "AS IS, WHERE IS" AND WITH ALL FAULTS. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT AND IN THE DOCUMENTS TO BE DELIVERED AT CLOSING, PURCHASER ACKNOWLEDGES THAT SELLER HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, PROMISES, COVENANTS, AGREEMENTS OR GUARANTIES OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, OF, AS TO, CONCERNING, OR WITH RESPECT TO, (I) THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, (II) THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH MAY BE CONDUCTED THEREON, (III) THE COMPLIANCE OF OR BY THE PROPERTY WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, (IV) THE HABITABILITY, MERCHANTABILITY, MARKETABILITY, PROFITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OF THE PROPERTY, OR (V) ANY OTHER MATTER WITH RESPECT TO THE PROPERTY.  EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT AND IN THE DOCUMENTS TO BE DELIVERED AT CLOSING, PURCHASER FURTHER ACKNOWLEDGES THAT SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS OR WARRANTIES REGARDING COMPLIANCE OF THE PROPERTY WITH ANY ENVIRONMENTAL PROTECTION, POLLUTION OR LAND USE LAWS, RULES, REGULATIONS, ORDERS OR REQUIREMENTS, INCLUDING, WITHOUT LIMITATION, THOSE PERTAINING TO SOLID WASTE, AS DEFINED BY THE U.S. ENVIRONMENTAL PROTECTION AGENCY REGULATIONS AT 40 C.F.R., PART 261, OR THE DISPOSAL OR EXISTENCE, IN OR ON THE PROPERTY, OF ANY

DocuSign Envelope ID: 49699B3D-A8D2-4456-8A80-2D3401B0714C

HAZARDOUS SUBSTANCES, AS DEFINED BY THE COMPREHENSIVE ENVIRONMENTAL RESPONSE COMPENSATION AND LIABILITY ACT OF 1980, AS AMENDED, AND THE REGULATIONS PROMULGATED THEREUNDER. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS AGREEMENT AND IN THE DOCUMENTS TO BE DELIVERED AT CLOSING, SELLER SHALL NOT BE LIABLE OR BOUND IN ANY MANNER BY ANY VERBAL OR WRITTEN STATEMENTS, REPRESENTATIONS OR INFORMATION PERTAINING TO THE PROPERTY OR THE OPERATION THEREOF, FURNISHED BY ANY PARTY PURPORTING TO ACT ON BEHALF OF SELLER. THE PROVISIONS OF THIS <u>SECTION 2.7</u> SHALL SURVIVE CLOSING.

## ARTICLE 3: TITLE AND SURVEY REVIEW

3.1 <u>**Delivery of Title Commitment and Survey**</u>. Seller shall cause to be prepared and delivered to Purchaser and its counsel within two (2) days after the Effective Date: (i) a current, effective commitment for title insurance (the "<u>**Title Commitment**</u>") issued by the Title Company, in the amount of the Purchase Price with Purchaser as the proposed insured, and accompanied by true, complete, and legible copies of all documents referred to in the Title Commitment and (ii) any existing survey of the Property the Seller may have in its possession (the "<u>Survey</u>"). Purchaser shall have the right, within two (2) days after receipt of the Title Commitment and all title exception documents, to obtain a new (dated on or after the Effective Date) on-the-ground Texas Category 1A, Condition II land title survey of the Property including a certification addressed to Purchaser, the Title Company and such other parties as Purchaser may specify (the "<u>**New Survey**</u>"). Should Purchaser obtain the New Survey, (i) the New Survey shall be considered the "<u>**Survey**</u>" for all purposes under this Agreement and (ii) upon completion of the New Survey the metes and bounds description of the Property prepared in connection with the New Survey will be used to describe the Property in all closing documents used to consummate the transaction contemplated by this Agreement.

3.2 <u>**Title Review and Cure**</u>. Purchaser shall notify Seller in writing (the "<u>**Title Notice**</u>") within three (3) days after last to be received by Purchaser of the Title Commitment, including all documents referred to in the Title Commitment, and the Survey, which exceptions to title (including Survey matters), if any, will not be accepted by Purchaser (the "<u>**Title Review Period**</u>"). If Purchaser fails to notify Seller in writing of its disapproval of any exceptions to title prior to the expiration of the Title Review Period, Purchaser shall be deemed to have approved the condition of title (including Survey matters) to the Property as then reflected in the Title Commitment and on the Survey, excluding Seller Cure Items (as hereinafter defined). Seller shall notify Purchaser in writing within two (2) days after its receipt of the Title Notice, indicating which objections to title (and Survey) Seller will cure (the "<u>**Cure Notice**</u>"). If Seller fails to timely deliver the Cure Notice to Purchaser, Seller shall be deemed to have elected not to cure any of the objections specified in the Title Notice at or prior to Closing. Seller shall have no obligation to cure title objections; provided, that notwithstanding any other provision of this Agreement to the contrary, Seller shall in all events be obligated at or prior to Closing, and regardless of whether Purchaser makes objection thereto, to obtain a release of any lien, mortgage or security interest encumbering the Property incurred or suffered by Seller, to satisfy all items on Schedule C of the

-7-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

Title Commitment required to be satisfied by Seller and satisfy any matter placed against the Real Property on or after the Effective Date (collectively, the "**Seller Cure Items**"). Purchaser shall have until the Closing Date to provide Seller with written notice indicating that either (A) Purchaser waives the objections that Seller has not agreed to cure (whereby such exceptions shall be deemed Permitted Exceptions (as hereinafter defined)); or (B) Purchaser elects to terminate this Agreement in which event Purchaser shall receive a prompt refund of the Earnest Money (less the Independent Contract Consideration) and neither party hereto shall have any further obligations hereunder except for any indemnity provisions or other provisions of this Agreement that specifically survive the termination of this Agreement. If Seller does not receive such a notice from Purchaser then Purchaser shall be deemed to have elected option (A) above. Seller agrees to remove any exceptions or encumbrances to title which are created by, under or through Seller after the date of this Agreement and which are not permitted by the terms of this Agreement. As used in this Agreement, the term "**Permitted Exceptions**" shall mean

(a)     those matters that either are not objected to in writing within the time period provided in this Section 3.2, or if objected to in writing by Purchaser, are those which Seller has elected not to remove or cure, excluding all Seller Cure Items, and subject to which Purchaser has elected or is deemed to have elected to accept the conveyance of the Property; and

(b)     the lien of all ad valorem real estate taxes and assessments not yet due and payable as of the Closing, subject to adjustment as herein provided.

3.3     **Amended Title Commitment**. In the event the Title Commitment is amended to include new exceptions that are not set forth in a prior Title Commitment, Purchaser shall have two (2) days after Purchaser's receipt of the amended Title Commitment within which to notify Seller of any such exceptions to which it objects, provided such new exceptions have not been created by Purchaser or its contractors or agents. If Purchaser objects to any such exceptions, Seller shall have two (2) days from receipt of Purchaser's objection(s) to remedy such exceptions by waiver or endorsement to the Title Commitment acceptable to Purchaser; provided, Seller shall have no obligation to cure any such new objections unless such are Seller Cure Items or otherwise are the result of the acts of omissions of Seller (which shall also be deemed to be Seller Cure Items under this Agreement). If Seller is unable or unwilling to cure any new objections that Seller is not otherwise under this Agreement obligated to cure within two (2) days after the date of Purchaser's notice of such new objections, then Purchaser may, as its sole and exclusive remedy, (i) not more than five (5) days after the expiration of Seller's 2-day cure period, terminate this Agreement and receive the Earnest Money (less the Independent Contract Consideration) immediately from the Title Company without the need for obtaining further consent or instruction from Seller, and thereafter all obligations hereunder shall terminate, except as otherwise provided herein or (ii) waive such objections to any uncured new matter and the transaction contemplated by this Agreement shall close as scheduled. If written notice of objection under this Section 3.3 is not timely given by Purchaser to Seller, then Purchaser shall be deemed to have approved of the condition of the title of the Real Property as shown by the amended Title Commitment (other than as to Seller Cure Items) and such uncured new matters (other than Seller Cure Items) shall be part of the Permitted Exceptions.

-8-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

**3.4** **Delivery of Title Policy at Closing**. At the Closing, as a condition to Purchaser's obligation to close, the Title Company shall deliver to Purchaser a Texas standard T-1 Owner Policy of Title Insurance ("**Title Policy**") issued by the Title Company containing the endorsements requested by Purchaser and that the Title Company has agreed to issue, dated the date and time of the recording of the Deed in the amount of the Purchase Price, insuring Purchaser as owner of good and indefeasible fee simple title to the Property, subject only to the Permitted Exceptions; provided, however, that (i) the standard exception for discrepancies, conflicts or shortages in area shall be deleted except for "shortages in area", (ii) such Title Policy shall have "None of Record" endorsed regarding restrictions (except for those that are Permitted Exceptions), (iii) no exception shall be made for the rights of parties in possession, and (iv) the standard exception for taxes shall be limited to the year in which the Closing occurs, marked "not yet due and payable" and subsequent years and subsequent assessments for prior years due to change in land usage or ownership. Seller shall execute at Closing an affidavit on the Title Company's standard form so that the Title Company can delete or modify the standard printed exceptions as to parties in possession, unrecorded liens, and similar matters. The Title Policy may be delivered after the Closing if at the Closing the Title Company issues a currently effective, duly-executed "marked-up" Title Commitment or Pro Forma Owner Policy of Title Insurance (the "**Pro Forma**") and irrevocably commits in writing to issue the Title Policy in the form of the "marked-up" Title Commitment or Pro Forma promptly after the Closing Date.

**3.5** **Title and Survey Costs**. Seller hereby covenants and agrees to reimburse Purchaser at Closing for the costs and expenses associated with Purchaser's obtaining the New Survey, but in an amount not to exceed $5,000.00. The cost of the premium for the Title Policy, excluding the premium for the survey deletion and any endorsements thereto requested by Purchaser, shall be paid by Seller. Purchaser shall pay for the costs of the Survey and survey deletion and any endorsements requested by Purchaser.

## ARTICLE 4: OPERATIONS AND RISK OF LOSS

**4.1** **Performance under Service Contracts**. During the pendency of this Agreement, Seller will perform its material obligations under Service Contracts and other agreements that may affect the Property.

**4.2** **New Contracts**. During the pendency of this Agreement, Seller will not enter into any contract that will be an obligation affecting the Property subsequent to the Closing except contracts entered into in the ordinary course of business that are terminable without cause and without penalty to Seller or Purchaser on 30-days' notice, and Seller will not amend or modify any Service Contracts.

**4.3** **Listings and Other Offers**. During the pendency of this Agreement, Seller will not solicit or make or accept any offers to sell the Property, engage in any discussions or negotiations with any third party with respect to the sale or other disposition of the Property, or enter into any contracts or agreements (whether binding or not) regarding any disposition of the Property.

106354.0000010 EMF_US 78132740v3

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

4.4 **Damage**. Risk of loss up to and including the Closing Date shall be borne by Seller. Seller shall immediately notify Purchaser in writing of the extent of any damage to the Property. In the event of any material damage to or destruction of the Property or any portion thereof, Purchaser may, at its option, by notice to Seller given within ten (10) days after Purchaser is notified of such damage or destruction (and if necessary the Closing Date shall be extended to give Purchaser the full 10-day period to make such election): (i) terminate this Agreement and the Earnest Money (less the Independent Contract Consideration) shall be immediately returned to Purchaser or (ii) proceed under this Agreement, receive any insurance proceeds due Seller as a result of such damage or destruction and assume responsibility for such repair, and Purchaser shall receive a credit at Closing for any deductible, uninsured or coinsured amount under said insurance policies. If Purchaser elects (ii) above, Seller will cooperate with Purchaser after the Closing to assist Purchaser in obtaining the insurance proceeds from Seller's insurers. If the Property is not materially damaged, then Purchaser shall not have the right to terminate this Agreement, but Seller shall at its cost repair the damage before the Closing in a manner reasonably satisfactory to Purchaser or if repairs cannot be completed before the Closing, credit Purchaser at Closing for the reasonable cost to complete the repair. "**Material damage**" and "**Materially damaged**" means damage reasonably exceeding two percent (2%) of the Purchase Price to repair. The terms of this Section 4.4 shall apply to the transaction set out in this Agreement in lieu of the terms of the Uniform Vendor and Buyer Risk Act, Texas Property Code, Section 5.007.

4.5 **Condemnation**. Seller shall immediately notify Purchaser of any proceedings in eminent domain that are contemplated, threatened or instituted by anybody having the power of eminent domain. Within ten (10) days after Purchaser receives written notice from Seller of proceedings in eminent domain that are contemplated, threatened or instituted by anybody having the power of eminent domain (and if necessary the Closing Date shall be extended to give Purchaser the full 10-day period to make such election) Purchaser may: (i) terminate this Agreement and the Earnest Money (less the Independent Contract Consideration) shall be immediately returned to Purchaser; or (ii) proceed under this Agreement, in which event Seller shall, at the Closing, assign to Purchaser its entire right, title and interest in and to any condemnation award, and Purchaser shall have the sole right during the pendency of this Agreement to negotiate and otherwise deal with the condemning authority in respect of such matter. The terms of this Section 4.5 shall apply to the transaction set out in this Agreement in lieu of the terms of the Uniform Vendor and Buyer Risk Act, Texas Property Code, Section 5.007.

4.6 **Operation**. Except as Purchaser may otherwise consent in writing, until the Closing Date, unless this Agreement is sooner terminated, Seller shall: (i) carry on the business of the Property in the ordinary course and in a manner consistent with Seller's prior practices; (ii) maintain the Property in its present condition and repair, ordinary wear and tear excepted and subject to the terms of Article 4 hereof; (iii) maintain the existing insurance policies for the Property and the operation thereof (and any replacements thereof) in full force and effect and (iv) not grant to any third party any interest in the Property or any part thereof or further voluntarily encumber the Property.

4.7 **Payment of Bills**. Seller agrees that between the Effective Date and the Closing or any earlier termination of this Agreement, it shall, at its sole cost and expense, except for (i) any

-10-

DocuSign Envelope ID: 48899B3D-A6D2-4456-8A80-2D3401B0714C

item to be prorated at the Closing in accordance with this Agreement, (ii) bills or invoices that are not received by Seller at least ten (10) days prior to the Closing Date and (iii) bills or invoices that are being contested in good faith, at or prior to the Closing Date, pay all bills or invoices arising out of or in connection with or resulting from Seller's use, ownership or operation of the Property up to and on the day before the Closing Date. Notwithstanding the foregoing, Seller will remain obligated, after the Closing, for the payment of all bills and invoices arising out of or in connection with or resulting from Seller's use, ownership or operation of the Property prior to the Closing Date.

   4.8     **Zoning.**  Seller agrees that between the Effective Date and the Closing or any earlier termination of this Agreement, it shall, at its sole cost and expense, without Purchaser's prior written consent, not restrict, rezone, file or modify any development plan or zoning plan or establish or participate in the establishment of any improvement district with respect to all or any portion of the Property.

   4.9     **Litigation.**  Following Seller's receipt of notice, Seller will advise Purchaser promptly of any litigation or any arbitration proceeding or any administrative hearing (including condemnation) before any governmental agency which concerns or affects the Property in any manner and which is instituted after the Effective Date.

### ARTICLE 5:  CLOSING

   5.1     **Closing.**  The consummation of the transaction contemplated herein ("**Closing**") shall occur on the Closing Date at the offices of the Title Company or at such other location to which the parties may mutually agree.

   5.2     **Conditions to Parties' Obligations to Close.**  In addition to all other conditions set forth herein, the obligation of Seller, on the one hand, and Purchaser, on the other hand, to consummate the transactions contemplated hereunder shall be contingent upon the following:

             (a)     Each of the representations and warranties contained herein shall be true and correct as of the Effective Date and on the Closing Date. For purposes of this clause (a), a representation shall be false if the factual matter that is the subject of the representation is false notwithstanding any lack of knowledge or notice to the party making the representation;

             (b)     As of the Closing Date, each party shall have performed in all material respects all of the obligations, covenants and deliveries required of each party hereunder;

             (c)     There shall exist no actions, suits, arbitrations, claims, attachments, proceedings, assignments for the benefit of creditors, insolvency, bankruptcy, reorganization or other proceedings, pending or threatened against either party that would materially and adversely affect the operation or value of the Property or either party's ability to perform its obligations under this Agreement;

-11-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

(d)     There shall exist no pending or threatened action, suit or proceeding with respect to either party before or by any court or administrative agency which seeks to restrain or prohibit, or to obtain damages or a discovery order with respect to, this Agreement or the consummation of the transactions contemplated hereby.

So long as a party is not in default hereunder, if any condition to such party's obligation to proceed with the Closing hereunder has not been satisfied as of the Closing Date, such party may, in its sole discretion, terminate this Agreement by delivering written notice to the other party on or before the Closing Date, or elect to close, notwithstanding the non-satisfaction of such condition, in which event such party shall be deemed to have waived any such condition. In the event such party elects to close, notwithstanding the non-satisfaction of such condition, there shall be no liability on the part of any other party hereto for breaches of representations and warranties of which the party electing to close had actual knowledge at the Closing. Nothing in the foregoing shall relieve a party from any liability it would otherwise have if the failure of a party to satisfy a condition also constitutes a default by such party hereunder.

5.3     **Conditions to Purchaser's Obligations to Close.** Purchaser shall not be obligated to close this transaction if as of the Closing Date, there is any condition applicable to the Property that materially differs from that which existed on the last day of the Due Diligence Period.

5.4     **Seller's Deliveries in Escrow.** At least one business day prior to the Closing Date, Seller shall deliver in escrow to the Title Company the following:

(a)     **Deed.** A special warranty deed in the form of **Exhibit A** attached hereto, executed and acknowledged by Seller, conveying to Purchaser good and indefeasible fee simple title to the Real Property, subject only to the Permitted Exceptions (the "**Deed**");

(b)     **Assignment of Service Contracts and Personal Property.** An Assignment of Service Contracts and Personal Property in the form of **Exhibit B** attached hereto, executed and acknowledged by Seller, vesting in Purchaser good title to the property described therein free of any claims except for the Permitted Exceptions to the extent applicable;

(c)     **State Law Disclosures.** Such disclosures and reports, required by applicable state and local law in connection with the conveyance of real property;

(d)     **FIRPTA.** A Foreign Investment in Real Property Tax Act affidavit executed by Seller. If Seller fails to provide the necessary affidavit and/or documentation of exemption on the Closing Date, Purchaser may proceed with withholding provisions as provided by law;

(e)     **Authority.** Evidence of existence, organization, and authority of Seller and the authority of the person executing documents on behalf of Seller reasonably satisfactory to Purchaser and the Title Company; and

-12-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

(f)     **Additional Documents**. Any additional documents that Purchaser or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

5.5     **Purchaser's Deliveries in Escrow**. Except as specified below, at or prior to the Closing, Purchaser shall deliver in escrow to the Title Company the following:

(a)     **Purchase Price**. On the Closing Date, the Purchase Price, less the Earnest Money that is applied to the Purchase Price, plus or minus applicable prorations, deposited by Purchaser with the Title Company in immediate, same-day federal funds wired for credit into the Title Company's escrow account;

(b)     **Assignment of Service Contracts and Personal Property**. Execution by Purchaser of the Assignment of Service Contracts and Personal Property;

(c)     **State Law Disclosures**. Such disclosures and reports required by applicable state and local law in connection with the conveyance of real property; and

(d)     **Additional Documents.** Any additional documents that Seller or the Title Company may reasonably require for the proper consummation of the transaction contemplated by this Agreement.

5.6     **Closing Statements/Escrow Fees**. At least one (1) business day prior to the Closing Date, Seller and Purchaser shall deposit with the Title Company executed closing statements consistent with this Agreement in form required by the Title Company. The Title Company's escrow fee shall be paid one-half by Seller and one-half by Purchaser.

5.7     **Title Policy**. The Title Company shall deliver to Purchaser the Title Policy pursuant to **Section 3.4**.

5.8     **Possession**. Seller shall deliver possession of the Property to Purchaser at the Closing subject only to the Permitted Exceptions.

5.9     **Obligations under Service Contracts**. On or prior to the expiration of the Due Diligence Period, Purchaser shall notify Seller in writing of which of the Service Contracts Purchaser does not wish to assume at Closing (the "**Rejected Contracts**") and Seller shall, at or before Closing, terminate all Rejected Contracts; provided that Seller shall only be obligated to terminate those Rejected Contracts that Seller may terminate at or prior to Closing without the payment of any penalty or fee in connection with such termination, unless Purchaser agrees to pay in full and assume responsibility for any such penalty or fee. Seller warrants that it shall have performed, and shall indemnify Purchaser from and against any liability for nonperformance and nonpayment of, its obligations and liabilities under the Service Contracts that are assumed by Purchaser up to and including the Closing Date, and Purchaser agrees to perform Seller's obligations under such Service Contracts accruing after the Closing Date. This obligation shall survive the Closing Date.

-13-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

5.10    **Delivery of Books and Records**. Immediately after the Closing, Seller shall deliver to Purchaser the following (i) original Permits in Seller's possession or control and (ii) copies or originals of all books and records of account, contracts, copies of correspondence with suppliers, receipts for deposits, unpaid bills and other papers or documents which pertain to the Property together with all advertising materials, booklets, keys and other items, if any, used in the operation of the Property.

5.11    **Close of Escrow**. Upon satisfaction or completion of the applicable foregoing conditions and deliveries, the parties shall direct the Title Company to immediately record and deliver the documents described above to the appropriate parties and make disbursements according to the closing statements executed by Seller and Purchaser.

## ARTICLE 6: PRORATIONS

6.1    **Prorations**. The items in this Section 6.1 shall be prorated between Seller and Purchaser as of the Closing Date (unless otherwise provided herein), with Purchaser being responsible for such items beginning on the Closing Date:

(a)    **Taxes and Assessments.** General real estate taxes and assessments imposed by governmental authority ("**Taxes**") and any assessments by private covenant constituting a lien or charge on the Property for the then-current calendar year or other current tax period not yet due and payable. If the Closing occurs prior to the receipt by Seller of the tax bill for the calendar year or other applicable tax period in which the Closing occurs, Purchaser and Seller shall prorate Taxes for such calendar year or other applicable tax period based upon the most recent ascertainable assessed values and tax rates. If the Property has not been assessed on a completed basis but will be for the current year or other applicable tax period, the parties shall complete the proration based upon an assessed value equal to the Purchase Price. All taxes and interest that become due as a penalty, whether retroactive or not, imposed due to the transfer of the Property shall be paid by Seller, other than with respect to rollback taxes incurred as a result of Purchaser's use of the Property before or after Closing. If this sale or Purchaser's use of the Property after Closing results in additional assessments for periods before Closing, the assessments will be the obligation of Purchaser. If Seller changes the use of the Property before Closing or if a denial of a special valuation on the Property claimed by Seller results in the assessment of additional taxes, penalties or interest (assessments) for periods before Closing, the assessments will be the obligation of the Seller.

(b)    **Utility Charges**. Electric, water, sewer, gas, fuel, waste collection and removal and other utility and operating expenses relating to the Property shall be prorated as of the day preceding the Closing Date. It shall be assumed that the utility charges were incurred uniformly during the billing period in which the Closing occurs. If bills for the applicable period are unavailable, the amounts of such charges will be estimated based upon the latest known bills. Notwithstanding the foregoing, to the extent possible, Seller and Purchaser shall request the utility companies to read the meters as of the date preceding the

-14-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

Closing Date, and Seller shall be responsible for all charges incurred through the day preceding the Closing Date. All prepaid deposits for utilities shall be refunded to Seller at the time of closing by the utility companies, and it shall be Purchaser's responsibility to make any utility deposits required for service. Notwithstanding the foregoing, Purchaser shall be solely responsible for ensuring that utility services including water, gas, electrical, telephone, storm water drainage, storm water detention (if necessary) and sanitary sewer will be available in capacities sufficient to serve Purchaser's intended use of the Property as developed at no expense to Seller.

(c)    Proration Adjustment. After receipt of final Taxes and other bills, Purchaser shall prepare and present to Seller a calculation of the proration of such Taxes and other items, based upon the actual amount of such items charged to or received by the parties for the year or other applicable fiscal period. The parties shall make the appropriate adjusting payment between them within 30 days after presentment to Seller of Purchaser's calculation. Seller may inspect Purchaser's books and records related to the Property to confirm the calculation.

6.2    **Sales, Transfer, and Documentary Taxes.**  Seller shall pay all sales, gross receipts, compensating, stamp, excise, documentary, transfer, deed or similar taxes and fees imposed in connection with this transaction under applicable local or state law.

6.3    **Commissions**. Seller and Purchaser hereby represent and warrant to each other that other than the brokers listed in Section 1.1(i) hereof they have not dealt with any real estate broker, sales person or finder in connection with this transaction. Upon Closing, Seller agrees to pay Purchaser's Broker a commission of five percent (5%) of the Purchase Price. Seller will indemnify, defend (with counsel reasonably acceptable to Purchaser) and save Purchaser harmless from and against any commissions or fees payable to Purchaser's Broker and any commissions or fees alleged to be payable by any other broker, finder or sales person engaged or alleged to be engaged by, through or under Seller. Purchaser will indemnify, defend (with counsel reasonably acceptable to Seller) and save Seller harmless from and against any commissions or fees alleged to be payable to any broker, finder or sales person engaged or alleged to be engaged by, through or under Purchaser (other than Purchaser's Broker).

6.4    **Survival**. The provisions of this Article 6 shall survive the Closing.

## ARTICLE 7: REPRESENTATIONS AND WARRANTIES

7.1    **Seller's Representations and Warranties**. As a material inducement to Purchaser to execute this Agreement and consummate this transaction, Seller represents and warrants to Purchaser that:

(a)    Authority.  Seller is qualified to do business in the state in which the Property is located.  Seller has the full right and authority and has obtained any and all consents required therefor to enter into this Agreement, consummate or cause to be consummated the sale.  This Agreement and all of the documents to be delivered by Seller

-15-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

at the Closing have been and will be authorized and properly executed and will constitute the valid and binding obligations of Seller, enforceable in accordance with their terms.

(b)     Conflicts and Pending Actions or Proceedings. There is no agreement to which Seller is a party or, to Seller's knowledge, binding on Seller which is in conflict with this Agreement. There is no action or proceeding pending or, to Seller's knowledge, threatened against the Property, including, without limitation, any condemnation or re-zoning proceedings, or which challenges or impairs Seller's ability to execute or perform its obligations under this Agreement. Seller has not received written notice of any suits or claims pending or threatened with respect to or in any manner adversely affecting the Property, nor has Seller received written notice of any circumstances which should or could reasonably form the basis for any such suits or claims which have not otherwise been disclosed in writing to Purchaser by Seller.

(c)     Contractors and Suppliers. All contractors, subcontractors, suppliers, architects, engineers, and others who have performed services, labor, or supplied material in connection with Seller's acquisition, development, ownership, and management of the Property have been paid in full and all liens arising therefrom (or claims which with the passage of time or notice or both, could mature into liens) have been satisfied and released. There are no unrecorded liens which could affect the Property.

(d)     Service Contracts and Specified Documents. The Specified Documents provided pursuant to Article 2, including, without limitation, the list of Service Contracts, and all other information provided by Seller, are true, correct, and complete. Other than the Service Contracts delivered as part of the Specified Documents and the Permitted Exceptions, there are no contracts, agreements or other documents that will affect the Property from and after the Closing. Neither Seller nor, to Seller's knowledge, any other party is in default under any Service Contract or in default or violation of any Permit.

(e)     Notice of Violations or Defects. Seller has received no written notice: that the Property or the use thereof violates any governmental law or regulation or any covenants or restrictions encumbering the Property; of any material physical defect in the Property; or from any insurance company or underwriter of any defect that would materially adversely affect the insurability of the Property or cause an increase in insurance premiums.

(f)     Environmental. Seller has no knowledge of (i) the presence of any Hazardous Materials (as hereinafter defined) in, on or under the Real Property or (ii) any noncompliance or violation of Environmental Laws (as hereinafter defined) related to the Real Property or (iii) any environmental lien, charge, assessment, or threatened inclusion of the Real Property into any Super Fund designated cleanup area, or inclusion of the Real Property into any designated environmental area by any governmental body, entity, or agency. The term "Environmental Laws" shall include, without limitation, those laws commonly known as the Clean Air Act, the Clean Water Act, and the Water Quality Act of 1987; the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"); the Marine Protection, Research, and Sanctuaries Act; the National Environmental Policy Act; the

-16-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

Noise Control Act; the Occupational Safety and Health Act; the Resource Conservation and Recovery Act ("**RCRA**"), as amended by the Hazardous and Solid Waste Amendments of 1984; the Safe Drinking Water Act; the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"), as amended by the Superfund Amendments and Reauthorization Act, and the Emergency Planning and Community Right-to-Know Act; the Toxic Substance Control Act ("**TSCA**"); and the Atomic Energy Act; as each of the same may be amended, with implementing regulations and guidelines. Environmental Laws shall also include all state, regional, county, municipal and other local laws, regulations and ordinances that are equivalent or similar to the federal laws recited above or purport to regulate Hazardous Materials. The term "**Hazardous Materials**" shall include, without limitation, any hazardous substance, pollutant, or contaminant regulated under CERCLA; oil and petroleum products and natural gas, natural gas liquids, liquefied natural gas, and synthetic gas usable for fuel; pesticides regulated under FIFRA; asbestos, polychlorinated biphenyls, and other substances regulated under TSCA; source material, special nuclear material, and by-product materials regulated under the Atomic Energy Act; and industrial process and pollution control wastes to the extent regulated under applicable Environmental Laws.

(g)     <u>Withholding Obligation</u>.  Seller's sale of the Property is not subject to any federal, state or local withholding obligation of Purchaser under the tax laws applicable to Seller or the Property.

(h)     <u>ERISA</u>.  Seller is not and is not acting on behalf of an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, a "plan" within the meaning of Section 4975 of the Internal Revenue Code of 1986, as amended or an entity deemed to hold "plan assets" within the meaning of 29 C.P.R.§ 2510.3101 of any such employee benefit plan or plans.

(i)     <u>Consent</u>.  No consent of any third party is required in order for Seller to enter into this Agreement and perform Seller's obligations hereunder or thereunder.

(j)     <u>Third Party Possession</u>.  There are no parties in possession of any part of the Property, and there are no written leases or other rental agreements, licenses or subleases affecting any part of the Property.

(k)     <u>Zoning</u>.  Seller has not taken any action, the object of which would be to change the present zoning of or other land-use limitations upon the Property, or any portion thereof, or its potential use, and Seller has not received written notice of any pending proceedings, the object of which would be to change the present zoning or other land-use limitations applicable to the Property.

(l)     <u>Purchase Rights</u>.  No party (other than Purchaser) has a purchase option, right of first refusal or other right to purchase the Property.

-17-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

(m)     OFAC.  Neither Seller, nor any owner of an interest in Seller, appears on the Specially Designated Nationals and Blocked Persons list maintained by the Office of Foreign Assets Control of the United States Department of the Treasury, or is a person or entity with whom Purchaser is otherwise restricted from doing business under applicable laws relating to national security (such as the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, commonly known as the "USA Patriot Act") and executive orders and regulations relating to such applicable laws.

7.2     **Purchaser's Representations and Warranties**.     Purchaser represents and warrants to Seller that:

(a)     Organization and Authority.  Purchaser has the full right and authority and has obtained any and all consents required therefor to enter into this Agreement, consummate or cause to be consummated the purchase of the Property.  This Agreement and all of the documents to be delivered by Purchaser at the Closing have been and will be authorized and properly executed and will constitute the valid and binding obligations of Purchaser, enforceable in accordance with their terms.

(b)     Conflicts and Pending Action.  There is no agreement to which Purchaser is a party or to Purchaser's knowledge binding on Purchaser which is in conflict with this Agreement.  There is no action or proceeding pending or to Purchaser's knowledge, threatened, against Purchaser or which challenges or impairs Purchaser's ability to execute or perform its obligations under this Agreement.

7.3     **Survival of Representations and Warranties**.     The representations and warranties set forth in this Article 7 are made as of the Effective Date and are remade as of the Closing Date and shall not be deemed to be merged into or waived by the instruments of Closing.  Each party agrees to defend and indemnify the other against any claim, liability, damage or expense asserted against or suffered by such other party arising out of the breach or inaccuracy of any such representation or warranty.  Notwithstanding the foregoing or anything herein to the contrary, the indemnity set forth herein shall survive until the expiration of any applicable statute of limitations affecting the matters set forth therein. **DEFAULT AND REMEDIES**

8.1     **Seller's Default**.  If this transaction fails to close as a result of Seller's default, Purchaser shall be entitled, as its sole and exclusive remedy, to (i) terminate this Agreement, receive the Earnest Money (less the Independent Contract Consideration), and recover from Seller all of Purchaser's out-of-pocket costs and expenses incurred in connection with this Agreement or (ii) enforce specific performance of Seller's obligations hereunder.  Notwithstanding anything to the contrary contained in the foregoing, in the event the equitable remedy of specific performance is not available due to the Seller no longer owning title to the Property at Closing, Purchaser may seek aggregate actual damages in an amount not to exceed ten percent (10%) of the Purchase Price. Seller shall not refuse to consent to the release of the Earnest Money to Purchaser if required to do so by the terms of this Agreement.  In the event of a breach of this Section 8.1, Purchaser shall be

-18-

DocuSign Envelope ID: 49899B3D-A6D2-4456-8A80-2D3401B0714C

entitled to all fees, costs and expenses (including reasonable attorneys' fees), and the amount of any such fees, costs and expenses awarded to Purchaser shall be in addition to any amounts that Purchaser is provided hereunder. This <u>Section 8.1</u> shall survive the termination of this Agreement.

8.2    <u>Purchaser's Default</u>.  If this transaction fails to close due to the default of Purchaser, then Seller's sole and exclusive remedy shall be to terminate this Agreement and retain the Earnest Money as agreed liquidated damages, Seller waiving all other rights or remedies in the event of such default by Purchaser.  The parties acknowledge that Seller's actual damages in the event of such default by Purchaser under this Agreement will be difficult to ascertain, and that such liquidated damages represent the parties' best estimate of such damages.  Purchaser shall not refuse to consent to the release of the Earnest Money to Seller if required to do so by the terms of this Agreement.

## ARTICLE 9:  MISCELLANEOUS

9.1    <u>Parties Bound</u>.  Purchaser may assign this Agreement at any time prior to Closing without the prior consent of Seller.

9.2    <u>Headings</u>.    The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

9.3    <u>Invalidity and Waiver</u>.  If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and effect shall be given to the intent manifested by the portion held invalid or inoperative.  The failure by either party to enforce against the other any term or provision of this Agreement shall be deemed not to be a waiver of such party's right to enforce against the other party the same or any other such term or provision.

9.4    <u>Governing Law</u>.  This Agreement and said other instruments shall, in all respects, be governed, construed, applied, and enforced in accordance with the law of the state in which the Real Property is located.

9.5    <u>Survival</u>.  The provisions of this Agreement that contemplate performance after the Closing and the obligations of the parties not fully performed at the Closing shall survive the Closing and shall not be deemed to be merged into or waived by the instruments of Closing.

9.6    <u>No Third Party Beneficiary</u>.  This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions or remedies to any person or entity as a third party beneficiary, decree, or otherwise.

9.7    <u>Entirety and Amendments</u>.  This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Property.  This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

-19-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

9.8    **Time.** Time is of the essence of this Agreement.  However, if this Agreement requires any act to be done or action to be taken on a date which is a Saturday, Sunday, legal holiday, the Friday after Thanksgiving or Christmas Eve, such act or action shall be deemed to have been validly done or taken if done or taken on the next succeeding day which is not a Saturday, Sunday, legal holiday, the Friday after Thanksgiving or Christmas Eve, and the successive periods shall be deemed extended accordingly.  The term "**business day**" excludes Saturdays, Sundays, legal holidays, the Friday after Thanksgiving and Christmas Eve.

9.9    **Confidentiality.** Seller shall make no public announcement or disclosure of the existence of this Agreement or any information related to this Agreement to outside brokers or other third parties, before or after the Closing, without the prior written specific consent of Purchaser.  Seller may make disclosure of this Agreement to its lenders, creditors, officers, employees and agents as necessary to perform of its obligations hereunder and to Seller's attorneys and accountants.

9.10    **Attorneys' Fees.**  Should either party employ attorneys to enforce any of the provisions hereof, the party losing in any final judgment agrees to pay the prevailing party all reasonable costs, charges and expenses, including attorneys' fees, expended or incurred in connection therewith.

9.11    **Notices.**  All notices required or permitted hereunder shall be in writing and shall be served on the parties at the following address:

If to Seller:        Keyvan Parsa
                     810 N Kansas St.
                     El Paso, TX 79902
                     Phone:  (915) 224-0104
                     Email: klp000@gmail.com

If to Purchaser:     IDEA Public Schools
                     2115 W. Pike
                     Weslaco, Texas 78596
                     Attn: Wyatt J. Truscheit
                     Phone: (956) 377-8046
                     Email: wyatt.truscheit@ideapublicschools.org

With a copy to:      Hunton Andrews Kurth LLP
                     600 Travis Street, Suite 4200
                     Houston, TX 77002
                     Attn: Christopher D. Richardson
                     Phone: (713) 220-4541
                     Email:  ChrisRichardson@huntonak.com

Any such notices shall be either (a) sent by certified mail, return receipt requested, in which case notice shall be deemed delivered three (3) business days after deposit, postage prepaid, in the

-20-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

U.S. Mail, (b) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one business day after deposit with such courier, (c) sent by personal delivery, in which case notice shall be deemed delivered on the date personally delivered as evidenced by a written receipt therefor or (d) sent by email, in which case notice shall be deemed delivered upon confirmation of transmission. The above addresses may be changed by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice. Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.

9.12 **Construction**. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

9.13 **Calculation of Time Periods**. Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designed period of time begins to run is not to be included and the last day of the period so computed is to be included, unless such last day is a Saturday, Sunday or legal holiday, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, or legal holiday. The last day of any period of time described herein shall be deemed to end at 11:59 p.m. Weslaco, Texas, time.

9.14 **Information and Audit Cooperation**. At Purchaser's request, at any time after the Closing, Seller agrees to provide to the Purchaser's designated independent auditor access to the books and records of the Property and all related information regarding the period for which Purchaser is required to have the Property audited under the regulations of the Securities and Exchange Commission, and a representation letter in such form as may be reasonably required by Purchaser or its auditor regarding the books and records of the Property in connection with the normal course of auditing the Property in accordance with generally accepted auditing standards. The terms of this Section 9.14 shall survive Closing.

9.15 **Procedure for Indemnity**. The following provisions govern actions for indemnity under this Agreement. Promptly after receipt by an indemnitee of notice of any claim, such indemnitee will, if a claim in respect thereof is to be made against the indemnitor, deliver to the indemnitor written notice thereof and the indemnitor shall have the right to assume the defense thereof with counsel mutually satisfactory to the parties; provided, however, that an indemnitee shall have the right to retain its own counsel, with the fees and expenses to be paid by the indemnitor, if the indemnitee reasonably believes that representation of such indemnitee by the counsel retained by the indemnitor would be inappropriate due to actual or potential differing interests between such indemnitee and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnitor within a reasonable time of notice of any such claim shall relieve such indemnitor of any liability to the indemnitee under this indemnity only if and to the extent that such failure is prejudicial to its ability to defend such action, and the omission so to deliver written notice to the indemnitor will not relieve it of any liability that it may have to any indemnitee other than under this indemnity. The terms of this Section 9.15 shall survive Closing.

-21-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

9.16 **Execution in Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement. To facilitate execution of this Agreement, the parties may execute and exchange by telephone facsimile, pdf or other electronic imaging technology counterparts of the signature pages.

9.17 **Section 1031 Exchange.** Upon Seller's request to Purchaser, Purchaser agrees to reasonably cooperate with Seller so that Seller's transfer of the Property to Purchaser shall, at Seller's election, be accomplished in a manner enabling the transfer to qualify as part of a like-kind exchange of property by Seller within the meaning of Section 1031 of the Internal Revenue Code (a "**Like-Kind Exchange**"). If Seller so elects, Purchaser shall reasonably cooperate with Seller to effect such Like-Kind Exchange, which cooperation shall include, without limitation, taking such actions as Seller reasonably requests to enable such transfer to qualify as part of a Like-Kind Exchange. Upon Purchaser's request to Seller, Seller agrees to reasonably cooperate with Purchaser so that Seller's transfer of the Property to Purchaser shall, at Purchaser's election, be accomplished in a manner enabling the transfer to qualify as part of a Like-Kind Exchange of property by Purchaser. If Purchaser so elects, Seller shall reasonably cooperate with Purchaser to effect such Like-Kind Exchange, which cooperation shall include, without limitation, taking such actions as Purchaser reasonably requests to enable such transfer to qualify as part of a Like-Kind Exchange. Neither party's obligations hereunder shall be increased as a result of the agreements provided in this subsection, and each party shall bear all costs and expenses associated with any Like-Kind Exchange initiated for such party's benefit.

9.18 **Further Assurances.** In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by Seller to Purchaser at Closing, Seller agrees to perform, execute and deliver, but without any obligation to incur any additional liability or expense, on or after the Closing any further deliveries and assurances as may be reasonably necessary to consummate the transactions contemplated hereby or to further perfect the conveyance, transfer and assignment of the Property to Purchaser. The terms of this <u>Section 9.18</u> shall survive Closing.

9.19 **Confidentiality.** Purchaser shall keep confidential the existence and the terms of this Agreement, except as to its employees, consultants, attorneys, accountants, lenders and other persons or entities (collectively, the "**Purchaser Parties**") who may be involved in conducting the due diligence related to the transactions contemplated by this Agreement. Purchaser and Purchaser Parties who receive such confidential information shall hold in strictest confidence all data and information obtained with respect to the Property and/or Seller or its business, whether obtained before or after the execution and delivery of this Agreement, and shall not disclose the same to others; provided, however, that it is understood and agreed that (i) Purchaser may disclose such data and information to the Purchaser Parties provided that Purchaser advises such persons of the confidential nature of such information and in all events Purchaser shall be responsible for each such person's obligation to keep confidential the data and information provided to them pursuant to this Agreement, and (ii) Purchaser's and the Purchaser Parties' obligation to keep such information confidential shall terminate as of the earlier to occur of the consummation and closing of the transaction contemplated by this Agreement or the expiration of twelve (12) months after

-22-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

termination of this Agreement. Purchaser and the Purchaser Parties shall use Seller's confidential information only for purposes of evaluating whether to consummate the transactions contemplated by this Agreement, and for no other purposes. Notwithstanding the foregoing, each party consents to any disclosure of this Agreement which the other party reasonably believes is required by law, by the public disclosure obligations required by the U.S. Securities and Exchange Commission, by Ontario Securities Commission or which is recommended in good faith by counsel to such other party. In the event of a breach or threatened breach by Purchaser and/or the Purchaser Parties of this Section 9.19, Seller shall be entitled to an injunction restraining Purchaser and/or the Purchaser Parties from disclosing, in whole or in part, such confidential information. The provisions of this Section 9.19 shall survive the termination of this Agreement, but shall not survive Closing.

9.20    **Exculpation of the Seller and Purchaser.**  Notwithstanding anything to the contrary contained herein, the partners or members of the Seller or Purchaser, as applicable, and the members and partners of such members and the trustees, officers, directors, employees, agents and security holders of Seller or Purchaser, as applicable, assume no personal liability for any obligations entered into on behalf of Seller or Purchaser, as applicable, and his, her or its individual assets shall not be subject to any claims of any person relating to such obligations. The foregoing shall govern any direct and indirect obligations of Seller or Purchaser under this Agreement. The provisions of this Section 9.20 shall survive the Closing and any termination of this Agreement.

## ARTICLE 10: EARNEST MONEY PROVISIONS

10.1    **Investment and Use of Funds.**  The Title Company shall invest the Earnest Money in government insured interest-bearing accounts satisfactory to Purchaser, shall not commingle the Earnest Money with any funds of the Title Company or others, and shall promptly provide Purchaser and Seller with confirmation of the investments made. If the Closing under this Agreement occurs, the Title Company shall deliver the Earnest Money to, or upon the instructions of, Purchaser on the Closing Date. Provided such supplemental escrow instructions are not in conflict with this Agreement as it may be amended in writing from time to time, Seller and Purchaser agree to execute such supplemental escrow instructions as may be appropriate to enable Title Company to comply with the terms of this Agreement. Seller and Purchaser designate the Title Company as the "Reporting Person" for the transaction pursuant to Section 6045(e) of the United States Internal Revenue Code 1986, as amended.

10.2    **Termination.**  If Purchaser elects to terminate the Agreement, Title Company shall pay the entire Earnest Money (minus the Independent Contract Consideration) to Purchaser one business day following receipt of Purchaser's termination notice, as applicable (as long as the current investment can be liquidated in one day) and this Agreement shall thereupon terminate. No notice to Title Company from Seller shall be required for the release of the Earnest Money to Purchaser by Title Company. The Earnest Money shall be released and delivered to Purchaser from Title Company upon Title Company's receipt of the purchaser's termination notice, as applicable, despite any objection or potential objection by Seller. Seller agrees it shall have no right to bring any action against Title Company which would have the effect of delaying,

-23-

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

preventing, or in any way interrupting Title Company's delivery of the Earnest Money to Purchaser pursuant to this Article, any remedy of Seller being against Purchaser, not Title Company.

10.3  **Other Terminations.**  Upon a termination of this Agreement (other than pursuant to Article 2 of this Agreement or a default under this Agreement), either party to this Agreement (the "**Terminating Party**") may give written notice to the Title Company and the other party (the "**Non-Terminating Party**") of such termination and the reason for such termination. Such request shall also constitute a request for the release of the Earnest Money to the Terminating Party. The Non-Terminating Party shall then have five business days in which to object in writing to the release of the Earnest Money to the Terminating Party. If the Non-Terminating Party provides such an objection, then the Title Company shall retain the Earnest Money until it receives written instructions executed by both Seller and Purchaser as to the disposition and disbursement of the Earnest Money, or until ordered by final court order, decree or judgment, which is not subject to appeal, to deliver the Earnest Money to a particular party, in which event the Earnest Money shall be delivered in accordance with such notice, instruction, order, decree or judgment.

10.4  **Interpleader.**  Seller and Purchaser mutually agree that in the event of any controversy regarding the Earnest Money, other than termination of this Agreement by Purchaser pursuant to Article 2 of this Agreement, unless mutual written instructions are received by the Title Company directing the Earnest Money's disposition, the Title Company shall not take any action, but instead shall await the disposition of any proceeding relating to the Earnest Money or, at the Title Company's option, the Title Company may interplead all parties and deposit the Earnest Money with a court of competent jurisdiction in which event the Title Company may recover all of its court costs and reasonable attorneys' fees. Seller or Purchaser, whichever loses in any such interpleader action, shall be solely obligated to pay such costs and fees of the Title Company, as well as the reasonable attorneys' fees of the prevailing party in accordance with the other provisions of this Agreement.

10.5  **Liability of Title Company.**  The parties acknowledge that the Title Company is acting solely as a stakeholder at their request and for their convenience, that the Title Company shall not be deemed to be the agent of either of the parties, and that the Title Company shall not be liable to either of the parties for any action or omission on its part taken or made in good faith, and not in disregard of this Agreement, but shall be liable for its negligent acts and for any loss, cost or expense incurred by Seller or Purchaser resulting from the Title Company's mistake of law respecting the Title Company's scope or nature of its duties. Seller and Purchaser shall jointly and severally indemnify and hold the Title Company harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of the Title Company's duties hereunder, except with respect to actions or omissions taken or made by the Title Company in bad faith, in disregard of this Agreement or involving negligence on the part of the Title Company.

[SIGNATURES SET FORTH ON NEXT PAGE]

-24-

DocuSign Envelope ID: 49899B3D-A6D2-4456-8A80-2D3401B0714C

106354.0000010 EMF_US 78132740v3

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the day and year written below.

Seller:

**MONTOYA PARK PLACE INC.**, a Texas corporation

By: _Albert Flores_

Name: Albert Flores

Title: Director

Dated: 05-07-2020

Purchaser:

**IDEA PUBLIC SCHOOLS**, a Texas non-profit corporation

By: _Wyatt Truscheit_

Name: Wyatt J. Truscheit

Title: Chief Financial Officer

Dated: 5/30/2020

[Signature Page to Agreement of Purchase and Sale]

DocuSign Envelope ID: 49899B3D-A6D2-4456-8A80-2D3401B0714C

## TITLE COMPANY'S AGREEMENT AND RECEIPT

Escrow Agent has executed this Agreement in order to agree that Title Company shall act as escrow agent with respect to and hold in escrow the Earnest Money and the interest earned thereon, and shall disburse the Earnest Money and the interest earned thereon, pursuant to this Agreement.

ESCROW AGENT:

By: _____

Name: Travis Joel Smith

Title: V.P., Commercial Escrow Manager

Dated: June 1, 2020

[Title Company's Agreement and Receipt]

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

## AGREEMENT OF PURCHASE AND SALE

### EXHIBITS

A    Special Warranty Deed

B    Assignment of Service Contracts and Personal Property

DocuSign Envelope ID: 49699B3D-A8D2-4456-8A80-2D3401B0714C

## EXHIBIT A

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

## SPECIAL WARRANTY DEED

STATE OF _____ §

§        KNOW ALL MEN BY THESE PRESENTS THAT:

COUNTY OF _____ §

THAT _____, a _____(hereinafter called "<u>Grantor</u>"), for and in consideration of the sum of TEN AND NO/100 Dollars ($10.00) and other good and valuable consideration in hand paid by _____, a _____ (hereinafter called "*<u>Grantee</u>*"), whose mailing address is _____, the receipt and sufficiency of which are hereby acknowledged, has GRANTED, SOLD AND CONVEYED and by these presents does GRANT, SELL AND CONVEY unto Grantee that certain real property situated in _____ County, _____ and more particularly described on <u>**Exhibit A**</u> attached hereto and made a part hereof for all purposes (the "<u>Land</u>"), together with (i) all and singular the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances therein or in anywise appertaining to the Land, (ii) all right, title and interest to all minerals, oil, gas and other hydrocarbon substances thereon or thereunder, (iii) all air, water, riparian and solar rights related thereto and (iv) all right, title, and interest of Seller in and to all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining the Land (the Land, together with any and all of the related improvements, appurtenances, rights and interests referenced in items (i) through (iv) above are herein collectively referred to as the "<u>Property</u>").

TO HAVE AND TO HOLD the Property, together with all and singular the rights and appurtenances thereto in any wise belonging, unto Grantee, its successors and assigns forever, subject to the matters described on <u>**Exhibit B**</u> attached hereto (collectively, the "<u>Permitted Exceptions</u>") and Grantor does hereby bind itself, its successors and assigns, to WARRANT AND FOREVER DEFEND all and singular the Property, subject to the Permitted Exceptions, unto Grantee, its successors and assigns, against every person whomsoever lawfully claiming or to claim the same or any part thereof.

All ad valorem taxes and assessments for the Property for the year in which this Deed is executed have been prorated by the parties hereto and Grantee hereby expressly assumes liability for the payment thereof. If such proration was based upon an estimate of such taxes and assessments for such year, then upon demand the parties hereto shall promptly and equitably adjust all such taxes and assessments as soon as actual figures for the Property for such year are available.

*[Signature and Acknowledgement Page Follows]*

Exhibit A – Page 1

DocuSign Envelope ID: 49699B3D-A6D2-4458-8A80-2D3401B0714C

EXECUTED to be effective for all purposes as of the _____ day of _____, 20\_\_.

*"Grantor"*

_____, a _____

By: _____

Name: _____

Title: _____

STATE OF _____ §
§
COUNTY OF _____ §

This instrument was acknowledged before me on this _____ day of _____, 20\_\_, by _____, as _____ of _____, on behalf of said _____.

[S E A L]

Notary Public, State of _____

_____
Printed Name of Notary

My Commission Expires: _____

Exhibit A – Page 2

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

## **EXHIBIT B**

### **ASSIGNMENT OF SERVICE CONTRACTS AND PERSONAL PROPERTY**

This Assignment of Service Contracts and Personal Property (this "Assignment") is executed to be effective as of_____, 20___ (the "Effective Date") and delivered pursuant to that certain Agreement of Purchase and Sale ("Agreement") dated _____ _____by and between _____ ("Seller") and _____ ("Purchaser") covering the real property described in **Exhibit A** attached hereto ("Real Property").

1.      Assignment and Assumption.  For good and valuable consideration Seller hereby assigns, transfers, sets over and conveys to Purchaser all Seller's interest, and Purchaser hereby accepts THE FOLLOWING, if any (collectively, the "Assigned Property"):

(a)      Intangible Property.  All intangible personal property related to the Real Property, including, without limitation: (i) all trade names and trademarks associated with the Real Property including Seller's rights and interests in the name of the Real Property, (ii) warranties, contract rights related to the construction, operation, ownership, or management of the Real Property (but excluding Seller's obligations thereunder), (iii) governmental permits, approvals and licenses (to the extent assignable) and (iv) telephone exchange numbers (to the extent assignable); and

(b)      Service Contracts.  The management, service, supply, equipment rental, and other contracts related to the Real Property (the "Service Contracts") described in **Exhibit B** attached hereto.

2.      Indemnification.  Seller warrants that it shall have performed, and shall indemnify Purchaser from and against any liability for nonperformance and nonpayment of, its obligations and liabilities under the Service Contracts that are assumed by Purchaser up to and including the Effective Date. Purchaser agrees to perform Seller's obligations under such Service Contracts accruing after the Effective Date and shall indemnify Seller from and against any liability for non-performance and non-payment of its obligations and liabilities under the Service Contracts accruing after the Effective Date.

3.      Warranty.  Seller hereby represents and warrants to Purchaser that it is the owner of any Seller's interest in the Assigned Property, that the Seller's interest in the Assigned Property is free and clear of all liens, charges and encumbrances other than the Permitted Exceptions (as defined in the Agreement), and Seller warrants and defends title to Seller's interest in the Assigned Property, if any, unto Purchaser, its successors and assigns, against any person or entity claiming, or to claim, the same or any part thereof, subject only to the Permitted Exceptions.

4.      Counterparts.  This Assignment may be executed in multiple counterparts, each of which shall constitute an original and all of which when taken together shall constitute one instrument.

5.      Further Assurances.  On or after the Effective Date, Seller and Purchaser will each take all appropriate and commercially reasonable actions and execute (or cause to be executed) all documents, instruments or conveyances of any kind which are reasonably necessary to carry out any of the provisions hereof.

Exhibit B – Page 1

106354.0000010 EMF_US 78132740v3

DocuSign Envelope ID: 49699B3D-A6D2-4456-8A80-2D3401B0714C

IN WITNESS WHEREOF, the undersigned have caused this Assignment to be executed as of the Effective Date.

**Seller:**

By: _____
Name: _____
Title: _____

**Purchaser:**

By: _Wyatt Truscheit_____
Name: _Wyatt Truscheit_____
Title: _Chief Financial Officer_____

Exhibit B – Page 2

# EXHIBIT "M"

IN THE DISTRICT COURT
OF EL PASO COUNTY, TEXAS
327TH JUDICIAL DISTRICT COURT

| | | |
|---|---|---|
| ALBERT FLORES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 2020DCV2997 |
| | § | |
| KEYVAN PARSA, M.D. | § | |
| and MONTOYA PARK PLACE, INC. | § | |
| | § | |
| Defendant. | § | |

## SWORN STATEMENT OF ALBERT FLORES IN SUPPORT OF HIS SECOND AMENDED PETITION (SUIT FOR RESCISSION OF CONTRACT, FOR FRAUD IN A STOCK TRANSACTION, FOR UNJUST ENRICHMENT, AND TO APPOINT A RECEIVER) AND MOTION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTIVE RELIEF

BEFORE ME, the undersigned Notary Public, on this day personally appeared ALBERT FLORES who after being by me first duly sworn, stated upon oath as follows:

"My name is Albert Flores. I am above the age of minority and not under any disability which would prevent me from making this statement under oath. I have direct personal knowledge of the factual statements I am making below, and those statements are true and correct.

"I am the Plaintiff in the foregoing Amended Petition. For a long time I had a co-ownership with a cousin of mine, in a parcel of land at the intersection of Doniphan Drive and Johannsen Street in El Paso's Upper Valley. My cousin got the idea of re-developing the land, which for decades had been the site of an auto wrecking yard. We advertised the availability of the property, and eventually we found an interested buyer, Deborah Jordan, who formed a corporation called JOHANNSEN DEVELOPMENT GROUP, INC. She, too, saw the potential of the property, and she was willing to undertake the environmental remediation, re-zoning, and subdivision planning and engineering, to upgrade the property and make it productive and more valuable. My cousin and I agreed on the financing for most of the purchase price. I agreed he could have the cash portion of the sale, and I took a note for my interest, payable in a lump sum in 6 months. The source of the cash portion of the purchase was a loan from an investor, Dr.

1

KEYVAN PARSA, so my note had to become a second-lien note.

"JOHANNSEN DEVELOPMENT GROUP'S $437,500.00 lump-sum note to me came due on April 6, 2018. They defaulted, and I extended a forbearance agreement to them. After a few installments my note went into default again, so I tried to foreclose it in December of 2018. JOHANNSEN DEVELOPMENT GROUP, INC. got a temporary restraining order. I re-posted for January, 2019, but again was unable to foreclose. I was offered another forbearance agreement, which paid on time for three months, and then I was supposed to have my note paid off in full by March 31, 2019, according to the second forbearance agreement.

"March 31, 2019 came and went, and I did not get paid off. Instead JOHANNSEN DEVELOPMENT GROUP, INC. promised I would be paid off from an imminent re-financing. The refinancing did not close until the 29th day of June, 2019. The refinancing lender was RIGHT IMMIX CAPITAL, INC. (sometimes hereinafter called "RIGHT IMMIX"). They were only willing to lend $800,000.00 on the property, now known as Tract 3 Johannsen Subdivision, and Dr. KEYVAN PARSA was being paid $650,000.00 of that, so all I was going to get was $150,000.00, and I would have to subordinate the balance of my lien on Tract 3 to RIGHT IMMIX CAPITAL'S lien. I agreed to do that.

"Dr. PARSA became a shareholder in JOHANNSEN DEVELOPMENT GROUP, INC. after receiving $650,000.00 from the refinancing. He had to give a personal guaranty to RIGHT IMMIX CAPITAL, in order to persuade them to make the loan. I watched carefully to see if RIGHT IMMIX CAPITAL got regular payments after the refinancing closed, because I didn't want to have my second lien note "cut off" by a RIGHT IMMIX CAPITAL foreclosure. But I got no payments on my second lien note. So I had my attorney make demand again and set up a foreclosure for my note.

"At that point Dr. PARSA sought me out. I learned from him that he had had a falling out with Deborah Jordan, and he was now the sole shareholder in JOHANNSEN DEVELOPMENT GROUP, INC. He sought me out to say he wanted to go halves with me, on payments to RIGHT IMMIX CAPITAL, until my foreclosure was complete and I could dispose of the property in a re-sale. Of course any re-sale by me would have to pay off RIGHT IMMIX CAPITAL. I knew Dr. PARSA had personally guaranteed the RIGHT IMMIX CAPITAL note, and making half-payments each month to RIGHT IMMIX CAPITAL would help him. But I was glad to have help paying RIGHT IMMIX CAPITAL, because their monthly payments were about $8,000.00 each month.

"Dr. PARSA, however, never paid his half of the RIGHT IMMIX CAPITAL monthly payments. Instead he would talk with me about finishing the

2

rest of the subdivision improvements on Tract 3, with him covering the cost, and splitting the profits 50-50. I was non-committal at first, and I was talking with some developers about what to do with Tract 3 after I foreclosed on it.

"I made the high bid on Tract 3 at the foreclosure steps on February 4, 2020. My trustee, who is my regular attorney E.P. BUD KIRK, announced it was a second lien foreclosure and told the bystanders the approximate balance of the RIGHT IMMIX CAPITAL note. My bid was the only bid.

"After the sale Dr. PARSA was anxious to form a corporation into which I would put title to Tract 3. He said his contribution was to come later, in the form of more development money, but no promissory note for that was ever created, to my knowledge. This, even though he was still not paying his half of the monthly debt service to RIGHT IMMIX CAPITAL.

"I signed over a deed of Tract 3 to MONTOYA PARK PLACE, INC. on February 11, 2020. Dr. PARSA never contributed any more money to future development of Tract 3.

"In the weeks before the foreclosure I got a lot of telephone calls from two brokers, Dan Olivas and Manny Jemente. They had a buyer for Tract 3 at $1.495 million and wanted to know if I would sell to their buyer once Tract 3 was mine. Dr. PARSA did not want to sell at that price, once Tract 3 was deeded to the corporation. Finally Dr. PARSA agreed to sell, once the offer from Dan Olivas' client, IDEA CHARTER SCHOOLS, reached $1.95 million. IDEA CHARTER SCHOOLS wanted the location because they needed a campus of that size and because the location was now good for commuting: Montoya Drive had been extended all the way to I-10 by the City of El Paso.

"All this while, there was never any organizational meeting of MONTOYA PARK PLACE, INC. No stock was issued. No by-laws were approved. No officers were elected. A Certificate of Incorporation from the Texas Secretary of State was the only corporate formality. It said Dr. PARSA and I were the Initial Directors, and I was the registered agent.

"The sale of Tract 3 to IDEA CHARTER SCHOOLS closed at WESTSTAR TITLE CO. in El Paso on July 1 and 2. Dr. PARSA went to sign the papers the afternoon before I did. He had given the title company a bank account name and number for MONTOYA PARK PLACE, INC. at Western Heritage Bank in El Paso. I found out about this later when Western Heritage Bank called me to get my Social Security number for the account. I was never given any checks. If I had check-writing privileges, I was never told of any.

"There was a big mistake in the seller's closing statement at WESTSTAR

3

TITLE.  Dr. PARSA had already approved and signed the closing statement and told me everything was in order.  But I noticed when I was at the title company that the money coming to MONTOYA PARK PLACE INC. was roughly $700,000.00 higher than it should have been.  I decided I would talk to Dr. PARSA about the mistake.

"I met with Dr. PARSA the next day.  He told me the wire transfer of about $1.9 million to Western Heritage Bank had been made.  I asked him about the extra $700,000.00 and if that was money that should have gone to UPRISING INVESTMENTS.  (UPRISING INVESTMENTS is the servicing company for RIGHT IMMIX CAPITAL).  He said, "we paid $10,000 for the title insurance, so UPRISING will be taken care of.  That's what the insurance is for."  I told Dr. PARSA I wanted nothing to do with keeping UPRISING's money, because I had subordinated my lien to theirs.  Dr. PARSA as I recall, said he was not willing to point out the mistake at the closing, because he had lost too much money on Tract 3 to Deborah Jordan already.

"I told Dr. PARSA that I just wanted my half of the sale proceeds that should have been left if RIGHT IMMIX had been paid.  That would have been half of about $1.2 million plus half of the $36,000 I had paid to RIGHT IMMIX in monthly payments.  Dr. PARSA asked me to make a list of what I needed right away, and he would get me the rest of my share of the money in "a little while, give me a little time."  I gave him a short list of four items, totaling $280,000.00.  The next day he gave me a cashier's check from WESTERN HERITAGE BANK;  the remitter was MONTOYA PARK PLACE for $280,000.00.  I had also told him when asking for the $280,000.00 that I didn't want to be in a corporation with him anymore, and he should deal with the RIGHT IMMIX payoff problem by himself.  A day or two after handing over the $280,000.00 check to me he called me to his office, where he had on his laptop the "Stock Purchase Agreement" that is attached to my Amended Complaint.

"Then he gave me his personal check in the amount of $50.00 for the "Stock Purchase Agreement."  The $50.00 check was the last money I received from Dr. PARSA, whether on a MONTOYA PARK PLACE, INC. bank account or on his personal bank account.

"The money I had coming, after the $280,000.00, was another $338,000.00 including $18,000.00 for the monthly half-payments Dr. PARSA did not make to RIGHT IMMIX CAPITAL.  $50.00 is not adequate consideration for the promise to pay $338,000.00 "in a little while."  I believe that promise was false when made, that Dr. PARSA knew it was false, and that is why the "Stock Purchase Agreement" makes no mention of the rest of my share of the money.  It was never my intention to give up my right to $338,000.00 for $50.00.

4

"Dr. PARSA has since July 2, 2020 acknowledged the obligation to pay me my last $338,000.00. He told me, after WESTSTAR TITLE COMPANY demanded return of the money to satisfy the RIGHT IMMIX lien, that he had moved the money out of Western Heritage Bank and into Mexico. When I asked when I would get my share, he said, "Don't worry, give me a little time, I'll take care of it." He also offered to use my share of the sale proceeds to buy me an interest in a Mexican medical practice carried on by a Jamaican friend of his. To my knowledge Dr. PARSA has not made any offer to WESTSTAR TITLE or to its underwriter Fidelity National, to defray their loss over the RIGHT IMMIX CAPITAL lien. He has ignored my ongoing requests that he restore the $700,000.00 to the title companies.

In late September of 2020 Dr. PARSA, in one of my visits to him to find out when I would get the rest of my share of the sale proceeds and when he was going to pay back the $700,000.00 to the title companies, had me sign the document that is Exhibit "F" to the foregoing petition. Obviously, he wanted that document signed because he was afraid I might claim half of the money that should have paid the first-lien. I signed the document because I did not want any part of the $700,000.00 for myself. But I very much wanted that money paid to the title companies, so that I would not be sued or prosecuted. I also signed it because there was no disclaimer of the $338,000.00 still owed to me. The document was undated when I signed it. I asked for a copy, which PARSA never sent to me. I see now that the copy that has come to my attorney through Mr. RAGO's, office has been backdated July 2, 2020. That was almost weeks before anyone--RIGHT IMMIX CAPITAL, WESTSTAR TITLE or FIDELITY NATIONAL TITLE--made any claim for the return of the $700,000.00.

"I would like this Court to order a stop to Dr. PARSA'S predatory and inequitable windfalls, by issuing a temporary restraining order, followed by a temporary injunction, and ordering rescission of the "Stock Purchase Agreement," whether for fraud, for grossly inadequate consideration, or for breach of promise, or unconscionable conduct. I am ready to pay back his $50.00 to him. He needs nothing else to put him back where he was. I would then like this Court to appoint a receiver for the corporation MONTOYA PARK PLACE, INC., because it is not paying its debt, because its assets are being secreted and dissipated, because the corporation is deadlocked as between initial directors, and because under Dr. PARSA'S ill-gotten control through naked possession it is oppressing my equitable interests as a shareholder."

"I have read all of the other statements of fact within the foregoing Second Amended Petition. They are truly and correctly stated and within my personal knowledge."

5

FURTHER AFFIANT SAITH NOT.

_____
ALBERT FLORES

SUBSCRIBED AND SWORN TO BEFORE ME, the undersigned Notary Public by ALBERT FLORES on this, the _20_ day of November, 2020, TO CERTIFY WHICH WITNESS MY HAND AND SEAL OF OFFICE.

_____
NOTARY PUBLIC, State of Texas
Notary's Name Typed or Printed:
Samantha Nicole Resendez
My commission expires: Sep 21, 2024

SAMANTHA NICOLE RESENDEZ
Notary Public, State of Texas
My Commission Expires
September 21, 2024
NOTARY ID 13288851-1

6