IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| In re | § | |
| | § | |
| WESTMOUNT GROUP, INC. | § | Case No. 21-30633-HCM-11 |
| | § | |
| Debtor. | § | |

## OBJECTION TO APPLICATION OF STEVEN SATHER
## TO BE EMPLOYED AS ATTORNEY FOR
## THE DEBTOR-IN-POSSESSION

TO THE HONORABLE H. CHRISTOPHER MOTT, UNITED STATES BANKRUPTCY JUDGE:

Now comes the creditor ALBERT FLORES (hereinafter "FLORES") in these Subchapter V of Chapter 11 proceedings, and through his attorney undersigned files this Objection to the Application of STEVEN SATHER to be employed as counsel for the Debtor WESTMOUNT GROUP, INC. in this case, and would show as follows:

1.

Mr. SATHER's representation of WESTMOUNT GROUP, INC. began in State Court proceedings on July 16, 2021 when he filed a Petition in Intervention for WESTMOUNT GROUP, INC. that is hereto attached in copy as Exhibit "A."

## BACKGROUND

2.

The action in the 327th District Court was begun by FLORES as a suit, primarily against the Defendant KEYVAN PARSA (hereinafter "PARSA"), to compel him to return, as an unjust enrichment, an overpayment of approximately $720,000 at a real estate closing at WESTSTAR TITLE COMPANY ("WESTSTAR TITLE") on June 30-July 1, 2020.*

---

* FLORES and PARSA were Co-Initial Directors in the seller entity, MONTOYA PARK

1

3.

It appears that Mr. SATHER had been informed that WESTMOUNT GROUP, INC. was the owner of two money market certificates at WELLS FARGO BANK, in amounts of "at least" $700,000 and "at least" $338,000, and that the 327th District Court had entered several orders about what would have to be done with those funds. In chronological sequence, those orders were:

a) An Agreed Temporary Restraining Order ("TRO") dated January 4, 2021, that PARSA and MONTOYA PARK PLACE, INC. would cease concealing the whereabouts of the funds and would make no alienations of them. In connection with the TRO, PARSA and MONTOYA PARK PLACE, INC. showed the 327th District Court statements from WELLS FARGO BANK showing the money

---

PLACE, INC. The property being sold was Tract 3, Johannsen Subdivision (hereinafter "Tract 3"), to IDEA PUBLIC SCHOOLS for $1.95 million. PARSA closed his part of the closing on June 30, 2020. FLORES closed his part on July 1, 2020. Separate closings were necessary because there had never been an organizational meeting for MONTOYA PARK PLACE, INC. No officers had been elected, no stock had been issued, no by-laws drafted and approved. PARSA had obtained a Certificate of Incorporation on February 5, 2020, but he never made any capital contribution. FLORES' capital contribution was title to Tract 3, on February 9, 2020. FLORES had foreclosed his second-lien note against Tract 3 with a bid of $558,000 on February 4, 2020. The first-lien note on Tract 3 was held by RIGHT IMMIX CAPITAL, LLC (hereinafter "RIGHT IMMIX"). The balance still owing on it, as of the WESTSTAR TITLE COMPANY closing June 30-July 1, 2020 was approximately $720,000.00. The RIGHT IMMIX note should have been picked up on the title commitment, but WESTSTAR TITLE missed it. FLORES went to his part of the closing on the morning of July 1, 2020, expecting to see a seller's statement figure of about $1,109,000.00 cleared by MONTOYA PARK PLACE, INC. Instead the figure was $1,829,295.40. FLORES knew something was wrong, but decided to talk to PARSA about it. FLORES went to see PARSA the next day, July 2. PARSA had opened a checking account at WESTERN HERITAGE BANK in the name of MONTOYA PARK PLACE, INC. PARSA was the only authorized signatory on the account, and PARSA had the only checks. PARSA had instructed WESTSTAR TITLE to wire the closing proceeds to the WESTERN HERITAGE BANK account. The funds arrived there on July 1, 2020. FLORES had "done the math" by the time he met with PARSA, and FLORES realized the RIGHT IMMIX first lien note had not been paid off by WESTSTAR TITLE. FLORES told PARSA they should put the money back with WESTSTAR. PARSA would not hear of it. He told FLORES that MONTOYA had paid $10,000 for a title policy and was covered by the insurance for WESTSTAR's mistake; and that he (PARSA) had so many losses to his co-shareholder DEBORAH JORDAN in the development of TRACT 3, that the money was rightfully his to keep. FLORES then told PARSA that he (FLORES) wanted no part of keeping the $720,000 windfall, that PARSA was on his own if he tried keeping it, and that all he (FLORES) wanted was his half of the legitimate proceeds, plus reimbursement for monthly payments he had made to RIGHT IMMIX, to keep them current.

2

market certificates to be in the name of WESTMOUNT GROUP, INC., in the amounts of "at least" $700,000 and "at least" $338,000. *See* Exhibits "B-C" hereto attached.

b) The TRO became an Agreed Temporary Injunction on January 27, 2021. Again the WELLS FARGO BANK certificates in the name of WESTMOUNT GROUP, INC. were shown to the Court.

c) There followed a Motion to deposit the funds contained in the money market certificates, into the registry of the 327th District Court, which the Judge, The Honorable Thomas A. Spieczny, granted. PARSA and MONTOYA PARK PLACE, INC. moved to vacate the order to deposit. Hearings on the *vacatur* issue took place on May 18, 2021, June 8, 2021 and July 14, 2021, at which PARSA contended the following:

I. The Order to deposit was unnecessary because he was in complete control of the funds and they were absolutely safe. May 18, 2021 transcript, at pages 9-10, hereto appended as Exhibit "D."

II. The story changed on June 8. The 327th District Court was informed there were three loans at WELLS FARGO BANK for which the certificates were collateral, and that there were 6.7% penalties for early withdrawals of the certificates. PARSA refused to divulge any maturity dates. *See* the transcript hereto attached as Exhibit "E" at its pages 31-55.

III. The hearing on July 14th again presented harms to the money market certificates that would occur, if the money had to be deposited into the registry. Judge Spieczny lowered the amount of the ordered deposit to $750,000.

3

4.

Mr. SATHER's championing of WESTMOUNT GROUP, INC. and its interests in the money market certificates went further than just his Petition in Intervention and yet another Motion to Vacate the deposit Order. Mr. SATHER filed a Petition for Writ of Mandamus for WESTMOUNT GROUP, INC. in the Eighth Judicial District Court of Appeals, asking for a Mandate to Vacate the deposit Order. The Writ of Mandamus was denied, 18 days after it was filed. *See* Exhibits "F" and "G" hereto attached.

5.

The Defendants in the 327th District Court now are three: PARSA, MONTOYA PARK PLACE, INC., and WESTMOUNT GROUP, INC. Amended Petitions filed by FLORES on July 27, 2021, filed by WESTSTAR TITLE on August 19, 2021, and filed by FIDELITY NATIONAL TITLE INSURANCE on August 6, 2021, now name WESTMOUNT GROUP, INC. as the fraudulent transferee of PARSA or MONTOYA, under Tex. Business Commerce Code §§ 24.005 and 24.006.

6.

None of the Orders to Deposit was ever obeyed; all had deadlines that PARSA, MONTOYA, and WESTMOUNT GROUP, INC. ignored.

7.

A marked change occured in the legal and factual position of WESTMOUNT GROUP, INC., however, when Mr. SATHER filed the Schedules and Statement of Affairs in this bankruptcy case. One can only surmise why the Schedules were filed 11 days late, and without any Motion for Extension of Time. What the Schedules and Statement of Affairs reveal, are the following:

a) The Debtor has no money market certificates. *See* Schedule A/B.

b) The Statement of Affairs reveals no transfers of money market certificates.

4

c) Surprise!   WESTMOUNT GROUP, INC. owes a promissory note for $1,461,000 to MONTOYA PARK PLACE, INC., shown on Schedule D, supposedly secured by "all assets" of WESTMOUNT GROUP, INC.   There is no financing statement on file in Austin.   And "all assets" are ascribed a value of only $794,000.   The money market certificates are just gone, with no explanation.   And PARSA never mentioned any note payable to MONTOYA PARK PLACE, INC. at any point in the 327th District Court proceedings.

d) The note for $1,461,000 is probably worthless.   The Statement of Affairs reveals that WESTMOUNT GROUP, INC. has no income, and the § 1116 Statement (Doc.#12) shows no tax returns have been filed, and no statements of operation, balance sheets, or cash flow statements have been maintained.

e) The Statement of Financial Affairs, part 6, shows that within five days of July 14, 2021 when the last Motion to Vacate the deposit order was denied in the 327th District Court and within 3 days of Mr. SATHER's Plea in Intervention for WESTMOUNT GROUP, INC., Mr. PARSA orchestrated six transfers of real properties owned by the Debtor, having a combined CAD value of $583,776, to insiders** in exchange for 100% financing promissory notes having a combined face amount of $349,552.09,

f) The assets left with the Debtor have nowhere near a value of $794,000.

g) The Schedules also reveal that there are no loans owed by WESTMOUNT GROUP, INC. to WELLS FARGO BANK

---

** These transfers to insiders are discussed in more detail, and with supporting documentation, in FLORES "Supplement to his Motion to Dismiss this case as a bad-faith filing, (Doc. #17), which is here incorporated by reference.

5

8.

Perplexed, and hoping for some explanation, the undersigned attorney wrote to Mr. SATHER on September 20, 2021, and got the reply hereto attached as Exhibit "H," in email string.

9.

Through concealed transfers of the money market certificates and transfers of real estate for worthless notes, Mr. PARSA has, within two months, depleted this estate with the obvious intention of defeating, hindering, and delaying creditors. Mr. SATHER may or may not be the architect of the rampant transfers, but he is certainly an apologist for them, unworthy as they are, and he appears to have been sworn to silence about the disappearance of the money market certificates he was trying to preserve in two other courts. The certificates are not glimpsed at all in a promissory note payable to MONTOYA for $1.461 million.

10.

The employment of Mr. SATHER is not in the best interests of the estate. It appears a Chapter 7 Trustee should be appointed, who can be depended on to pursue all the evasions of Mr. PARSA as principal of the Debtor.

11.

Any hope the undersigned attorney had, that Mr. SATHER would, as capable and experienced bankruptcy counsel, be advising PARSA to gather assets to try to get creditors paid fairly in this case, disappeared when the Scheduled and Statement of Affairs were filed. And FLORES doubts that PARSA will listen to Mr. SATHER if he belated tries to get PARSA to restore the transferred assets. Mr. PARSA has just fired his third attorney in the 327th District Court proceeding. It seems Mr. PARSA will only go along with what he likes to hear.

WHEREFORE, PREMISES CONSIDERED, FLORES prays that the Application of STEVEN SATHER to be employed as counsel for the Debtor WESTMOUNT GROUP, INC. be denied for the reasons previously pleaded. Further FLORES prays for all other relief deserved in the circumstances, general or special, at law or equity.

6

Respectfully submitted this 1st day of October, 2021.

/s/ *E.P. Bud Kirk*

E.P. BUD KIRK
Texas State Bar No. 11508650
600 Sunland Park Dr.
Building Four, Suite 400
El Paso, TX 79912
(915) 584-3773
(915) 581-3452 facsimile
budkirk@aol.com

Attorney for ALBERT FLORES

## CERTIFICATE OF SERVICE

I do hereby certify that on this 1st day of October, 2021, I did cause a copy of the foregoing Objection to Application of Steven Sather to be employed as counsel for the Debtor Westmount Group, Inc. to be mailed to Jim Rose, Attorney for the United States Trustee, 615 E. Houston, Ste. 533, P.O. Box 1539, San Antonio, TX 78295-1539; to Brad W. Odell, Subchapter V Trustee, 1500 Broadway, Ste. 700, Lubbock, TX 79401-3169; to Westmount Group, Inc., 810 N. Kansas Street, El Paso, TX 79902-5207; to Stephen W. Sather, 7320 N MoPac Expy, Ste. 400, Austin, TX 78731; to City of El Paso, c/o Don Stecker, 112 E. Pecan St., Ste. 2200, San Antonio, TX 78205-1588; to Weststar Title, LLC, c/o James W. Brewer, 221 N. Kansas, Ste. 1700, El Paso, TX 79901-1401; and to all persons who have been identified to date as parties in interest in this case, as shown on the attached list.

/s/ *E.P. Bud Kirk*

E.P. BUD KIRK

4063.007-AE-09272

7

Fidelity National Title Insurance Co.
c/o Shakira Kelley
6900 Dallas Parkway, Ste. 610
Plano, TX   75024-7164

Albert Flores
3605 Arcadia
El Paso, TX   79902

Keyvan Parsa
7604 Plaza Redonda
El Paso, TX   79912-8402

Keyvan Parsa, M.D. and
Montoya Park Place, Inc.
c/o Troy Chandler Brown
P.O. Box 221588
El Paso, TX 79913

Manny Jemente
Acala Investments
6044 Gateway Blvd. East
El Paso, TX   79905-2023

Shabnam Izadpanahi
36 Micmac Crescent
North York, ON   M2H2K2

Ulrick Moise
Palacio de Paquim
C. Durango 2047
32575 CD Juarez
Chih. Mexico

Wells Fargo Business
P.O. Box 6995
Portland, OR   97228-6995

8

# EXHIBIT "A"

CAUSE NO. <u>2020DCV2997</u>

| | | |
|---|---|---|
| **ALBERT FLORES** | § | IN THE DISTRICT COURT OF |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **KEYVAN PARSA, M.D. and** | § | |
| **MONTOYA PARK PLACE, INC.** | § | |
| | § | |
| **Defendants,** | § | |
| | § | |
| **FIDELTIY NATIONAL TITLE** | § | |
| **INSURANCE COMPANY and** | § | |
| **WESTSTAR TITLE, INC.** | § | **EL PASO COUNTY, TEXAS** |
| | § | |
| **Intervenors/Third Party Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **KEYVAN PARSA, M.D. and** | § | |
| **MONTOYA PARK PLACE, INC.,** | § | |
| **ALBERT FLORES, and DEBORAH** | § | |
| **JORDAN** | § | |
| | § | |
| **Third Party Defendants,** | § | **327TH JUDICIAL DISTRICT** |
| | § | |
| **and** | § | |
| | § | |
| **WESTMOUNT GROUP, INC.** | § | |
| | § | |
| **Intervenor-Third Party Defendant** | § | |

## PLEA IN INTERVENTION OF WESTMOUNT GROUP, LLC

COMES NOW Westmount Group, Inc. Intervenor-Third Party Defendant, and files this Plea in Intervention and would shows as follows:

      1.     Intervenor Westmount Group, Inc. is a Texas corporation with its principal place of business in El Paso County, Texas.

2.      Westmount Group, Inc. has a justiciable interest in this suit because it is the owner of funds which have been ordered to be tendered into the registry of the court.

3.      Westmount Group, Inc. was incorporated on December 7, 2012. It has multiple shareholders. It is in the business of owning real estate and engaging in lending.

4.      On July 17, 2020, Westmount Group, Inc. received two deposits of funds which it used to open brokerage accounts with Wells Fargo Bank in the amounts of approximately $700,000 and $338,000 as shown by Exhibit A.

5.      On August 7, 2020, Westmount Group, Inc. signed a line of credit with Wells Fargo Bank, a true and correct copy of which is attached as Exhibit B.

6.      On September 16, 2020, Plaintiff Albert Flores filed this action.

7.      At a later date, Fidelity National Title Insurance Company and WestStar Title, LLC intervened in this action.

8.      On or about April 21, 2021, Fidelity and WestStar filed a Joint Motion to Compel Interpleaders of Funds Into Registry of Court.

9.      The Court granted the Motion without a hearing on April 26, 2021.

10.     Although the funds sought to be interpleaded were the property of Westmount Group, Inc., Westmount was not made a party to the motion nor was it given notice.

11.     Notwithstanding the filing of several motions for reconsideration, the Court has continued to order that the funds belonging to Westmount Group, Inc. be deposited into the registry of the Court.

12.     Westmount Group, Inc. denies each and every, all and singular, of the allegations of Fidelity National Title Insurance and WestStar Title, Inc. and demands strict proof thereof.

WHEREFORE, PREMISES CONSIDERED, Westmount Group, Inc. prays that it be granted leave to intervene in this action and for such other and further relief, at law and in equity to which it may be entitled.

Respectfully Submitted,

**BARRON & NEWBURGER, P.C.**
7320 N. Mopac Expy, Suite 400
Austin, Texas 78731
(512) 649-3243
(512) 476-9253 Facsimile

/s/ Stephen W. Sather
Barbara M. Barron (SB No1817300)
Stephen Sather (SBN 7657520)
**ATTORNEY FOR INTERVENOR**

## CERTIFICATE OF SERVICE

I certify that a true copy of this document was served in accordance with Rule 21a of the Texas Rules of Civil Procedure on the following on this the 16th day of July 2021.

All Counsel of record by electronic filing manager.

/s/Stephen W. Sather
Stephen W. Sather

Institutional Class shares



# 100% Treasury Money Market Fund

All information is as of 12-31-20 unless otherwise indicated. Information is subject to change.

## Key facts

| | |
|---|---|
| S&P rating | AAAm |
| Moody's Rating | Aaa-mf |
| Share Class | Institutional |
| Investment Minimum | $10 million |
| Ticker | WOTXX |
| CUSIP | 94988A759 |
| Gross Expense Ratio | 0.23% |
| Net Expense Ratio | 0.20% |
| Total fund assets | $18.9 billion |
| Fund Manager | Laurie R. White, Jeffrey L. Weaver, CFA, Michael C. Bird, CFA |
| Fund Inception Date | 12-03-90 |
| Class Inception Date | 10-31-14 |
| Trading deadline | 1 p.m. Eastern Time |

## Performance

Current yield as of 12-31-20

| | 7-day SEC yield (%) |
|---|---|
| | 0.01 |

| Month | 30-day current yield (%) |
|---|---|
| December 2019 | 1.46 |
| January 2020 | 1.42 |
| February 2020 | 1.41 |
| March 2020 | 0.91 |
| April 2020 | 0.25 |
| May 2020 | 0.09 |
| June 2020 | 0.05 |
| July 2020 | 0.05 |
| August 2020 | 0.01 |
| September 2020 | 0.01 |
| October 2020 | 0.01 |
| November 2020 | 0.01 |
| December 2020 | 0.01 |

Average annual total returns (%) as of 12-31-20

| 1 year | 3 year | 5 year | 10 year | Since Inception |
|---|---|---|---|---|
| 0.36 | 1.35 | 0.98 | 0.49 | 2.30 |

The Manager has contractually committed through May 31, 2021, to waive fees and/or reimburse expenses to the extent necessary to cap the fund's total annual fund operating expenses after fee waivers at the amounts shown above. Brokerage commissions, stamp duty fees, interest, taxes, acquired fund fees and expenses (if any), and extraordinary expenses are excluded from the expense cap. The Manager may also voluntarily waive or reimburse additional fees and expenses, and such voluntary waivers may be discontinued or modified at any time without notice. Without these reductions, the fund's seven-day current yield would have been -0.09%. Prior to or after the commitment expiration date, the cap may be increased or the commitment to maintain the cap may be terminated only with the approval of the Board of Trustees. The expense ratio paid by an investor is the net expense ratio (the total annual fund operating expenses after fee waivers) as stated in the prospectus.

*Figures quoted represent past performance, which is no guarantee of future results and do not reflect taxes that a shareholder may pay on an investment in a fund.* Investment returns will fluctuate. The fund's yield figures more closely reflect the current earnings of the fund than the total return figures. Current performance may be lower or higher than the performance data quoted and assumes the reinvestment of dividends and capital gains. Current month-end performance is available at the fund's website, wfam.com.

*Money market funds are sold without a front-end sales charge or contingent deferred sales charge. Other fees and expenses apply to an investment in the fund and are described in the fund's current prospectus.*

## Principal investment strategies

Seeks current income exempt from most state and local individual income taxes, while preserving capital and liquidity. Invests in high-quality, short-term money market instruments that consist of U.S. Treasury obligations.

## Portfolio composition

% of portfolio

☑ Treasury debt: (100)



Total : 100%

## Portfolio maturity schedule (%)

| | WAL | WAM |
|---|---|---|
| 1-7 days | | 21 |
| 8-29 days | 23 | 23 |
| 30-89 days | 42 | 40 |
| 90-179 days | 15 | 13 |
| 180-269 days | 2 | 1 |
| 270+ days | 13 | 2 |

■ WAL
□ WAM

## Money market fund statistics

Weighted average maturity: 53 days

Weighted average life: 110 days

Daily liquid assets: 100%

Weekly liquid assets: 100%

(Continued on next page.)

 **Advisors**

Wells Fargo Advisors
MAC H0005-035
One North Jefferson Avenue
St. Louis, MO 63103

January 14, 2021

Westmount Group, Inc.
7604 Plaza Redonda Drive
El Paso, TX  79912-8402

**RE: Verification of Assets for Account** ▮▮▮▮▮▮

Dear Westmount Group, Inc.:

This letter confirms that:

(i)    You maintain a brokerage account with Wells Fargo Clearing Services, LLC ("Wells Fargo Advisors"), numbered ▮▮▮▮▮▮ ("Account"), established on 07/20/2020;

(ii)    As of 01/13/2021, the Account maintains a total account value in excess of $338,000.00.

This letter is provided for informational purposes and does not represent future Account value, if your Account will remain with Wells Fargo Advisors in the future, any purposes not mentioned in this letter, or the creditworthiness of the person(s) referenced within. Wells Fargo Advisors will have no liability with any party's reliance on this letter or the information within.

Sincerely,

*Denise Gilles*

Denise Gilles
Securities Operations Services Specialist 3
Client Mailings – Verifications & Inquiries

Investment and Insurance Products are:
• Not Insured by the FDIC or Any Federal Government Agency
• Not a Deposit or Other Obligation of, or Guaranteed by, the Bank or Any Bank Affiliate
• Subject to Investment Risks, Including Possible Loss of the Principal Amount Invested



© 2019 Wells Fargo Advisors is a trade name used by Wells Fargo Clearing Services, LLC and Wells Fargo Advisors Financial Network, LLC, separate registered broker-dealers and non-bank affiliates of Wells Fargo & Company

Institutional Class shares



# 100% Treasury Money Market Fund

All information is as of 12-31-20 unless otherwise indicated. Information is subject to change.

## Key facts

| | |
|---|---|
| S&P Rating | AAAm |
| Moody's Rating | Aaa-mf |
| Share Class | Institutional |
| Investment Minimum | $10 million |
| Ticker | WOTXX |
| CUSIP | 94988A759 |
| Gross Expense Ratio | 0.23% |
| Net Expense Ratio | 0.20% |
| Total fund assets | $18.9 billion |
| Fund Manager | Laurie R. White, Jeffrey L. Weaver, CFA, Michael C. Bird, CFA |
| Fund Inception Date | 12-03-90 |
| Class Inception Date | 10-31-14 |
| Trading deadline | 1 p.m. Eastern Time |

## Performance

Current yield as of 12-31-20

| | 7-day SEC yield (%) |
|---|---|
| | 0.01 |
| Month | 30-day current yield (%) |
| December 2019 | 1.46 |
| January 2020 | 1.42 |
| February 2020 | 1.41 |
| March 2020 | 0.91 |
| April 2020 | 0.25 |
| May 2020 | 0.09 |
| June 2020 | 0.05 |
| July 2020 | 0.05 |
| August 2020 | 0.01 |
| September 2020 | 0.01 |
| October 2020 | 0.01 |
| November 2020 | 0.01 |
| December 2020 | 0.01 |

Average annual total returns (%) as of 12-31-20

| 1 year | 3 year | 5 year | 10 year | Since Inception |
|---|---|---|---|---|
| 0.36 | 1.35 | 0.98 | 0.49 | 2.30 |

*The Manager has contractually committed through May 31, 2021, to waive fees and/or reimburse expenses to the extent necessary to cap the fund's total annual fund operating expenses after fee waivers at the amounts shown above. Brokerage commissions, stamp duty fees, interest, taxes, acquired fund fees and expenses (if any), and extraordinary expenses are excluded from the expense cap. The Manager may also voluntarily waive or reimburse additional fees and expenses, and such voluntary waivers may be discontinued or modified at any time without notice. Without these reductions, the fund's seven-day current yield would have been -0.09%. Prior to or after the commitment expiration date, the cap may be increased or the commitment to maintain the cap may be terminated only with the approval of the Board of Trustees. The expense ratio paid by an investor is the net expense ratio (the total annual fund operating expenses after fee waivers) as stated in the prospectus.*

## Principal investment strategies

Seeks current income exempt from most state and local individual income taxes, while preserving capital and liquidity. Invests in high-quality, short-term money market instruments that consist of U.S. Treasury obligations.

## Portfolio composition

% of portfolio

 Treasury debt: (100)

Total : 100%

## Portfolio maturity schedule (%)



| | |
|---|---|
| 1-7 days | 21 |
| 8-29 days | 23 23 |
| 30-89 days | 42 40 |
| 90-179 days | 15 13 |
| 180-269 days | 2 1 |
| 270+ days | 13 2 |

WAL
WAM

## Money market fund statistics

Weighted average maturity: 53 days
Weighted average life: 110 days

Daily liquid assets: 100%
Weekly liquid assets: 100%

*Figures quoted represent past performance, which is no guarantee of future results and do not reflect taxes that a shareholder may pay on an investment in a fund. Investment returns will fluctuate. The fund's yield figures more closely reflect the current earnings of the fund than the total return figures. Current performance may be lower or higher than the performance data quoted and assumes the reinvestment of dividends and capital gains. Current month-end performance is available at the fund's website, wfam.com.*

*Money market funds are sold without a front-end sales charge or contingent deferred sales charge. Other fees and expenses apply to an investment in the fund and are described in the fund's current prospectus.*

(Continued on next page.)

 **Advisors**

Wells Fargo Advisors
MAC H0005-035
One North Jefferson Avenue
St. Louis, MO 63103

January 14, 2021

Westmount Group, Inc.
7604 Plaza Redonda Drive
El Paso, TX 79912-8402

**RE: Verification of Assets for Account** ▉▉▉▉▉

Dear Westmount Group, Inc.:

This letter confirms that:

(i)    You maintain a brokerage account with Wells Fargo Clearing Services, LLC ("Wells Fargo Advisors"), numbered ▉▉▉▉ ("Account"), established on 07/20/2020;

(ii)    As of 01/13/2021, the Account maintains a total account value in excess of $700,000.00.

This letter is provided for informational purposes and does not represent future Account value, if your Account will remain with Wells Fargo Advisors in the future, any purposes not mentioned in this letter, or the creditworthiness of the person(s) referenced within. Wells Fargo Advisors will have no liability with any party's reliance on this letter or the information within.

Sincerely,

*Denise Gilles*

Denise Gilles
Securities Operations Services Specialist 3
Client Mailings – Verifications & Inquiries

Investment and Insurance Products are:
• Not Insured by the FDIC or Any Federal Government Agency
• Not a Deposit or Other Obligation of, or Guaranteed by, the Bank or Any Bank Affiliate
• Subject to Investment Risks, Including Possible Loss of the Principal Amount Invested



© 2019 Wells Fargo Advisors is a trade name used by Wells Fargo Clearing Services, LLC and Wells Fargo Advisors Financial Network, LLC, separate registered broker-dealers and non-bank affiliates of Wells Fargo & Company

# Signature Page

WESTMOUNT GROUP, LLC
PRIORITY CREDIT LINE
7604 PLAZA REDONDA DR
EL PASO TX 79912-8402

| Sub Firm # | BR Code | FA Code | Account Number |
|---|---|---|---|
| 20 | TK | TK2Y | XXXX -0087 |

Account Type
C-Corporation-privately owned

BY SIGNING THIS PAGE, I/WE ("I") ACKNOWLEDGE THAT I HAVE RECEIVED AND REVIEWED A COPY OF MY/OUR INVESTMENT PROFILE(S) INCLUDED IN THIS PACKAGE AND I HAVE READ AND AGREE TO BE BOUND BY THE AGREEMENTS AND/OR DOCUMENTS LISTED BELOW AND ANY OTHER AGREEMENTS AND DOCUMENTS THAT ARE INCORPORATED BY REFERENCE INTO SUCH AGREEMENTS AND/OR DOCUMENTS.

020 - New Account Application, WBS - 1001
024 - Supplemental Account Owner Documentation *
131 - Trusted Contact Authorization, WFA - ICED

I UNDERSTAND AND ACKNOWLEDGE THAT INVESTMENTS AND INSURANCE PRODUCTS IN MY BROKERAGE ACCOUNT:
- ARE NOT INSURED BY THE FDIC OR ANY FEDERAL GOVERNMENT AGENCY
- ARE NOT A DEPOSIT OR OTHER OBLIGATION OF, OR GUARANTEED BY, THE BANK OR BY ANY BANK AFFILIATE
- ARE SUBJECT TO INVESTMENT RISKS, INCLUDING POSSIBLE LOSS OF PRINCIPAL AMOUNT INVESTED

I agree to promptly review and immediately advise Wells Fargo Advisors if any of the Owners and/or Account Profile information is not accurate or becomes inaccurate. I understand that Wells Fargo Advisors will rely on this information and that it is my responsibility to provide accurate and timely updates. My failure to do so may affect recommendations that are given to me related to my Priority Credit Line Account. If I decide to close or make changes to my Priority Credit Line Account, I will provide notification to Wells Fargo Advisors.

BY SIGNING THIS SIGNATURE PAGE, I/WE AUTHORIZE, ACKNOWLEDGE, AND AGREE TO THE TERMS AND CONDITIONS OF THE PRIORITY CREDIT LINE AGREEMENT AND TO THE FOLLOWING:
- Stock Lending: My securities may be loaned to Wells Fargo Clearing Services, LLC or to others.
- Communications Consent: My Financial Advisor may contact me/us as described in the Communications, Recording and Monitoring, Statements and Confirmations section of the Priority Credit Line Agreement.
- PCL Account Holders: In connection with my Priority Credit Line Account, Wells Fargo Bank, N.A. may establish a Bank Account in my/our name(s) and provide the banking-related services as set forth in the Priority Credit Line Account Agreement and may make any inquiry considered appropriate, including credit or other reports, to determine if the Bank Account should be opened. I/We also agree to the terms of the dispute resolution program described in the Priority Credit Line Account Agreement relating to disputes specifically involving the Bank Account.

| W-9: (Not Applicable to W-8 Clients) | Under penalties of perjury, I certify that: |
|---|---|
| Payer's Request for Taxpayer Identification Number | 1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me); and |
| Is this your correct Social Security/Tax ID? If not, please enter the correct number in the appropriate boxes. | 2) I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and |
| ☐ Social Security  ☒ Tax ID  XXXX 9727 | 3) I am a U.S. citizen or other U.S. person; and |
| or  Corrected Social Security/ Tax ID (Please omit dashes) | 4) The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct. (NOTE: The FATCA code is not applicable for accounts maintained in the United States.) |
|  | ☐ Check here if you have been notified by the IRS that you are currently subject to backup withholding because of un erreporting interest or dividends on your tax return. |

THE INTERNAL REVENUE SERVICE DOES NOT REQUIRE YOUR CONSENT TO ANY PROVISION OF THIS DOCUMENT OTHER THAN THE CERTIFICATIONS REQUIRED TO AVOID BACKUP WITHHOLDING.

THIS PRIORITY CREDIT LINE AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE LOCATED ON PAGE 4, PARAGRAPH 6. BY EXECUTING THIS DOCUMENT CLIENT IS AGREEING TO BE BOUND BY THE PRE-DISPUTE ARBITRATION CLAUSE. THE UNDERSIGNED ACKNOWLEDGES RECEIPT OF A COPY OF THE PRIORITY CREDIT LINE AGREEMENT.

— MUST SIGN AND DATE —
I agree to the terms and conditions of this agreement and attest that the certification made of the W-9 above is true. (Not Applicable to W-8 Clients)

| Signature of KEYVAN PARSA  (Primary Owner) Use BLACK ink only. | Title if Applicable  Pres. L.t | Date (Required)  08-07-20 |
|---|---|---|

I agree to the terms and conditions of this agreement.

| Signature of  X | Title if Applicable | Date (Required) |
|---|---|---|
| Signature of  X | Title if Applicable | Date (Required) |
| Signature of  X | Title if Applicable | Date (Required) |
| Signature of  X | Title if Applicable | Date (Required) |

Investment and Insurance Products:

| Not Insured by FDIC or any Federal Government Agency | May Lose Value | Not a Deposit of or Guaranteed by a Bank or any Bank Affiliate |
|---|---|---|

Wells Fargo Advisors is a trade name used by Wells Fargo Clearing Services, LLC, a registered broker-dealer and non-bank affiliate of Wells Fargo & Company.

* Total Supplemental Form(s) - 1, 1096

591213 (Rev 11 - 11/20)

75530087    WFGESGN    0080811608001

75530087 WFGESGN 0080811608001

**EXHIBIT A**

# EXHIBIT "B"



**Institutional Class shares**

# 100% Treasury Money Market Fund

All information is as of 12-31-20 unless otherwise indicated. Information is subject to change.



## Key facts

| | |
|---|---|
| S&P rating | AAAm |
| Moody's Rating | Aaa-mf |
| | |
| Share Class | Institutional |
| Investment Minimum | $10 million |
| Ticker | WOTXX |
| CUSIP | 94988A759 |
| Gross Expense Ratio | 0.23% |
| Net Expense Ratio | 0.20% |
| | |
| Total fund assets | $18.9 billion |
| Fund Manager | Laurie R. White, Jeffrey L. Weaver, CFA, Michael C. Bird, CFA |
| Fund Inception Date | 12-03-90 |
| Class Inception Date | 10-31-14 |
| Trading deadline | 1 p.m. Eastern Time |

## Principal investment strategies

Seeks current income exempt from most state and local individual income taxes, while preserving capital and liquidity. Invests in high-quality, short-term money market instruments that consist of U.S. Treasury obligations.

## Portfolio composition

% of portfolio

■ Treasury debt: (100)



Total : 100%

## Performance

Current yield as of 12-31-20

| | 7-day SEC yield (%) |
|---|---|
| | 0.01 |

| Month | 30-day current yield (%) |
|---|---|
| December 2019 | 1.46 |
| January 2020 | 1.42 |
| February 2020 | 1.41 |
| March 2020 | 0.91 |
| April 2020 | 0.25 |
| May 2020 | 0.09 |
| June 2020 | 0.05 |
| July 2020 | 0.05 |
| August 2020 | 0.01 |
| September 2020 | 0.01 |
| October 2020 | 0.01 |
| November 2020 | 0.01 |
| December 2020 | 0.01 |

Average annual total returns (%) as of 12-31-20

| 1 year | 3 year | 5 year | 10 year | Since inception |
|---|---|---|---|---|
| 0.36 | 1.35 | 0.98 | 0.49 | 2.30 |

## Portfolio maturity schedule (%)



## Money market fund statistics

Weighted average maturity: 53 days
Weighted average life: 110 days

Daily liquid assets: 100%
Weekly liquid assets: 100%

*The Manager has contractually committed through May 31, 2021, to waive fees and/or reimburse expenses to the extent necessary to cap the fund's total annual fund operating expenses after fee waivers at the amounts shown above. Brokerage commissions, stamp duty fees, interest, taxes, acquired fund fees and expenses (if any), and extraordinary expenses are excluded from the expense cap. The Manager may also voluntarily waive or reimburse additional fees and expenses, and such voluntary waivers may be discontinued or modified at any time without notice. Without these reductions, the fund's seven-day current yield would have been -0.09%. Prior to or after the commitment expiration date, the cap may be increased or the commitment to maintain the cap may be terminated only with the approval of the Board of Trustees. The expense ratio paid by an investor is the net expense ratio (the total annual fund operating expenses after fee waivers) as stated in the prospectus.*

**Figures quoted represent past performance, which is no guarantee of future results and do not reflect taxes that a shareholder may pay on an investment in a fund. Investment returns will fluctuate. The fund's yield figures more closely reflect the current earnings of the fund than the total return figures. Current performance may be lower or higher than the performance data quoted and assumes the reinvestment of dividends and capital gains. Current month-end performance is available at the fund's website, wfam.com.**

**Money market funds are sold without a front-end sales charge or contingent deferred sales charge. Other fees and expenses apply to an investment in the fund and are described in the fund's current prospectus.**

(Continued on next page.)



**Advisors**

Wells Fargo Advisors
MAC H0005-035
One North Jefferson Avenue
St. Louis, MO 63103

January 14, 2021

Westmount Group, Inc.
7604 Plaza Redonda Drive
El Paso, TX 79912-8402

**RE: Verification of Assets for Account xxxx-7582**

Dear Westmount Group, Inc.:

This letter confirms that:

(i)      You maintain a brokerage account with Wells Fargo Clearing Services, LLC ("Wells Fargo Advisors"), numbered xxxx-7582 ("Account"), established on 07/20/2020;

(ii)     As of 01/13/2021, the Account maintains a total account value in excess of $700,000.00.

This letter is provided for informational purposes and does not represent future Account value, if your Account will remain with Wells Fargo Advisors in the future, any purposes not mentioned in this letter, or the creditworthiness of the person(s) referenced within. Wells Fargo Advisors will have no liability with any party's reliance on this letter or the information within.

Sincerely,

*Denise Gilles*

Denise Gilles
Securities Operations Services Specialist 3
Client Mailings – Verifications & Inquiries

Investment and Insurance Products are:
• Not Insured by the FDIC or Any Federal Government Agency
• Not a Deposit or Other Obligation of, or Guaranteed by, the Bank or Any Bank Affiliate
• Subject to Investment Risks, Including Possible Loss of the Principal Amount Invested



© 2019 Wells Fargo Advisors is a trade name used by Wells Fargo Clearing Services, LLC and Wells Fargo Advisors Financial Network, LLC, separate registered broker-dealers and non-bank affiliates of Wells Fargo & Company

# EXHIBIT "C"

Institutional Class shares



# 100% Treasury Money Market Fund

All information is as of 12-31-20 unless otherwise indicated. Information is subject to change.



## Key facts

| | |
|---|---|
| S&P rating | AAAm |
| Moody's Rating | Aaa-mf |
| | |
| Share Class | Institutional |
| Investment Minimum | $10 million |
| Ticker | WOTXX |
| CUSIP | 94988A759 |
| Gross Expense Ratio | 0.23% |
| Net Expense Ratio | 0.20% |
| | |
| Total fund assets | $18.9 billion |
| Fund Manager | Laurie R. White, Jeffrey L. Weaver, CFA, Michael C. Bird, CFA |
| Fund Inception Date | 12-03-90 |
| Class Inception Date | 10-31-14 |
| Trading deadline | 1 p.m. Eastern Time |

## Performance

Current yield as of 12-31-20

| | 7-day SEC yield (%) |
|---|---|
| | 0.01 |
| Month | 30-day current yield (%) |
| December 2019 | 1.46 |
| January 2020 | 1.42 |
| February 2020 | 1.41 |
| March 2020 | 0.91 |
| April 2020 | 0.25 |
| May 2020 | 0.09 |
| June 2020 | 0.05 |
| July 2020 | 0.05 |
| August 2020 | 0.01 |
| September 2020 | 0.01 |
| October 2020 | 0.01 |
| November 2020 | 0.01 |
| December 2020 | 0.01 |

Average annual total returns (%) as of 12-31-20

| 1 year | 3 year | 5 year | 10 year | Since inception |
|---|---|---|---|---|
| 0.36 | 1.35 | 0.98 | 0.49 | 2.30 |

*The Manager has contractually committed through May 31, 2021, to waive fees and/or reimburse expenses to the extent necessary to cap the fund's total annual fund operating expenses after fee waivers at the amounts shown above. Brokerage commissions, stamp duty fees, interest, taxes, acquired fund fees and expenses (if any), and extraordinary expenses are excluded from the expense cap. The Manager may also voluntarily waive or reimburse additional fees and expenses, and such voluntary waivers may be discontinued or modified at any time without notice. Without these reductions, the fund's seven-day current yield would have been -0.09%. Prior to or after the commitment expiration date, the cap may be increased or the commitment to maintain the cap may be terminated only with the approval of the Board of Trustees. The expense ratio paid by an investor is the net expense ratio (the total annual fund operating expenses after fee waivers) as stated in the prospectus.*

## Principal investment strategies

Seeks current income exempt from most state and local individual income taxes, while preserving capital and liquidity. Invests in high-quality, short-term money market instruments that consist of U.S. Treasury obligations.

## Portfolio composition

% of portfolio
☑ Treasury debt: (100)



Total : 100%

## Portfolio maturity schedule (%)



## Money market fund statistics

Weighted average maturity: 53 days
Weighted average life: 110 days

Daily liquid assets: 100%
Weekly liquid assets: 100%

*Figures quoted represent past performance, which is no guarantee of future results and do not reflect taxes that a shareholder may pay on an investment in a fund. Investment returns will fluctuate. The fund's yield figures more closely reflect the current earnings of the fund than the total return figures. Current performance may be lower or higher than the performance data quoted and assumes the reinvestment of dividends and capital gains. Current month-end performance is available at the fund's website, wfam.com.*

*Money market funds are sold without a front-end sales charge or contingent deferred sales charge. Other fees and expenses apply to an investment in the fund and are described in the fund's current prospectus.*

(Continued on next page.)



**Advisors**

Wells Fargo Advisors
MAC H0005-035
One North Jefferson Avenue
St. Louis, MO 63103

January 14, 2021

Westmount Group, Inc.
7604 Plaza Redonda Drive
El Paso, TX 79912-8402

**RE: Verification of Assets for Account xxxx-7582**

Dear Westmount Group, Inc.:

This letter confirms that:

(i)    You maintain a brokerage account with Wells Fargo Clearing Services, LLC ("Wells Fargo Advisors"), numbered xxxx-7582 ("Account"), established on 07/20/2020;

(ii)   As of 01/13/2021, the Account maintains a total account value in excess of $338,000.00.

This letter is provided for informational purposes and does not represent future Account value, if your Account will remain with Wells Fargo Advisors in the future, any purposes not mentioned in this letter, or the creditworthiness of the person(s) referenced within. Wells Fargo Advisors will have no liability with any party's reliance on this letter or the information within.

Sincerely,

*Denise Gilles*

Denise Gilles
Securities Operations Services Specialist 3
Client Mailings – Verifications & Inquiries

Investment and Insurance Products are:
• Not Insured by the FDIC or Any Federal Government Agency
• Not a Deposit or Other Obligation of, or Guaranteed by, the Bank or Any Bank Affiliate
• Subject to Investment Risks, Including Possible Loss of the Principal Amount Invested



© 2019 Wells Fargo Advisors is a trade name used by Wells Fargo Clearing Services, LLC and Wells Fargo Advisors Financial Network, LLC, separate registered broker-dealers and non-bank affiliates of Wells Fargo & Company

# EXHIBIT "D"

1              REPORTER'S RECORD        COPY

2        TRIAL COURT CAUSE NO. 2020DCV2997

3            VOLUME 1 OF 1 VOLUMES

4  ALBERTO FLORES,              )
        Plaintiff,             )
5  vs.                          )
   KEYVAN PARSA, M.D. and       )
6  MONTOYA PARK PLACE, INC.,    )
        Defendants,            )  IN THE DISTRICT COURT
7                               )
   vs.                          )  OF EL PASO COUNTY, TEXAS
8                               )
   WESTSTAR TITLE, L.L.C.,      )  327TH JUDICIAL DISTRICT
9  Intervenor/Third-Party       )
   Plaintiff,                   )
10                              )
   FIDELITY NATIONAL TITLE      )
11 INSURANCE, CO.               )

12

13        *********************************

14              MOTIONS HEARING

15        *********************************

16        The 18th day of May, 2020, the following

17 proceedings came on to be heard in the above-entitled

18 and numbered cause before the Honorable THOMAS A.

19 SPIECZNY  Judge Presiding, via Zoom in accordance with

20 the Supreme Court of Texas' Emergency Order Regarding

21 the COVID-19 State of Disaster, held in El Paso, El Paso

22 County, Texas:

23        Proceedings reported by machine shorthand

24 utilizing computer-assisted realtime transcription.

25

```
 1                          APPEARANCES

 2

 3   Mr. E.P. Bud Kirk              Mr. Richard Roman
     SBOT NO. 11508650             SBOT NO. 00789595
 4   ATTORNEY AT LAW               ATTORNEY AT LAW
     600 Sunland Park Dr., Bldg    1018 Brown
 5   4, Ste 400                    El Paso, Texas 79902
     El Paso, Texas 79912          (915) 351-2679
 6   (915) 584-3773                Rromanattorney@yahoo.com
     Budkirk@aol.com
 7                                 ATTORNEY FOR DEFENDANT
     ATTORNEY FOR                  DEBORAH JORDAN
 8   PLAINTIFF/DEFENDANT/
     COUNTER PLAINTIFF FLORES
 9
     Mr. Carlos A. Miranda         Mr. Michael J. Willey
10   SBOT NO. 14199582             SBOT NO. 24115952
     MIRANDA & MALDONADO, P.C.     ATTORNEY AT LAW
11   5915 Silver Springs, Bldg     14786 Preston Road, Suite
     7                             1150
12   El Paso, Texas 79912          Dallas, Texas 75254
     (915) 587-5000                (972) 812-6478
13   Cmiranda@eptxlawyers.com      Michael.willey@fnf.com

14   ATTORNEY FOR DEFENDANTS       ATTORNEY FOR COUNTER
     MONTOYA PARK PLACE AND        DEFENDANT/INTERVENOR
15   KEYVAN PARSA                  FIDELITY

16   Mr. James Brewer
     SBOT NO. 02965200
17   KEMP SMITH, L.L.P.
     221 N. Kansas, Suite 1700
18   El Paso, Texas  79901
     (915) 533-4424
19   James.brewer@kempsmith.com

20   ATTORNEY FOR INTERVENOR
     WESTSTAR
21

22

23

24

25
```

3

```
 1                    CHRONOLOGICAL INDEX
                      VOLUME 1 OF 1 VOLUMES
 2                      MOTIONS HEARING

 3                                          PAGE     VOL
        May 18, 2020
 4

 5      Announcement of Counsel....................    4      1

 6      Motion by Mr. Miranda.....................     7      1

 7      Response by Mr. Kirk......................    11      1

 8      Response by Mr. Brewer....................    12      1

 9      Response by Mr. Willey....................    13      1

10      Response by Mr. Roman.....................    17      1

11

12      DEFENDANTS' WITNESSES   Direct   Cross    Voir Dire    VOL

13      KEYVAN PARSA             17     21,23       --          1

14                                      24

15

16      Court's Ruling............................    30      1

17      Adjournment...............................    41      1

18      Court Reporter's Certificate..............    42      1

19

20

21

22

23

24

25
```

1          THE COURT:  I am going to call the case of

2    Albert Flores, plaintiff, versus -- and Fidelity

3    National Title Insurance, intervenor plaintiff, versus

4    Keyvan Parsa, M.D., and Montoya Park Place, Inc.,

5    defendants, and Keyvan Parsa, M.D., and Montoya Park

6    Place, Inc., Albert Flores and Deborah Jordan, as

7    intervenor defendants.

8          Could we have the announcements of all

9    Counsel, please.

10          MR. MIRANDA:  Yes, Your Honor.  This is

11    Carlos A. Miranda for Keyvan Parsa and Montoya Park

12    Place.

13          MR. KIRK:  Good morning, Your Honor.

14          MR. BREWER:  Go ahead, Mr. Kirk.

15          MR. KIRK:  Go ahead.

16          MR. BREWER:  Good morning, Your Honor.  Jim

17    Brewer on behalf of WestStar Title, L.L.C.

18          MR. WILLEY:  Morning, Your Honor.  Michael

19    Willey on behalf of Fidelity National Financial, a

20    subsidiary.

21          MR. KIRK:  Morning, Your Honor.  Bud Kirk

22    on behalf of Albert Flores.

23          THE COURT:  Okay.  I -- I recall Richard

24    Roman was in this case representing somebody.  Is he --

25    is that still the case?

1           MR. MIRANDA:  He was representing Deborah

2   Jordan, but she may not necessarily have a dog in this

3   part of the hunt, so perhaps he decided not to join in.

4           THE COURT:  Okay.  All right.  My -- my

5   recollection of where we were in this case is we had a

6   hearing a while back because there was opposition to

7   going forward with a mediation, and I denied that

8   opposition.  The parties went to mediation.  It's my

9   understanding that did not result in a settlement of the

10  case.

11          I then signed an order that I thought was

12  an agreed-upon order, and I got a motion by Mr. Miranda

13  to reconsider that order and vacate my ruling.  And

14  seeing that this case was not resolved at mediation, we

15  also need to do a scheduling conference.

16          Let me talk about that a little bit first,

17  because the way this would work is we would have to give

18  you a date.  And the way things are now, we are looking

19  at the summer of next year.  So it would be maybe July

20  or August of 2022.  You would then be given a scheduling

21  order and the Court's docket control order, and you --

22  you'd have to essentially create -- use that as a

23  template and create your own scheduling -- you know, put

24  in all of the dates for discovery cutoff and time for

25  filing dispositive motions and things like that.

6

```
 1                 So let's start talking about the order that
 2   Mr. Miranda wants me to reconsider.
 3                 And, Mr. Miranda, it's your motion.  I've
 4   read it, but let me hear from you first.
 5                 COURT COORDINATOR:  I'm sorry -- I'm sorry
 6   to interrupt.  Judge, I do have somebody in the waiting
 7   room with an iPhone.  I believe it may be Mr. Miranda.
 8   Can I go ahead and allow him in just to make sure if it
 9   is him?
10                 THE COURT:  Mr. Miranda is already in.
11                 COURT COORDINATOR:  I'm sorry.  Not
12   Mr. Miranda.  Mr. Roman.
13                 THE COURT:  Yes, let's let him in.
14                 COURT COORDINATOR:  Okay.  Just a second.
15   Let me see.
16                 MR. MIRANDA:  I'll take that as a
17   compliment.
18                 COURT COORDINATOR:  Yes, it is.  There he
19   is.
20                 MR. ROMAN:  Good morning.
21                 COURT COORDINATOR:  Sorry about that.
22   Thank you.
23                 THE COURT:  Mr. Roman, how are you, sir?
24                 MR. ROMAN:  Just fine, Judge Spieczny.  How
25   are you?
```

1           THE COURT:  I am well.

2           Okay.  We have two matters we need to

3  address today, one is a scheduling conference hearing

4  but the second is there is a motion filed by Mr. Miranda

5  asking me to reconsider and abate a prior order that was

6  a joint motion, but apparently it was not totally a

7  joint motion.  So, Mr. Miranda, I'll hear you first with

8  regard to that motion.

9           MR. MIRANDA:  Yes, Your Honor.

10          May it please the Court.  Yes, this was not

11  a joint motion in the sense that all the parties agreed

12  to it.  It was joint because WestStar and Fidelity filed

13  it jointly.  I can fully understand the confusion.  I

14  don't think it was intentional.  I think it was just the

15  way that the -- the pleading was -- was captioned.

16          And we were taken by surprise because as I

17  was uploading my response and objection on the 26th of

18  April to the -- your order granting the joint motion for

19  interpleader, I -- I received the -- the order.  And --

20  and I think I understood, you know, where the Court's --

21  where the Court was coming from.  It -- it was simply

22  the title of the --

23          THE COURT:  I thought it was a totally

24  agreed-upon order, and I just signed it thinking it was

25  that.

1          MR. MIRANDA:  Yeah.  And we know you see

2  hundreds if not thousands of these, so, I mean -- and I

3  even told my client, and I spoke with Mr. Brewer and I

4  think that's where it came from.  That being said, it

5  was always our intention to object to the motion for the

6  interpleader funds, because, in all honesty, it -- it

7  remains our position that's unnecessary.

8          As the Court is well aware, not only has

9  Mr. Parsa voluntarily entered into an agreed temporary

10 restraining order, we also voluntarily entered into an

11 agreed temporary injunction.  And the agreed temporary

12 injunction has maintained the status quo of the funds.

13         Back in January I had discussions with

14 Mr. Brewer and Mr. Kirk, and I provided evidence where

15 the money was.  It's in a Wells Fargo account.  The

16 money has not been moved since that date.  And then as

17 recently as yesterday, May 17th, I provided Mr. Brewer

18 and Mr. Willey an updated copy and a letter from Wells

19 Fargo Bank confirming that the funds are still there.

20 So it was our position -- remains our position that this

21 is really unnecessary.

22         Now, I know that WestStar, Fidelity are

23 taking the position that, number one, they really didn't

24 participate in the agreed temporary injunction and the

25 agreed TRO.  My position on that would be, without

1  disclosing communications I had with other lawyers, I
2  did have conversations with -- with WestStar about this.
3  They knew what was going on.  And Fidelity has always
4  known what's going on.  And the reason that I have
5  Mr. Parsa here is that he would testify that Fidelity
6  has actually made a demand on him prior to the lawsuit
7  even being filed by Mr. Flores, in which WestStar and
8  Fidelity then intervened, that there's an issue about
9  these funds.
10           But the point is, the money hasn't gone
11  anywhere, and the money is not going to go anywhere.
12  And if I'm permitted to call Mr. Parsa to the stand, he
13  will testify that this closing occurred in July of 2020.
14  Mr. Flores' lawsuit wasn't filed until October 2020.
15  The TRO and the injunction were not entered until
16  January of 2021.  And at no point during those
17  six months did he do anything wrong with the money.  He
18  didn't transfer it.  He didn't hide it.  He didn't
19  launder it.  He didn't send it overseas.  He didn't
20  abscond with it to Las Vegas or Rio de Janeiro.  The
21  money's always been safe.  And since --
22           THE COURT:  Let me just interrupt you for a
23  second.  I have a vague recollection -- wasn't the money
24  in Mexico for a while?
25           MR. MIRANDA:  I -- I can call Mr. Parsa and

1 ask him that.  I don't believe, and I've never seen any

2 document where --

3             THE COURT:  Okay.  Maybe I'm wrong about

4 that.  Maybe there was a fear that it would be moved to

5 Mexico.

6             MR. MIRANDA:  Yes, there was.  And, yes,

7 that's in Mr. Kirk's pleadings that the money may have

8 gone to Mexico, but it -- it never left the country.

9 Money doesn't have a visa, so it's been here in the U.S.

10 the whole time.  So that being said, we really believe

11 that this motion was unnecessary.

12             I mean -- and, yes, we had a mediation.  I

13 don't -- to be honest, I don't recall opposing to it.

14 We willingly went to the mediation.  It got continued

15 because Mr. Parsa --

16             THE COURT:  Mr. Roman had -- had an

17 objection and I overruled the objection.

18             MR. MIRANDA:  Oh, yeah.  Yeah, but that

19 didn't come from Mr. Parsa.  We did continue it for a

20 month because of his quarantine for COVID.  But we've

21 always tried to do things in good faith, and since I've

22 been involved in the case, I've gone above and beyond to

23 do things in good faith and remain in communication with

24 opposing counsel.

25             So when we were hit with this motion, we

1  were surprised, but we understand.  I might have done

2  the same thing if I was on the other side.  And when we

3  were hit with the order, we were blindsided, but, you

4  know, we know where that came from, too.

5         So that being said, our position hasn't

6  changed.  This isn't really unnecessary [sic], and I can

7  call Mr. Parsa to the stand.  And I would be happy to

8  cover these points with him and provide direct testimony

9  as to the fact that the money hasn't gone anywhere and

10 the terms of the temporary injunction have been

11 respected since the moment it was entered by this Court.

12         THE COURT:  Let me -- before you call any

13 witnesses, let me just get a brief statement from all of

14 the other counsel as to what their position is.

15         Mr. Kirk, what is your position with regard

16 to Mr. Miranda's motion?

17         MR. KIRK:  Well, I've read the letter which

18 Mr. Miranda --

19         THE COURT:  Can you speak a little bit

20 louder?

21         MR. KIRK:  Yes, Your Honor.  I've read the

22 letter which Mr. Miranda circulated showing that -- that

23 there's a balance of over $700,000 in Wells Fargo Bank.

24 That does not satisfy me.  It worries me, because we had

25 two accounts.  And I think the total in them was one

1  million three.  So what has happened to the other

2  600,000?

3             Also, why is there activity?  Why are they

4  funds -- are there funds moving in and out of this

5  account, which is what Mr. Miranda's correspondence

6  shows?

7             MR. PARSA:  Can I answer this --

8             THE COURT:  I understand you've got some

9  concerns.  Okay.

10             MR. PARSA:  Can I answer these questions,

11  Your Honor?

12             MR. MIRANDA:  Mr. Parsa, hold on --

13             THE COURT:  Okay.  Mr. Brewer, what is your

14  position?

15             MR. BREWER:  Jim Brewer on behalf of

16  WestStar Title, L.L.C.  As the Court remembers, this

17  has -- this lawsuit has to do with a closing on a sale

18  of some real estate -- commercial real estate.  We are

19  contending that we think by fraud, possibly by mistake,

20  Montoya Park Place, the seller, was overpaid to the tune

21  of over $700,000.  And -- and there was not a lien

22  release that should have been in that closing.

23             The -- the moving to Mexico discussion,

24  that comes from an affidavit -- not just pleadings but

25  an affidavit of Mr. Flores, and it's attached to his

1  petition in this case.  The affidavit says, quote --

2  this is Mr. Flores testifying.  He told me after

3  WestStar Title Company demanded return of the money to

4  satisfy the lien, that he had moved the money out of

5  Western Heritage Bank and into Mexico.  So that's --

6  that's where this concern started.

7           I see Mr. Parsa is here.  He may have a

8  different position, but I would argue that the Court

9  does have inherent authority to order deposit of funds

10  into the registry of the Court and that's what we're

11  requesting.

12           THE COURT:  Okay.  Okay.  Mr. Willey.

13           MR. WILLEY:  Yes, Your Honor, for Fidelity

14  National Title Insurance Company.  I mean, it is our

15  stance that, Your Honor, there's -- we obviously wanted

16  to preserve our -- our right to demand deposit in the

17  registry.  And, obviously, the -- the order hasn't been

18  followed to date, even though it's been granted and

19  entered.  And we just don't want a waiver of our right

20  to demand deposit into the registry of the Court.

21           Also, as -- I'm sorry -- Mr. Miranda

22  pointed out that, you know, we're -- we weren't a party

23  to the temporary injunction.  We were able -- we were

24  not able to, you know, offer our terms in regards to

25  the -- the terms of the actual TRO itself.

1          The argument that Mr. Parsa, you know,

2   hasn't violated or -- or breached is -- is not really a

3   grounds for vacating said order.  There's -- there's no

4   real grounds to show that the Court erred in its

5   decision.  There's no real irregularity.  There's no

6   conduct administered by Mr. Brewer or client -- or my

7   client in this matter.  He hasn't shown that they're

8   actually going to be prejudiced by this.

9          And, also, you know, it's important to

10  point out that the temporary injunction that was filed

11  also agreed -- or there was terms in there that

12  indicated that this temporary injunction was going to be

13  filed without prejudice to any separate requests for

14  injunctive relief by WestStar Title itself.  So, I mean,

15  I understand the mistake that was made with the joint

16  vice [sic] and agreed order, but it still doesn't --

17  doesn't take away from the order that's been rendered by

18  the Court.

19          And, you know, obviously to date nothing

20  has been followed in regards to Mr. Parsa in that

21  regards either, because he's supposed to register within

22  10 days of the order being executed and entered.

23          Moreover, Mr. Kirk actually did point a

24  good fact in regards to the money actually being moved

25  back and forth.  You know, that's obviously a concern of

1  ours, and that's why we requested and filed the motion

2  in the first place, to ensure that those funds are

3  secure within the registry of the Court and are not

4  allowed to be moved in and out of -- you know, at -- at

5  a single person's discretion.

6           I also wanted to point out the fact that

7  the -- the motion that was filed -- I mean, I know -- I

8  know this may not go to substantive, but it needs to be

9  addressed, is that there is a complete

10  mischaracterization of our role and I believe WestStar

11  Title's role in regards to characterizing us as filing

12  this motion to be --

13           MR. MIRANDA:  Retributory.

14           MR. WILLEY:  Retributory, yeah.  Thank you.

15           You know, obviously there's no basis or

16  anything to offer as substance to make any, you know --

17  to make -- you know, substantiate that accusation.  And,

18  obviously, that's -- that's not why we requested the

19  monies to be entered into the -- into the registry of

20  the Court.  We do it for security and also for -- you

21  know, just to ensure that, you know, all the parties'

22  interest in this matter are addressed.

23           So, you know, I know Mr. Parsa hasn't done

24  anything to date to raise any concerns, but, you know,

25  in -- in fact, if, you know, the -- the relief that we

1  were requesting is not granted, you know, there's no

2  assurances, Your Honor, that, you know --

3           THE COURT:  I understand.

4           MR. WILLEY:  Yeah.  So --

5           THE COURT:  He could do something tomorrow.

6           MR. WILLEY:  Exactly.  And so in that

7  regards, I don't think saying that he hasn't done

8  anything to date is grounds to vacate that order.  And I

9  really don't see anything, especially with regards to

10  precedence or -- or any legal theories that would, you

11  know, substantiate an overturning of this -- of the

12  order that was granted, so --

13           THE COURT:  Okay.  Mr. Miranda, if you wish

14  to put on some testimony, you -- you can go ahead and do

15  that.

16           MR. MIRANDA:  Yes, Your Honor.  I'd like to

17  call Mr. Keyvan Parsa individually and as the

18  representative of Montoya Park Place to the stand.

19           MR. ROMAN:  Your Honor, I'm sorry.  Your

20  Honor, I'm sorry.  I don't -- I don't mean to interrupt,

21  but Richard Roman here on behalf --

22           THE COURT:  Oh, sorry.

23           MR. ROMAN:  And may -- may I just weigh in

24  just very quickly?

25           THE COURT:  Yes.  Please go ahead.  I'm

```
 1  sorry I didn't --
 2              MR. ROMAN:  It might be -- it might be
 3  within the Court's recollection that my client is a very
 4  minute party in this whole matter.  And in so far as
 5  there's any liability towards her, we have no position
 6  one way or the other -- one way or the other on this.
 7  And -- and I'll -- and I'll retract myself from here.
 8              THE COURT:  Thank you.
 9              MR. ROMAN:  Thank you.
10              THE COURT:  Okay.  All right.  We're back
11  with --
12              MR. MIRANDA:  Yes, I'm calling Mr. Parsa.
13                      KEYVAN PARSA,
14  having been first duly sworn by the Court, testified as
15  follows:
16              MR. MIRANDA:  Thank you, Your Honor.
17                   DIRECT EXAMINATION
18  BY MR. MIRANDA:
19     Q.   Mr. Parsa, will you please state your full name
20  for the record?
21     A.   Keyvan Parsa.
22     Q.   And what is your current county of residence?
23     A.   El Paso, Texas.
24              THE COURT:  Could you speak a little
25  louder, please, Doctor?
```

1          THE WITNESS:  El Paso, Texas.

2          THE COURT:  Thank you.

3     Q.   (BY MR. MIRANDA)  And are you familiar with an

4  entity named Montoya Park Place, Inc.?

5     A.   Yes, I do [sic].

6     Q.   And what is your relationship to Montoya Park

7  Place, Inc.?

8     A.   President of this corporation.

9     Q.   And are you the sole shareholder of the

10  corporation?

11     A.   Yes.  Yes, I am.

12     Q.   So when I ask you questions, will you be

13  answering on behalf of yourself and Montoya Park Place,

14  Inc., collectively?

15     A.   Yes.

16     Q.   Okay.  All right.  Are you familiar with an

17  agreed temporary injunction which my office negotiated

18  with Mr. Kirk in January 20 of '21?

19     A.   Yes, I am.

20     Q.   Okay.  And do you recall what that injunction

21  prohibited you from doing?

22     A.   Yes.

23     Q.   Can you --

24     A.   (Indecipherable.)

25     Q.   -- to the best of your recollection what your

```
 1  obligations are under that injunction?
 2      A.   Not -- not to spend the money, not to transfer
 3  the money and just keep the money until we have the
 4  solution with the outcome.
 5      Q.   Okay.  And since entering the injunction, is it
 6  your opinion that you've complied with its terms?
 7      A.   One hundred percent.
 8      Q.   Okay.  Is the money -- has the money ever been
 9  in Mexico?
10      A.   Never.  That was actually Mr. Kirk [sic]
11  imagination.
12      Q.   When you say --
13      A.   (Indecipherable.)
14      Q.   -- Mr. Kirk's imagination, can you describe to
15  us what the context of that statement --
16      A.   Yes.  He came up with this idea that the money
17  is in Mexico, and he has reason to believe that the
18  money is in Mexico.  The money never ever left the
19  United States and still was always in the bank with
20  Wells Fargo Bank forever.  Never left.
21      Q.   And was it ever your intention to transfer the
22  money out of the country?
23      A.   Never.  Never was my intention.  Never.
24      Q.   Okay.  Now, do you recall giving me a letter
25  yesterday, dated May 17th, from a Wells Fargo Bank
```

1  representative?

2      A.  Yes.

3      Q.  And can you explain to the Court what that

4  letter stated?

5      A.  Yes.  It all -- I had no idea that I have to

6  get the other statement.  There are not -- because

7  Mr. Kirk earlier stated that, What happened to the rest

8  of the money?  The money is in the bank -- in the Wells

9  Fargo Bank.  I just -- it was a short notice for the

10  bank to give me the statement.  I have the statement.  I

11  can forward it to you that the whole money is there.

12      Q.  And so you're willing to share all that

13  information with Mr. Flores and with WestStar and

14  Fidelity?

15      A.  As soon as possible.  Yes.

16      Q.  Okay.  Have you transferred any of the money

17  out of the accounts since the injunction was entered?

18      A.  Never.

19      Q.  Now, you heard some accusations earlier that

20  they were concerned about transfers being made.  Do you

21  know what they were referring to?

22      A.  I have no idea.  This -- I have no idea why

23  they -- why they are thinking that way.

24      Q.  So what's the total of the funds remaining in

25  the Wells Fargo accounts?

1      A.   Exactly what the -- the 700 and 338 that Mr. --

2 based on that joint temporary TRO that we signed.

3      Q.   So approximately over $1 million?

4      A.   That's correct.  Yes.

5      Q.   And is it your understanding that that amount

6 is sufficient to cover the claims of Fidelity and

7 WestStar?

8      A.   Yes.

9      Q.   And it would be sufficient to cover the claim

10 of Mr. Albert Flores?

11      A.   Of course.

12      Q.   Okay.

13           MR. MIRANDA:  All right.  No further

14 questions, Your Honor.  I'll pass the witness for now.

15           THE COURT:  Okay.  Mr. Kirk, do you have

16 any questions?

17                CROSS-EXAMINATION

18 BY MR. KIRK:

19      Q.   Mr. Parsa, aren't -- aren't you aware that

20 there's a demand for about $786,000 now from WestStar

21 and Fidelity?

22      A.   Yes, I'm aware of that.  Yes.

23      Q.   Are you not aware that there's a demand for

24 interest and attorneys' fees from Mr. Flores?

25      A.   Yes, I do.  Yes, I understand.

1    Q.    So $1,038,000 is not going to cover all that,
2  is it?
3    A.    It will, because I received my portion of the
4  money as well that I did not touch either.
5    Q.    What have you done with the rest of the money?
6    A.    It's in the bank.  I did not spend any -- a
7  penny of it.
8    Q.    Why isn't it in one of these two accounts?
9    A.    From the beginning, because I just wanted to
10 separate the money that you are claiming and the money
11 that WestStar and Fidelity are claiming.  Just -- I
12 didn't want to -- that was part of the agreement of the
13 TRO, if you remember.  That's exactly what I did.
14   Q.    So you set aside something that you think no
15 one else is asking for?
16   A.    No, it's not true.  I just wanted to clarify
17 that the funds, they are not getting mixed up.  They are
18 all -- they are translucent.  If you -- if you refer
19 to -- if you see the document that I provided a couple
20 of months ago, it's clear, but you didn't -- you didn't
21 object at that time, and I don't understand why you're
22 objecting this time.
23   Q.    I'm objecting because your attorney has been
24 saying that 700,000 in Wells Fargo takes care of
25 everything.

1      A.   No.

2              MR. MIRANDA:  Your Honor, I did not say

3 that.

4              MR. KIRK:  It's what your letter says,

5 Mr. Miranda.

6              MR. MIRANDA:  That was with regards to --

7 wait.  I'm not on the stand here.

8              Objection.  I did not say that, Your Honor.

9 It's irrelevant.

10             THE COURT:  Okay.  Let's just go ahead and

11 question the witness.

12             MR. MIRANDA:  Yes.

13             MR. KIRK:  I have nothing further for the

14 witness, Your Honor.  Thank you.

15             THE COURT:  Any other Counsel wish to ask

16 this witness any questions?

17             MR. BREWER:  Just a couple of questions.

18                  CROSS-EXAMINATION

19 BY MR. BREWER:

20     Q.   Mr. Parsa, my name is Jim Brewer.  I don't know

21 if we've ever met.  And I represent WestStar Title.

22 Montoya Park Place sold its commercial real estate in

23 the upper valley; is that right?

24     A.   Yes, sir.

25     Q.   Does it have any other assets?

1    A.   No, sir.

2    Q.   And do you understand that you signed an

3 affidavit of no liens on that sale transaction?

4    A.   There was bunch of paper that they are -- we

5 signed.

6    Q.   Okay.  Have you had a chance to look at that

7 affidavit of no liens?

8    A.   Well, you know, as I mention it to you, that

9 day we got late to -- to the closing, and there were

10 that bunch of paper we had to sign.  And they didn't

11 realize that one of them was the affidavit of --

12              MR. BREWER:  Okay.  I'll object as

13 nonresponsive, and I have no other questions.  Thank

14 you.

15              THE COURT:  Any other -- anybody else want

16 to ask any questions?

17              MR. WILLEY:  Yes, Your Honor, if you don't

18 mind.

19              THE COURT:  Please.  You may proceed.

20                    CROSS-EXAMINATION

21 BY MR. WILLEY:

22    Q.   Mr. Parsa, Michael Willey, Fidelity National

23 Title Insurance Company.  With regards to moving this

24 money or granting this money into the registry of the

25 Court, what is -- why would you characterize it -- or

1  why would you say that there's a problem with --

2      A.  I never --

3      Q.  -- moving it into the registry of the Court?

4      A.  You know, actually, that is -- I never said

5  there's a problem.  We came up with the agreement a

6  couple of months ago as a TRO, and I respect, as a good

7  citizen, the law of this country.  We came up with this

8  TRO and that's why the money is in Wells Fargo.  I did

9  not touch -- did not spend a penny of it.

10            And I do not understand, after the

11  mediation itself, you guys came up with this idea that

12  you want to transfer the money to the Court.  I don't

13  understand what you're afraid of.

14            And you mentioned earlier that at any time

15  the money can leave the country.  Maybe you would do

16  something like that.  I wouldn't do that, because I came

17  up with the agreement as a TRO, and I'm going to respect

18  that TRO.  I will never have any intention to play the

19  Court or anything like that.  So I don't understand why

20  you came up with this idea that you believe that I might

21  do that after the -- after any time.  I didn't really --

22  really follow you.

23      Q.  Well, just because you haven't shown anything

24  of wrongdoing doesn't mean that you don't have the

25  ability to commit wrongdoing.

1     A.   Everyone's innocent until proven guilty, right.

2          MR. WILLEY:  This is civil litigation,

3 Your Honor, not -- not criminal.

4          THE COURT:  I understand those

5 distinctions.  Okay.

6          MR. WILLEY:  No, actually, Your Honor, I

7 just --

8     Q.  (BY MR. WILLEY)  Real quick as well, though, in

9 the terms of the temporary injunction that you said is

10 signed and that you have been abiding by, it also

11 indicates that without prejudice WestStar Title could

12 ask for further relief in the injunctive relief that

13 you're requesting.  So why do you now not -- are not

14 abiding by those terms and allowing WestStar Title and

15 all the other parties, for safety and security, to allow

16 this money to be entered into the registry of the Court?

17          And to also answer your question of what's

18 stopping me, the -- the simple fact that it's going to

19 be registered in the Court.  I wouldn't be able to do

20 anything without a Court order.  Mr. Brewer wouldn't be

21 able to do anything without a Court order.  No parties

22 would be doing -- able to do anything without a Court

23 order.  So if you --

24          MR. MIRANDA:  Your Honor --

25          MR. WILLEY:  -- appreciate it.

```
 1                    THE COURT:  I -- I -- let me --
 2    Mr. Miranda, let me ask you this question --
 3                    MR. MIRANDA:  Yes, Your Honor.
 4                    THE COURT:  Right now this money is in
 5    Wells Fargo and in compliance with a TRO or a
 6    preliminary injunction?
 7                    MR. MIRANDA:  Yes, Your Honor.
 8                    THE COURT:  Your client is not touching it?
 9                    MR. MIRANDA:  Correct.  That's his
10    testimony.
11                    THE COURT:  Has not touched it, and you're
12    telling the Court he will not touch it.
13                    MR. MIRANDA:  Correct.
14                    THE COURT:  And he's telling the Court the
15    same thing.
16                    MR. MIRANDA:  Yes, Your Honor.
17                    THE COURT:  So how would you be in any way
18    prejudiced if it was in the registry of the Court
19    instead of in Wells -- Wells Fargo Bank?
20                    MR. MIRANDA:  It comes down to, I think,
21    what's going on behind the scenes in this litigation.  I
22    mean, it is some very contentious litigation, and
23    Mr. Parsa sees this as the way of these parties, for
24    lack of a better word, bullying him.  He's doing the
25    best he can to abide by these Courts' orders.  He's
```

1 | abided by the Court's orders.

2 | We went to mediation. It -- it failed.

3 | That doesn't mean this case may still not settle. We're

4 | doing things behind the scenes to get to that posture.

5 | And -- and more than anything -- you know, the mediation

6 | was concluded, I believe, on Friday afternoon, and the

7 | motion was filed the following Monday. So, yeah, that

8 | was my work. I said retributory. I had to look it up.

9 | THE COURT: Okay.

10 | MR. MIRANDA: And so that was the tone of

11 | the motion. I realize that it's without prejudice to

12 | ask for the relief. It doesn't mean the relief has to

13 | be granted if there's no evidence. I realize they

14 | didn't file a response to my objection. They didn't

15 | file a response or objection to my motion to vacate it.

16 | I asked this Court for a hearing on its

17 | first available setting, which was today. I realize the

18 | order said seven days, but we had a feeling that things

19 | may have been a little bit different than you thought

20 | they were. So we moved as quickly as possible to bring

21 | this back to the Court's attention, and that's why we

22 | are here today.

23 | The point is how are we prejudiced. I

24 | think that it goes to the parties' postures in trying to

25 | resolve this case. Because if it goes in the registry

1 of the Court, I mean, like we said, we may not be in

2 trial until summer of 2022. We're going to try to get

3 it to resolve -- get this resolved before then, but,

4 again, I think that the parties, the intervenors and the

5 plaintiffs are just trying to exercise leverage on

6 Mr. Parsa to get back what they claim to have mistakenly

7 paid out.

8             And realize, this isn't a dispute over

9 title. We're the -- Mr. Parsa is the owner of the

10 funds. So it's not a title dispute. It's a transfer

11 that they're asking be undone. That's really what it

12 is.

13             MR. PARSA: Can I say something?

14             MR. MIRANDA: Hold on. You don't have to

15 say anything right now, Mr. Parsa.

16             MR. PARSA: I'm sorry?

17             MR. MIRANDA: No. Hold on, Mr. Parsa.

18             Unless -- Your Honor, if you'd like to

19 question Mr. Parsa directly, that's well within your

20 discretion.

21             THE COURT: I -- I don't but it is

22 Dr. Parsa.

23             And, Doctor, I -- here is how I think I

24 should rule, and I want to explain this to you. I do

25 not have a basis for thinking that you're going to move

1  that money, and I do not have any basis to think you're

2  going to do anything devious or that you're going to do

3  anything sneaky or inappropriate. And I take and give

4  full credibility to everything you have said, that you

5  are honoring the injunction and that you intend to

6  continue to honor the injunction.

7            But I do understand the apprehension and

8  the fear of these -- these other lawyers and their

9  clients who don't know you and, you know, their interest

10  in wanting to get just some more security just in case

11  you were to do something with that money.

12            And so I am going to deny the motion to

13  abate that order. I don't know if I need to do another

14  order confirming that. I think the order was originally

15  in place. And I will accept full responsibility for the

16  confusion that has occurred here. You know, this is

17  part of Zoom life. I mean, I think had me or Judge Chew

18  or somebody been sitting in a -- in chambers and a

19  lawyer comes in and says, We've got this joint motion,

20  there would have been a discussion about, Well, is

21  everybody on board? Is there any objection?

22            But, you know, in the Zoom world we're in,

23  when you get a e-mail that there is a joint motion, you

24  just say, Okay; if it's a joint motion, send me an order

25  and I'll sign it. And that's what happened. And I

1 probably should have been more diligent and asked some

2 questions about the joint motion.

3        And I'm not criticizing the lawyers who

4 filed it as a joint motion, because it was joint as to

5 the two of the parties who were filing it.  So I

6 didn't -- I was not as attentive to all those details as

7 I should have been.  But I think at this stage of the

8 proceedings, what we are going to do is leave the

9 original order to deposit the money in the registry of

10 the Court in place.

11        That order would allow the doctor and

12 Mr. Miranda to ask for access to it at any time.  And,

13 you know, you would be free, if there was a need that

14 arose, for -- to come in and say, We need relief from

15 this order, and we'd have a hearing and I'd rule on it

16 at that time.  But right now I think the most cautious

17 thing to do is to go ahead and just leave the order in

18 place.

19        I think it did say that there were -- the

20 interpleader had to be done within a certain time.  All

21 of those times will run from today.  So if he's got,

22 like, 10 days to get it into the registry of the Court,

23 that will start from today.

24        Okay.  Let's go ahead and talk about

25 getting a trial setting.  And obviously, based on our

1  discussion we've had about where those funds are going

2  to be, I think it is in everybody's interest to get a

3  trial setting as quickly as we can.

4             MR. PARSA:  Can I say --

5             THE COURT:  Let's let everybody, you know,

6  raise everything and let's try and get this done.

7             MR. PARSA:  Can I say something,

8  Your Honor?

9             THE COURT:  Well, you do have a lawyer

10  representing you, so --

11             MR. PARSA:  But I cannot talk to my

12  attorney --

13             THE COURT:  Well, if you want, we can have

14  a short pause, and if you want -- I guess you are not in

15  the same location as your lawyer?

16             MR. PARSA:  No.

17             THE COURT:  You probably do have cell phone

18  communication, and if you want to take a few minutes and

19  speak with your lawyer, I'm going to give you that

20  opportunity.  You can go ahead and communicate with your

21  lawyer and we'll just wait.

22             MR. PARSA:  Thank you.

23             THE COURT:  Though you might want to mute

24  yourself so we don't hear what you and your lawyer are

25  saying.  And when you-all are ready to get back on, get

1   back on.  We'll just wait for you.

2              MR. MIRANDA:  Thank you, Your Honor.

3              (A break taken.)

4              THE COURT:  Before we talk about

5   scheduling, I do need to tell you what Ms. Alarcon

6   impressed upon me.  As -- as you all know, there's been

7   over a year with no trials scheduled.  We are now

8   beginning to try cases.  We have a huge backlog, so when

9   we do slot in a date, it has to be absolutely firm and

10  everybody's got to be ready to go, because we need to do

11  that to begin to address the backlog.  If, you know, we

12  set something and then there's continuances and more

13  continuances, we're not going to be able to get our head

14  above water.

15             So, Ms. Alarcon, can you give us potential

16  dates, the -- the earliest ones I think that the Court

17  can be available?

18             COURT COORDINATOR:  Yes, Judge.  The

19  earliest I have is March -- I'm sorry -- February

20  the 28th for the pretrial and June -- and March 1st for

21  the jury trial.

22             THE COURT:  And this is next -- 2022?

23             COURT COORDINATOR:  Yes, sir.

24             After that, though, it will not be until

25  June, and my first available is June 6th.

1          MR. KIRK:  Has anyone asked for a jury?

2          COURT COORDINATOR:  Let me check.

3          THE COURT:  You know, that was something

4  else I was going to say, and that is that if you-all

5  want to try this to the Court, we can just do it

6  whenever.  I mean, Ms. Alarcon's limitations are because

7  of the demands we have for juries after a year of not

8  having any.  But if we want to try this non-jury, we

9  could do it probably much quicker.

10          MR. ROMAN:  Has there been a jury fee paid

11  by anybody?

12          THE COURT:  I have no idea.

13          COURT COORDINATOR:  I'm checking.

14          No, sir.

15          THE COURT:  Okay.  Well, let's try -- try a

16  different tack [sic].  How long would it take you-all to

17  get this case ready to try on a non-jury basis?

18          MR. MIRANDA:  Your Honor, this is Carlos

19  Miranda.  We haven't started discovery.  Mr. Kirk just

20  served discovery last week on behalf of Mr. Flores, but

21  there will probably be discovery depositions.  So we

22  would probably need at least 120 days of discovery.

23  That's being optimistic.

24          THE COURT:  Sure.  Well, we could do that

25  and still give you a date this calendar year.

```
 1              MR. MIRANDA:  Correct.  Yes.
 2              THE COURT:  Does everybody sort of agree
 3  that we could, you know, do a non-jury trial in November
 4  or something around that time frame?
 5              MR. WILLEY:  Well, Your Honor, Fidelity
 6  National Title Insurance Company doesn't have any
 7  objections to that.
 8              MR. BREWER:  Same with WestStar Title.
 9  We'd be fine with the non-jury.  And -- and
10  Mr. Miranda's time frame sounds about right.
11              MR. ROMAN:  On behalf of Deborah Jordan,
12  Your Honor -- Judge Spieczny, we've got no objections.
13  It's -- it's a documents case.  The testimony is not
14  going to change what's in the documents, so we have no
15  objections.
16              THE COURT:  It sounds like there's going to
17  be not more than a few depositions and a lot of
18  documents, so --
19              COURT COORDINATOR:  How many days are we
20  looking at, Judge?
21              THE COURT:  Ms. Alarcon, what's -- pardon?
22              COURT COORDINATOR:  How many days are we
23  looking at?
24              THE COURT:  I think for non-jury maybe two
25  to three.  I mean, at most I would think a three-day
```

```
 1  trial.  Does everybody agree with that?
 2              MR. BREWER:  Agreed.
 3              MR. MIRANDA:  Agreed.
 4              MR. WILLEY:  Yes, Your Honor.  I don't see
 5  it more than three.
 6              COURT COORDINATOR:  Three whole days?
 7              I do have October the 19th, to begin the
 8  19th, and continue until the 21st available.
 9              THE COURT:  Everybody good with
10  October 19th?
11              MR. MIRANDA:  Yes, Your Honor.
12              THE COURT:  That's roughly five months from
13  now, so -- actually, it's almost exactly five months
14  from now.  All right.  Well, let's just set this for a
15  non-jury trial on October 19th.  Let me write that down.
16              COURT COORDINATOR:  Beginning at 10:00.
17  Yes, Judge?
18              THE COURT:  That's fine.
19              COURT COORDINATOR:  Okay.
20              THE COURT:  Is everybody here -- we've got
21  some out-of-town folks.  Would you be flying in that
22  day?  Does anybody need to start a little bit later?
23              MR. WILLEY:  If it's going to be in person,
24  Your Honor, yeah, we -- we're fine with that.
25              COURT COORDINATOR:  That was my other
```

1  question, Judge.  Will this be via Zoom or in person?

2  THE COURT:  My preference would be in

3  person.  I have had both vaccines.  I would feel

4  comfortable.  I think we would still do some social

5  distancing.  We may have some use of masks, but I'm not

6  going to impose that on anybody.

7  What I think we should do is wait until

8  maybe September to make that decision.  If more and more

9  people are getting vaccinated and it looks -- and

10  everybody is comfortable doing it safely, I would be

11  fine doing it in person.  But if people are

12  uncomfortable with that and really want to do it by

13  Zoom, or if people are appearing from out of town and

14  want to do that by Zoom, I think we could allow that,

15  also.

16  So when would we normally do a pretrial?

17  Like three or four weeks before?

18  COURT COORDINATOR:  Normally, Judge -- I

19  mean, I don't know -- I'm sure that, you know, if you

20  want to do it a little different -- we usually don't

21  have a pretrial before, but maybe because -- since this

22  is a three-day bench trial, I don't know if that's what

23  you want to do.  We can set it and by then we should

24  know.

25  I was just going to check with the Judge

1  just because of OCA.  I'm not sure as far as -- I know

2  that right now they have strict guidelines as far as

3  having in-person hearings, but I don't know if she feels

4  like maybe October will be okay.

5          THE COURT:  Okay.  Well, the -- the Office

6  of Court Administration does have some guidelines.  The

7  Texas Supreme Court has some guidelines.  Our Council of

8  Judges has some guidelines.  If based on any of those

9  guidelines we cannot go forward, we cannot go forward.

10 But I think we can, and I think certainly by October we

11 can.

12          And, you know, if the world changes and all

13 of a sudden there's another wave and the pandemic gets

14 worse, we'll have to reconsider it.  But I think for

15 right now let's schedule it for October 19th, and let's

16 have a pretrial one month before, sometime in, you know,

17 late September.  And at the pretrial, if there's any

18 questions about COVID and how safe it is, we'll

19 entertain those at that time.

20          COURT COORDINATOR:  So, Judge, do you mind

21 if I do it September 21st?

22          THE COURT:  No.  That sounds okay to me.

23          COURT COORDINATOR:  At 10:00.

24          THE COURT:  Okay.

25          COURT COORDINATOR:  And then what I can do

39

1  is, I can still provide you with a Zoom link for that

2  particular day, and then if, of course, anything

3  changes, then we just don't need the Zoom information.

4           THE COURT: For right now double book. I

5  mean, everything we're doing right now, keep Zoom links.

6  But I think we hopefully will reach the point where we

7  can do some of this stuff in person.

8           COURT COORDINATOR: Okay. Okay, Judge.

9           THE COURT: Okay.

10          COURT COORDINATOR: I'll send out the

11  notice.

12          THE COURT: Ms. Alarcon, is there anything

13  else you need from anybody in terms of getting

14  everything we need to do in terms of scheduling?

15          COURT COORDINATOR: No, sir. Just if they

16  have any pleadings that need to be reviewed by you, if

17  they can just either e-mail them to me or -- I don't

18  know if you want them to e-mail them to you directly and

19  just copy everyone or they --

20          THE COURT: I think file everything with

21  the Court.

22          COURT COORDINATOR: Okay.

23          THE COURT: Then if there's motions for

24  summary judgment or motions -- whatever motions there

25  are, Ms. Alarcon will schedule, and she'll be in charge

1   of setting -- getting ahold of me and setting a hearing.

2           MR. MIRANDA: Thank you, Your Honor.

3           THE COURT: Okay. Thank you. And, you

4   know, if you -- the fact that we're scheduling this for

5   trial does not mean you cannot settle it among

6   yourselves if you wish to. So, you know, good luck with

7   whatever you-all do. Everybody stay safe.

8           COURT COORDINATOR: I'm sorry, Judge. Just

9   one more thing. Are you going to be signing another

10   order or is the order that you already signed in place?

11           THE COURT: Does everybody understand the

12   order that I announced today?

13           MR. MIRANDA: Yes, Your Honor. I think we

14   can interpret it as the deal is what the deal is plus

15   10 days from today.

16           THE COURT: Yes. There is 10 days to --

17   starting today to comply with what the prior order was,

18   so I don't think I need a new order.

19           COURT COORDINATOR: Okay. And then you're

20   not going to order them to mediation, correct?

21           THE COURT: Not at this time. They went a

22   little while ago. If -- as we're going down the road,

23   if you-all think that would be helpful and you need me

24   to order the mediation, you know, raise that and file a

25   motion asking for it, but as of now I'm not going to

1  make that order again.

2          Okay.  Thank you, and we will be

3  dismissed -- you-all are dismissed.

4          (Proceedings concluded.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

42

1  STATE OF TEXAS              )

2  COUNTY OF EL PASO           )

3

4      I, Maria I. Stallings, Official Court Reporter in

5  and for the 327th District Court of El Paso County,

6  State of Texas, do hereby certify that the above and

7  foregoing contains a true and correct transcription of

8  all portions of evidence and other proceedings requested

9  in writing by counsel for the parties to be included in

10 this volume of the Reporter's Record, in the

11 above-styled and numbered cause, all of which occurred

12 in open court or in chambers and were reported by me.

13     I further certify that this Reporter's Record of

14 the proceedings truly and correctly reflects the

15 exhibits, if any, offered by the respective parties.

16     I further certify that the total cost for the

17 preparation of this Reporter's Record is $70.00 and was

18 paid by Mr. James Brewer, Esq.

19     WITNESS MY OFFICIAL HAND this the _2_nd day of

20 June, 2021.

21

22                         /s/ Maria I. Stallings
                           MARIA I. STALLINGS, Texas CSR# 8229
23                         Official Court Reporter
                           327th District Court
24                         500 E. San Antonio, Rm. 606
                           El Paso, TX 79901
25                         (915) 546-2032
                           Expires May 31, 2023

# EXHIBIT "E"

1          REPORTER'S RECORD          COPY

2      TRIAL COURT CAUSE NO. 2020DCV2997

3          VOLUME 1 OF 1 VOLUMES

4  ALBERTO FLORES,            )
        Plaintiff,            )
5  vs.                        )
   KEYVAN PARSA, M.D. and     )
6  MONTOYA PARK PLACE, INC.,  )
        Defendants,           )  IN THE DISTRICT COURT
7                             )
   vs.                        )  OF EL PASO COUNTY, TEXAS
8                             )
   WESTSTAR TITLE, L.L.C.,    )  327TH JUDICIAL DISTRICT
9  Intervenor/Third-Party     )
   Plaintiff,                 )
10                            )
   Fidelity National Title    )
11 Insurance, CO.             )

12

13      *********************************

14          MOTIONS HEARING

15      *********************************

16      The 8th day of June, 2021, the following

17  proceedings came on to be heard in the above-entitled

18  and numbered cause before the Honorable THOMAS A.

19  SPIECZNY Judge Presiding, via Zoom in accordance with

20  the Supreme Court of Texas' Emergency Order Regarding

21  the COVID-19 State of Disaster, held in El Paso, El Paso

22  County, Texas:

23      Proceedings reported by machine shorthand

24  utilizing computer-assisted realtime transcription.

25

2

1                          APPEARANCES

2

3   Mr. E.P. Bud Kirk              Ms. Shakira Ali Kelley
    SBOT NO. 11508650             SBOF NO. 91292
4   ATTORNEY AT LAW               FIDELITY NATIONAL LAW
    600 Sunland Park Dr., Bldg    GROUP
5   4, Ste 400                    6900 Dallas Pkwy, Ste 610
    El Paso, Texas 79912          Plano, Texas 75024
6   (915) 584-3773                (972) 812-6407
    Budkirk@aol.com               Shakira.kelley@fnf.com
7
    ATTORNEY FOR                  ATTORNEY FOR FIDELITY
8   PLAINTIFF/DEFENDANT/          NATIONAL TITLE INSURANCE
    COUNTER PLAINTIFF FLORES      COMPANY
9
    Mr. Troy C. Brown             Mr. James Brewer
10  SBOT NO. 00783735             SBOT NO. 02965200
    ATTORNEY AT LAW               KEMP SMITH, L.L.P.
11  1074 Country Club Rd.,        221 N. Kansas, Suite 1700
    Suite B-1                     El Paso, Texas 79901
12  El Paso, Texas 79932          (915) 533-4424
    (915) 543-9669                James.brewer@kempsmith.com
13  Troy@tcblegal.com
                                  ATTORNEY FOR INTERVENOR
14  ATTORNEY FOR DEFENDANTS       WESTSTAR
    MONTOYA PARK PLACE AND
15  KEYVAN PARSA

16

17

18

19

20

21

22

23

24

25

3

```
 1                    CHRONOLOGICAL INDEX
                     VOLUME 1 OF 1 VOLUMES
 2                      MOTIONS HEARING

 3                                        PAGE    VOL
       June 8, 2021
 4

 5     Announcement of Counsel....................    4     1

 6     Motion by Mr. Brown.......................    5     1

 7     Response by Mr. Kirk......................   12     1

 8     Response by Mr. Brewer....................   13     1

 9     Response by Ms. Kelley....................   15     1

10

11     DEFENDANTS' WITNESSES  Direct   Cross    Voir Dire   VOL

12     KEYVAN PARSA           18,50   22,27      - -         1

13                                    31,53      - -         1

14

15     Motion by Mr. Brown.......................   37     1

16     Response by Mr. Kirk......................   40     1

17     Response by Mr. Brewer....................   40     1

18     Response by Ms. Kelley....................   41     1

19     Response to Question by Ms. Kelley........   43     1

20     Response to Question by Mr. Brewer........   44     1

21     Response to Question by Mr. Kirk..........   45     1

22     Court's Ruling............................   55     1

23     Adjournment...............................   57     1

24     Court Reporter's Certificate..............   58     1

25
```

4

1           THE COURT:  I will call the case of Albert

2  Flores versus Keyvan Parsa, M.D., and Montoya Park

3  Place, Inc., defendants, and WestStar Title and Fidelity

4  National Title Insurance as intervenors/third-party

5  plaintiffs versus Mr. -- Dr. Parsa, Montoya Park Place,

6  Albert Flores and Deborah Jordan, third-party

7  defendants, Cause Number 2020DCV2997.

8           Could we have the announcements, please?

9           MS. KELLEY:  Shakira Ali Kelley,

10  K-E-L-L-E-Y, on behalf of Fidelity National Title

11  Insurance Company, Your Honor.

12           MR. BREWER:  Good afternoon, Your Honor.

13  Jim Brewer on behalf of WestStar Title, L.L.C.

14           MR. KIRK:  Bud Kirk on behalf of Albert

15  Flores.

16           MR. BROWN:  And Troy Brown, Your Honor, on

17  behalf of defendants, Dr. Keyvan Parsa and Montoya Park

18  Place, Inc.

19           THE COURT:  Okay.  I believe we've got two

20  different motions pending today.  There was a motion

21  filed by Mr. Brown to reconsider the earlier order to

22  deposit funds into the registry of the Court, and there

23  is a motion also to have a motion for contempt.  So I

24  think we'll go ahead --

25           Mr. Brown, I'll hear your motion first.

5

1          MR. BROWN:  Okay.

2          THE COURT:  You may proceed.

3          MR. BROWN:  Thank you, Your Honor.

4          The Court is correct.  We filed a -- a

5 second motion for reconsideration since I came into this

6 case substituting in for Carlos Miranda.  And this was

7 filed on May 28th, 2021.

8          At -- at that time, to my understanding,

9 the Court had entered an order on -- on May 8th -- 18th,

10 requiring these defendants to deposit certain monies

11 into the registry of the Court.  And for purposes of

12 this hearing, what I'll do is call them the deposited

13 funds, because that's how they were denominated in

14 WestStar and Fidelity's original joint motion for

15 interpleader.

16          The -- the joint motion spoke in terms of

17 interpleader, and so on May 28th I filed a motion for

18 reconsideration really addressing the elements of an

19 interpleader and a proper interpleader action and it

20 doesn't fit here.

21          And -- and then in -- in WestStar's

22 response to the motion for reconsideration, what it

23 appeared they were really asking was simply that monies

24 be deposited into the registry of the Court, which --

25          THE COURT:  In their response, you're

6

1   referring to the motion for contempt?

2           MR. BROWN: No, I'm not -- the -- the

3   motion for contempt came after that, I believe.

4           THE COURT: Okay. I'm not sure I've seen

5   that response, but -- but go ahead and continue.

6           MR. BROWN: Okay. Well, to -- in a

7   nutshell, Judge, what -- what WestStar argued in their

8   response was, Well, Rule 43 or 143, whatever the Rule

9   is, doesn't -- doesn't apply here because it's just a

10  standard related to deposit of monies into the registry

11  of the Court, and they cited some case law. That case

12  law says, essentially, that unless there is evidence

13  that the monies at issue, what I'll call the deposited

14  funds here -- unless there's evidence that those monies

15  are in danger of being lost or depleted, it's not

16  appropriate. In fact, it's an abuse of discretion to

17  order the monies be placed in the registry of the Court.

18          And -- and what you had here, if we go

19  back -- and what I've -- what I've also done, Judge --

20  and I -- I sent it probably a little over an hour or so

21  before the hearing to you at your e-mail address. It

22  took me a while to -- to find your e-mail address, but

23  in any event, at the hearing --

24          THE COURT: What e-mail address did you

25  send something to?

```
 1              MR. BROWN:  Let me -- let me see.
 2         Tomspieczny@yahoo.com.
 3              THE COURT:  Okay.  You sent that an hour
 4    ago?
 5              MR. BROWN:  About 1:15, Judge, so not quite
 6    an hour.  But what I -- I sent are copies of our
 7    pleadings and then the most recent pleading, which we
 8    filed today, which was a reply to the response.
 9              But if you look at the -- the hearing
10    transcript, which I didn't have at the time I filed the
11    motion for reconsideration, during that hearing, it --
12    it appeared to me that all Counsel were really of the
13    opinion that the -- the monies at issue had not been
14    transferred or moved or there's no mutations of that
15    money, not only since the temporary injunction was --
16    was agreed and put in place but as far back as July 20th
17    of 2020.
18              In fact, attached to -- to the original
19    joint motion was an Exhibit B, and that Exhibit B had
20    two letters from Wells Fargo Bank identifying that the
21    sums of 700,000 and 338,000, which are the -- the funds
22    at issue, the deposited funds -- that those funds
23    remained under deposit as of at least January 14th,
24    2021, with Wells Fargo Bank.  And that was before the
25    temporary injunction was -- was consented to and signed
```

1  by this Court and then before it was filed of record on

2  January 27th, 2021.

3                At the hearing Dr. Parsa testified that any

4  claim that the monies -- and this came in an affidavit

5  attached to Albert Flores's petitions -- any claim that

6  the monies were ever transferred to Mexico was -- was

7  not true.  And, in fact, if we look at those same

8  letters that are attached as Exhibit B to -- to the

9  joint motion, they indicate that the funds were

10  originally deposited on July 20th of 2020.  That's well

11  in advance of the -- of the lawsuit being filed in

12  September of 2020; obviously well in advance of the

13  temporary injunction.

14                Dr. Parsa continued to testify that the --

15  the -- the monies remained on account in the sum of

16  $1,038,000 as of the hearing on May 18th, 2021.  Mr. --

17  I think his name was Willey, who was at that point

18  Fidelity's counsel, said on the record -- and I've

19  included these -- these passages from the transcript in

20  both the response to the motion for contempt and in our

21  reply to the -- the responses to our motion for

22  reconsideration.  Mr. Willey said on the record, Even

23  though we don't have any basis to believe that

24  these mon- -- that anything has happened with these

25  monies to date, meaning at least as of May 18th, 2021,

1  nevertheless it could happen tomorrow.  Well, that's --

2  that's not the standard.

3          The standard is -- is whether the -- the

4  monies are in danger of being lost or depleted.  And

5  based on the evidence that was attached to the joint

6  motion, Mr. -- or excuse me -- Dr. Parsa's testimony at

7  the hearing, there was no evidence, and Your Honor

8  actually agreed with that, in explaining the ruling at

9  that time to Dr. Parsa that -- that Your Honor agreed

10 that he was credible in his statements and -- and in

11 view of the -- the documentary evidence that had been

12 provided at that time, that there was no concern that

13 there was going to be any kind of improper activity.

14 And, of course, there hadn't been any transfer of any

15 monies at that time.

16          I would like to call Dr. Parsa just briefly

17 in a moment, but to -- to continue on, the -- the

18 responses to our motion for reconsideration, both by the

19 plaintiff and by WestStar, don't provide any new

20 evidence that's not already been before the Court that

21 there's any danger of the monies being lost or depleted.

22          In fact, Albert Flores, in his response,

23 says, Well, at some point -- and he's just reiterating

24 what he said attached to his petition, which hasn't been

25 substantiated, which is, Well, he -- Dr. Parsa told me

1 the monies had been transferred to Mexico.  Well,

2 there's no reason to believe that occurred based on all

3 the deposit information we have that's been before the

4 Court, which was that on July 20th the monies were, in

5 fact, in the Wells Fargo account.

6           The only place they had been before that

7 was the West- -- was the Western Heritage account, and

8 the monies remained on deposit since then.  So there's

9 no -- there's -- there's simply no credibility to any

10 kind of, I guess, speculation that the monies went to

11 Mexico.

12           And -- and then WestStar says, Well,

13 there's evidence that it's in the name at this time --

14 although remaining in the Wells Fargo accounts, it's in

15 the name of Westmount Group, Inc., and -- and in -- and,

16 in fact, that is also contained within the Exhibit B to

17 their original joint motion.  So putting aside for the

18 moment that the monies are in accounts in the name of

19 Westmount Group, Inc., and not -- and not Dr. Parsa or

20 Montoya Park Place, Inc. -- putting that aside for the

21 moment, those same letters show the monies were on

22 deposit on -- on July 20th, 2020, and that hasn't

23 changed.

24           And so any allegation in -- in any of these

25 motions that somehow the monies have been moved around

1   or been -- have been gone -- undergone any mutations is

2   simply -- simply incorrect.  And I --

3              THE COURT:  Let me just ask you about those

4   dates.  The -- you said there is documentation

5   confirming that the money was in the bank, untouched,

6   July 20th, 2020?

7              MR. BROWN:  That's right.

8              THE COURT:  So that's just about a year

9   ago.

10             MR. BROWN:  Right.

11             THE COURT:  Okay.  What is the current

12  status of -- is there something showing where they are

13  today or very recently?

14             MR. BROWN:  Well, I'd like to -- to put --

15  to put Dr. Parsa on the stand just briefly to talk about

16  that, but his testimony at the last hearing was -- and

17  there was mention by Attorney Miranda that there had

18  been a -- a letter circulated among the parties showing

19  that the monies were on account on -- at Wells Fargo as

20  of May 18th, 2021.

21             THE COURT:  Okay.  Let me -- you'll --

22  you'll have a right to put him on, but let me hear

23  briefly from each of the other lawyers before we start

24  hearing evidence.

25             Mr. Kirk, do you want to go next?

1          MR. KIRK:  Yes.  Thank you, Your Honor.

2               If the Court bases its ruling to deposit

3    funds into the registry on the risk, danger of

4    depletion, we have evidence now that there is danger of

5    depletion.  We've learned that instead of these funds

6    being in unfettered accounts, one of the accounts is put

7    up as collateral for a loan that Dr. Parsa used to buy

8    some equipment for his practice, and the other account

9    has a -- an early withdrawal penalty -- a substantial

10   $60,000 early withdrawal penalty.

11              So there is danger of depletion.  There is

12   danger of depletion if there's a default on whatever the

13   loan obligation is.  There's also danger of depletion if

14   Dr. Parsa doesn't put up other funds instead of these

15   restricted funds, these funds that are at risk of

16   depletion.  And Dr. Parsa --

17              THE REPORTER:  Mr. Kirk, I'm sorry.  There

18   was interference.  Can you repeat?

19              MR. KIRK:  Thank you.

20              Dr. Parsa took away from the closing

21   1,829,000, a few days later, at Mr. Flores' request,

22   paid Mr. Flores what he said he had to have right away

23   and that was 280,000.  So Dr. Parsa has almost a million

24   six.  And what funds did he point us to as security not

25   to worry?  It was funds that he'd already tied up at the

1 time, put at risk of depletion at the time and not told

2 anybody about that.

3         THE COURT: Let -- let me ask you a

4 question.  You mentioned an early withdrawal penalty.

5 If I were to order that these funds be put into the

6 registry of the Court, would that penalty be invoked and

7 the bank would impose that penalty?

8         MR. KIRK:  All we have is Dr. Parsa's word

9 for that, and I don't know why he couldn't use some

10 other part of the million six to put this money into the

11 Court.  Why is he saying, you know, The security that I

12 have for these gentlemen is these funds, funds that he's

13 already not able to reach himself?

14         THE COURT:  Yeah.  He -- they're

15 encumbered.

16         MR. KIRK:  Because of the early withdrawal

17 penalty and because of the encumbrance.  One account is

18 put up as collateral for the loan.

19         THE COURT:  Okay.  Mr. Brewer, could I hear

20 from you next?

21         MR. BREWER:  Sure.  Jim Brewer on behalf of

22 WestStar Title.  Just very briefly, I'll start with the

23 obvious.  We've already had a hearing on this back in

24 May, an evidentiary hearing in which the Court ruled.  I

25 think -- I don't think it's right for a party to simply

1  go out and get new counsel and try again.  I don't think

2  that's appropriate, and I don't think that sets a good

3  precedent.  That's the -- that's the obvious thing.

4          Secondly, I do think that the Court's order

5  was correct, and I think it should stand.  The -- we are

6  talking about a specific fund of money that is -- that

7  are sale proceeds from a sale by a Montoya Park Place,

8  L.L.C.  That entity is -- has two different

9  stakeholders, I guess, or -- or principals, Mr. Flores

10  and Mr. Parsa, and they are at odds.

11          Mr. Parsa has taken the money himself and

12  has moved them at least twice, once to Western Heritage

13  Bank and the second time to Wells Fargo Bank.  The Wells

14  Fargo Bank account, as has been discussed, is in the

15  name of a different entity, not a party to this lawsuit,

16  Westmount Group, Inc.  I don't know why that is.  I

17  don't know why Montoya Park Place, L.L.C., is not

18  holding the sale proceeds.  And -- and those proceeds

19  have been pledged.

20          Mr. Parsa testified at the last hearing

21  that Montoya Park Place has no other assets, and -- and

22  we have allegations, at least, of money going into

23  Mexico.  I think taking the -- taking the sum of all

24  these different factors, there is sufficient at least

25  concern or danger that these funds could be lost if

15

```
 1  they're not placed in the registry of the Court.  And I
 2  think that Mr. Parsa's refusal to comply since April is
 3  further evidence of that.
 4           That's -- that's -- that's what I have to
 5  say.  Thank you.
 6           THE COURT:  Ms. Kelley.
 7           MS. KELLEY:  Your Honor, good afternoon.
 8  Shakira Kelley on behalf of Fidelity.
 9           Mr. Brown is correct.  I was not counsel
10  for Fidelity at the last hearing, but I have
11  supplemented the Court transcript as Exhibit B to my
12  motion, which holds the testimony.
13           And to echo what Mr. Brewer just said,
14  there has -- we have -- there was an evidentiary motion,
15  which was actually a reconsideration as well.  The
16  initial deadline for the Court funds was May 6th, which
17  was then extended to -- to May 28th for the deposit in
18  the Court registry.  I filed my motion on June 7th.
19  Today is July 8th.
20           From those dates there has been no
21  compliance or attempt to at least deposit any of the
22  funds, any half of it, any quarter of it.  At any point
23  they could -- if they were to move for
24  reconsideration -- and I do -- I do agree, I don't
25  believe there's anything new pledged in this motion, but
```

1  if there is anything new, they still could have complied

2  with the Court order.

3           And I know I'm going into my motion, but

4  essentially this is my response for the motion for

5  reconsideration as well.  Reviewing the transcript,

6  Your Honor, Mr. Brown reiterates about the funds being

7  held in the Wells Fargo account.  The Court questioned

8  counsel for Mr. Parsa how they would be prejudiced if

9  they would just transfer it into the Court registry and

10  for the funds to remain there instead of the Wells Fargo

11  account.  At no point there was there any evidentiary

12  information given of a pre-penalty depository fee or

13  anything like that.

14           And as we state today, we don't actually

15  know where the funds are to -- from recent amounts.  We

16  do know that I -- Mr. Miranda, counsel for Mr. Parsa, is

17  no longer counsel, and the due date for these funds to

18  be deposited, May 28th, was the date of the appearance

19  of the new counsel.  So those actions by itself allude

20  to a voluntary disobedience of the previous Court order,

21  when, again, we've already had a testimony hearing.

22  There has been no -- there is no Rules of Civil

23  Procedure which will allow a -- an additional

24  reconsideration without applying by the following Court

25  order.

1          And I do want to echo what -- what Mr. Kirk

2    said as well, or I believe Mr. Brewer.  We do have a --

3    the concern remains.  These funds, as we last know of

4    them, were in a account with a different entity that is

5    not related to this party at all, and there is still

6    sufficient funds that would have covered the demands

7    between these parties and there would be additional to

8    account for on top of that.

9          So there -- there has been new -- no new

10   evidence that would show that these funds don't --

11   should be in the Court regis- -- shouldn't be in the

12   Court registry.  There's been no new evidence offered.

13   And, more so, if anything, I believe that almost six --

14   two-month delay to abide by the following Court order

15   shows more reason for harm.

16          There's a reason why they don't want to

17   deposit these funds into the Court registry and abide by

18   Court orders.  You don't see Court orders on such a

19   large amount as being disobeyed unless the money is not

20   there.  I mean, that is the natural conclusion that we

21   are going to be concerned about, because why not just --

22   why not just comply with the Court order.

23          THE COURT:  Okay.  I think I understand

24   everybody's position.

25          Mr. Brown, I will allow you to put on your

1  witness.

2          Doctor, would you raise your right hand,

3  please?

4                    KEYVAN PARSA,

5  having been first duly sworn by the Court, testified as

6  follows:

7                  DIRECT EXAMINATION

8  BY MR. BROWN:

9      Q.   Dr. Parsa, can you please state your full name?

10     A.   Keyvan Parsa.

11     Q.   Doctor, you remember when you were here back on

12 May 18th of this year and you testified on -- on the

13 original motion that the defendants, Fidelity and

14 WestStar, had filed for interpleader.  Do you remember

15 that?

16     A.   Yes.

17     Q.   And at that time I believe that you testified

18 that the monies at issue, the $700,000 and the $338,000,

19 remained on deposit at Wells Fargo; is that correct?

20     A.   Yes.

21     Q.   As of today, July 8th, 2021, do those monies

22 still remain on deposit in those same accounts?

23     A.   Yes, sir.

24     Q.   When were the monies originally deposited into

25 those accounts?

```
 1        A.   July 2020.

 2        Q.   And --

 3        A.   July -- July 20th, 2020.

 4        Q.   Now, after that but before the lawsuit, were

 5   the monies used as collateral for a credit line?

 6        A.   Yes.

 7        Q.   When did that take place after July 20th of

 8   2020?

 9        A.   August 2020.

10        Q.   And that was in the name of what account

11   holder?

12        A.   Westmount Group.

13             THE COURT:  Can you speak a little louder,

14   please?

15             THE WITNESS:  Yes.

16             Westmount Group.

17        Q.   (BY MR. BROWN)  And is the correct name of that

18   entity Westmount Group, Inc.?

19        A.   Yes.

20        Q.   How are you affiliated with that entity?

21        A.   I'm the president.

22        Q.   All right.  There's an Exhibit B that was

23   attached to the joint motion for interpleader.  You've

24   had an opportunity to review that in preparation for

25   today?
```

1    A.   Yes.

2    Q.   There were a couple letters that were attached

3 that identified accounts in the name of Westmount Group,

4 Inc., which back in January of 2021 had the respective

5 sums of 700,000 and -- and 338,000 in them; is that

6 correct?

7    A.   That is correct.

8    Q.   Now, are those the same accounts and the same

9 funds that were deposited back in July of -- of '20?

10    A.   Identical, yes.

11    Q.   And so, to my understanding, a temporary

12 injunction was issued and entered into in this case in

13 the latter part of January of 2021; is that correct?

14    A.   Yes.

15    Q.   So since that date has there been any change in

16 where these monies are deposited and in -- in what name?

17    A.   No.

18    Q.   If -- if the monies were to be removed at this

19 point, are there any consequences that would flow --

20 monetary consequences that would flow from doing that?

21    A.   Yes.

22    Q.   What are those?

23    A.   At least the 4.5 penalty plus other fees, and,

24 also, there are tax -- tax consequences, and most

25 importantly, it's pledged to the loan, so it virtually

1  is illegal for me to take the funds and send it to the

2  registry of the Court.

3      Q.   Now, you said 4.5 penalty.  Is it a

4  4.5 percent --

5      A.   Percent penalty.  Yes.

6      Q.   Calculated on the sum of $1,038,000?

7      A.   At least, yes.

8      Q.   And you said there were other penalties or fees

9  that would be incurred?

10     A.   Yes.

11     Q.   And would the -- you said it was -- it would be

12  illegal to -- since the monies have been pledged as

13  collateral, to -- to remove the funds from the accounts.

14  Are you saying that in your -- to your understanding

15  that would be a breach of the contract where -- whereby

16  the funds were -- the monies were pledged?

17     A.   Yes, that is correct.

18              MS. KELLEY:  Objection, legal conclusion.

19              THE COURT:  I'll -- I'll overrule it.

20              You may continue.

21              MR. BROWN:  I'll pass the witness,

22  Your Honor.

23              THE COURT:  Okay.  Let's keep the same

24  order.

25              Mr. Kirk, do you want to question this

```
 1  witness?
 2                  MR. KIRK:  Yes, Your Honor.  Thank you.
 3                       CROSS-EXAMINATION
 4  BY MR. KIRK:
 5      Q.   Dr. Parsa, why did you not tell Albert Flores
 6  about the deposits into the Wells Fargo accounts?
 7                  THE WITNESS:  Do I need to answer the
 8  question?
 9                  MR. BROWN:  You need to.
10                  THE WITNESS:  I'm sorry?
11                  MR. BROWN:  You need to answer that.
12                  THE WITNESS:  Would you -- would you repeat
13  one more time your question, sir?
14      Q.   (BY MR. KIRK)  Yes.  Why did you not tell
15  Albert Flores about the deposits into the Wells Fargo
16  accounts?
17                  MR. BROWN:  Judge, I would object that that
18  assumes facts not in evidence at this point, as
19  Mr. Flores has never testified in this hearing.
20                  THE COURT:  I'll overrule the objection.
21                  You can go ahead and answer.
22                  THE WITNESS:  I should answer?
23                  MR. BROWN:  Yes.
24                  THE COURT:  Yes.
25                  THE WITNESS:  Well, you know, if you look
```

1  at the document, at that time Mr. Flores had no position

2  in the corporation and I had no obligation to give him

3  any report.  He resigned July 1st, 2020.  Why should I

4  give him any report of what I'm doing?

5      Q.  (BY MR. KIRK)  Why did you keep promising him

6  he'll get his money?

7          MR. BROWN:  Judge, I would -- I would argue

8  that that doesn't have anything to do with the motion

9  we're here on.  It's irrelevant.

10          THE COURT:  I'll overrule that.

11          You -- you can answer that.

12          THE WITNESS:  What was the question?

13          MR. BROWN:  Can you repeat the question,

14  Mr. Kirk?

15      Q.  (BY MR. KIRK)  Why did you keep promising

16  Mr. Flores --

17      A.  I did not promise anything to Mr. Flores.

18  You've been misinformed, Mr. Kirk.

19      Q.  Why did you ask Mr. Flores the day after the

20  closing how much money he needed right away?

21      A.  That wasn't the -- the question after the

22  hearing.  Prior that, Mr. Kirk, me and your client, that

23  obviously he doesn't disclose all the details to you, we

24  had the agreement -- we came up with the conclusion that

25  how much money he's supposed to receive and that was

24

1  $280,000, that he received couple of days after I got

2  the money.

3           And 1st of July -- as of 1st of July 2020,

4  he resigned of the position with the corporation, and I

5  had no obligation to give him any information, as the

6  document shows and you have it and you know it, by the

7  way.  And I don't understand why you're pretending that

8  you don't know anything.

9      Q.   May I remind you, Dr. Parsa, of some dates?

10     A.   I cannot hear you.  Can you speak up louder,

11 please?

12     Q.   May I remind you of some dates?

13     A.   Go ahead.

14     Q.   You closed on June 30th, correct?

15     A.   Say it again.

16     Q.   You closed your part of the transaction on

17 June 30th?

18     A.   No.  It was July 1st.

19     Q.   And Mr. Flores came to see you on July 2nd?

20     A.   I don't -- what I remember, it was July 1st.

21     Q.   The day after he closed he came to see you?

22     A.   Well, you know, I'm not really comfortable to

23 answer your questions right now.  You're talking about

24 referring to a year ago, and I don't understand.  We are

25 talking about this order or we are talking about the

1   case?  We are not here in trial, Mr. Kirk, right now.

2       Q.   You needed an --

3               THE COURT:  Doctor, if you can answer the

4   questions, just answer them.

5               THE WITNESS:  Well, you know, Judge, you

6   know -- well, you know, I just --

7               MR. BROWN:  Answer the question.

8               THE WITNESS:  No, I do not remember that I

9   had a meeting with Mr. Flores on July 2nd.

10      Q.   (BY MR. KIRK)  Why couldn't you pay Albert

11  Flores all of his share on July 2nd?

12      A.   On July 6th what?

13              MR. BROWN:  Judge, that --

14              MR. KIRK:  2nd.

15              MR. BROWN:  -- that assumes a legal

16  conclusion that he was doing some other share.  That's

17  irrelevant to this -- to this hearing.  It's an attempt

18  to try the case in this hearing.

19              THE COURT:  I'm going to overrule the

20  objection.

21              You -- you can go ahead and answer that.

22              THE WITNESS:  There -- there are no such

23  agreement that I have to return his share.  Actually,

24  I -- he sold his existing share, the 50 percent, to me

25  on July 1st.  So what you are telling me is totally

```
 1  irrelevant based on the document that you have.
 2      Q.   (BY MR. KIRK)  Please answer my question.  Why
 3  could you not pay Albert Flores his full share on
 4  July 2nd?
 5              MR. BROWN:  Objection, asked and answered.
 6              THE COURT:  It -- it has been asked and
 7  answered.  He's -- he's saying he didn't -- he didn't
 8  owe it, as I understand his testimony.
 9              THE WITNESS:  He --
10      Q.   (BY MR. KIRK)  What happened between July --
11  June 30th and July 2nd that made it right for you to
12  deny Mr. Flores his full share?
13      A.   We had agreement --
14              MR. BROWN:  Objection, asked and answered.
15              THE COURT:  No.  No.  Overruled.
16              Go ahead.  You may continue.
17              THE WITNESS:  We had agreement with
18  Mr. Flores, your client, way prior than that.  He didn't
19  want to be involved in anything.  He didn't want to --
20  he was tired of everything.  He said, you know, This is
21  the -- this is what I want, $280,000, and that was based
22  on our agreement.  He resigned on July 1st.  He sold the
23  remaining share to me, and he deposited the check.  I
24  mean, we already had the agreement.  And I -- and I
25  don't understand why you are interfering with my
```

27

1 agreement with your client.

2          THE COURT:  Mr. Kirk, any further

3 questions?

4          MR. KIRK:  No.  No, not from this witness,

5 Your Honor.

6          THE COURT:  Mr. Brewer, do you wish to

7 question the witness?

8          MR. BREWER:  Yes, Your Honor, just a few

9 questions.  Thank you.

10                    CROSS-EXAMINATION

11 BY MR. BREWER:

12    Q.   Jim Brewer on behalf of WestStar Title again.

13 Mr. Parsa, you've heard about a Western Heritage Bank

14 account, correct?

15    A.   Yes.

16    Q.   Who set that account up?

17    A.   Myself.

18    Q.   Were you the only signatory?

19    A.   Yes.

20    Q.   Why was Mr. Flores not a signatory to that

21 account?

22    A.   Because he -- he resigned the day before.  He

23 resigned July 1st.

24    Q.   Did you also set up the Wells Fargo Bank

25 account?

1    A.   No.  That was open long time ago since.

2    Q.   Is there a Western -- Wells Fargo Bank account

3 in the name of Montoya Park Place?

4    A.   No.

5    Q.   Who controls Westmount Group, Inc.?

6         THE WITNESS:  Should I answer this?

7         MR. BROWN:  Objection, Your Honor.  The

8 question is vague and calls for a legal conclusion.

9         THE COURT:  Overruled.

10         You can answer.

11         THE WITNESS:  I'm the president.

12    Q.   (BY MR. BREWER)  Are you also the sole

13 shareholder?

14    A.   Yes.

15    Q.   And you're familiar with -- there was a

16 temporary restraining order and also a temporary

17 injunction issued in this case.  Are you familiar with

18 those?

19    A.   Yes.

20    Q.   Both those orders enjoined you and Montoya Park

21 Place, Inc., from spending, transferring or alienating

22 any of the sale proceeds.  Is that -- is that a fair

23 rendition?

24    A.   Yes.  I said yes.

25    Q.   You need to answer orally.

```
1        A.   Yes.
2        Q.   But apparently the money was already
3   transferred.  Is that a fair assessment?
4        A.   Can you explore the idea?  I don't understand.
5        Q.   At the time these orders were entered, did
6   Montoya Park Place or yourself have the sale proceeds?
7        A.   Yes, prior that -- prior to the TRO.
8        Q.   Did you have the sale proceeds at the time the
9   TRO was entered and the temporary injunction was
10  entered?
11       A.   I answer you that was -- the TRO happened
12  after.  The -- the -- the money was transferred prior
13  any -- any lawsuit.
14       Q.   So at the time these orders were entered,
15  Montoya Park Place and yourself did not have any of the
16  sale proceeds; is that correct?
17       A.   Yes.
18       Q.   Did you notify the Court or any of the parties
19  of that fact?
20       A.   I mean, my attorney knew but there was a
21  confusion, I guess.  They were confused.
22       Q.   Okay.  Have you talked to any attorneys about a
23  bankruptcy filing?
24            MR. BROWN:  I'll -- I'll object,
25  Your Honor, to the relevance.
```

1          MR. BREWER:  Just goes to the danger of the

2    funds.

3          THE COURT:  No.  But I'm going to sustain

4    that on the basis of if he has, that's protected

5    attorney/client privilege.

6          MR. BREWER:  Fair enough.

7    Q.   (BY MR. BREWER)  Who borrowed the money that

8    the -- some of these -- that these sale proceeds are

9    pledged to?  Was it Westmount?

10   A.   What money?  The -- the -- the line of credit

11   you are referring to?

12   Q.   There are pleadings saying that the money is

13   pledged to secure a loan.  Whose loan is it?

14   A.   There are several loans.

15   Q.   Several loans?

16   A.   Yes.

17   Q.   Who are the borrowers?

18         THE WITNESS:  Do I answer that?

19         MR. BROWN:  Yes.

20         THE WITNESS:  It's a big list.  I don't

21   remember.  I have to go through my list.

22         MR. BREWER:  Okay.  No further questions.

23   Thank you.

24         THE COURT:  Ms. Kelley, do you have some

25   questions?

1      MS. KELLEY:  Yes, Your Honor.  Thank you.

2                  CROSS-EXAMINATION

3  BY MS. KELLEY:

4      Q.   Mr. Parsa, did you -- were you represented by

5  counsel on the previous hearing for the Court's

6  reconsideration of this Court order on May 18th, 2021?

7      A.   Yes.

8      Q.   Do you remember testifying in that hearing?

9      A.   Yes.

10      Q.   At no point did you inform the Court of a

11  pre-withdrawal penalty of Wells Fargo if you withdrew

12  the funds; is that correct?

13      A.   At that time, for some reason that I don't

14  know, my previous attorney did not mention it.  I don't

15  know why he didn't mention it.

16      Q.   Okay.  And -- I'm sorry.  Can you please --

17  I -- I talked over you.

18      A.   Yeah.  I don't know why he didn't mention it.

19  And even if you look at the -- the script, I tried to

20  say something, but Judge asked me to consult my

21  attorney.  I couldn't say anything.

22      Q.   So 10 days later -- well, let me ask you this:

23  On May 18th, 2021, how much -- what was the total amount

24  that you possessed in the Wells Fargo treasurer money

25  market accounts?

1    A.   You can see the -- the bank statement that you

2 already have.

3    Q.   On May -- I didn't -- I don't have a bank

4 statement from May 18th, 2021.

5    A.   You know, the letter from the bank, you can see

6 the -- the amount in the bank.  It says 338 and 700.

7    Q.   What date is that letter?

8    A.   I don't have it in front of me.

9    Q.   Okay.  My question is, on the Court's deadline

10 for you to deposit the Court registry -- into the Court

11 registry on May 28th, 2021, did you have $700,000 and

12 $338,000 to put -- to deposit into the Court registry?

13    A.   I didn't have --

14    Q.   I'm sorry?

15          THE COURT:  Could you repeat that?  I

16 didn't hear it.

17          THE WITNESS:  Well, you know, you -- she's

18 trying to tell me that if I had.  No, I didn't.  That

19 the corporation has, not me.

20    Q.   (BY MS. KELLEY)  And you are -- when you say

21 "the corporation," you meant -- you mean Westmont Creek,

22 Inc. [sic]?

23    A.   Westmount who?  Group?

24    Q.   What -- what corporation had the funds?

25    A.   Westmount Group.  And, ma'am, let me stop you

1  here.  You tried to tell me that I had the money and I

2  didn't -- I did not obey the Court order, which is

3  wrong.  I did not --

4      Q.   No.  I'm sorry, sir.  That wasn't -- that was

5  not my question.

6               On -- on May 28th, 2021, did Westmont Group

7  [sic], the account holder, held in their accounts enough

8  funds to abide by the Court order?

9      A.   I believe so.  Yes.

10      Q.   And you are the principal agent or principal

11  owner -- I'm sorry -- of Westmont Group?

12      A.   Ma'am, the money is there, but it's pledged to

13  the loan.  Do you expect me to break the law?

14               MR. BROWN:  Just answer the question.

15               THE COURT:  Question is you are the

16  principal owner and shareholder of Westmont Group.  I

17  think that's what she asked you.

18               THE WITNESS:  Yes.

19      Q.   (BY MS. KELLEY)  What is the primary business

20  of Westmont Group?

21               MR. BROWN:  Objection, irrelevant.

22               THE COURT:  I think that is irrelevant.

23  Yeah, I'll sustain that.

24      Q.   (BY MS. KELLEY)  After the hearing on May 18th,

25  2021, and after the Court's ruling, what was your

1  understanding that the Court's ruling was?

2      A.   That I need to transfer the funds into the

3  registry of the Court.

4      Q.   And why did you not transfer the funds into the

5  Court registry?

6      A.   I talked to my attorney --

7              MR. BROWN:  No.  Okay.

8              To the extent that this requires him to

9  divulge attorney/client confidences, I'll assert his

10 privilege.

11             THE COURT:  No.  If you're rely- -- if your

12 answer involves communications with your lawyers you do

13 not have to answer.  I'll sustain the objection to that

14 extent.

15     Q.   (BY MS. KELLEY)  Okay.  Separate from what your

16 attorney advised you, did you at any point make a

17 decision not to abide by the Court order?

18     A.   No.

19     Q.   Okay.  And as the Court asked on May 18th,

20 2021, if the funds are secured in the Wells Fargo

21 accounts, why can they not be deposited into the Court

22 registry?

23     A.   I just explained to you that I cannot.

24     Q.   Okay.  So you, as Westmount Group, Inc., cannot

25 deposit the disputed funds into the Court registry

1  because -- not because you don't have access to them but

2  because of the penalties you may potentially get; is

3  that correct?

4      A.  Well, you're asking two questions.  Will you

5  give me one question?

6      Q.  You have access to the funds?

7      A.  At this time I don't.

8      Q.  Who has access to the funds?

9      A.  I mean, it's pledged to the loan, if -- if that

10  clarify your -- clarify --

11      Q.  When was it pledged -- when was it pledged to

12  the loan?

13      A.  July -- August 2020.

14      Q.  Was that informed to the Court in May 18th,

15  2021, that it was pledged as collateral?

16      A.  My attorney supposed to say it but he didn't

17  say it.

18      Q.  Okay.  And why did you pledge these funds as

19  collateral?

20      A.  For get the line of credit.

21      Q.  And is this af- -- you pledged these funds

22  after WestStar Title and Mr. Flores made a demand on

23  that; is that correct?

24      A.  No.  No.

25              MS. KELLEY:  Nothing further, Your Honor.

1          THE COURT:  Mr. Brown, do you have any

2  redirect?

3          MR. BROWN:  No, Your Honor.

4          THE COURT:  Do you wish to call any other

5  witnesses?

6          MR. BROWN:  I do not.

7          THE COURT:  Any of the other lawyers wish

8  to present any testimony or evidence?

9          MS. KELLEY:  No, Your Honor.

10          MR. BREWER:  No, Your Honor.

11          THE COURT:  Okay.  I've got a couple of

12  questions that are raised by the pleadings.  Mr. Brown's

13  motion refers to interpleader and essentially makes an

14  argument that it is relief available to a totally

15  disinterested neutral party and not when different

16  parties have competing claims to the same money, so that

17  this type of remedy is inappropriate in this kind of a

18  dispute.  I'm somewhat oversimplifying, but I think that

19  is the gist of what he is arguing.

20          Let -- let me have you all address that

21  issue as to whether this is or is not an appropriate

22  remedy in this situation where we do have competing or

23  apparently possibly competing interests from the two

24  sides.

25          And, Mr. Brown, you -- you raised that, so

1  I'll let -- let you go ahead and make that argument.

2             MR. BROWN:  Okay.  Right.  The -- the

3  original joint motion did read, both in the title and in

4  the body of the motion, that it was a motion or

5  petition, so to speak, for interpleader to interplead

6  these -- these funds, the deposited funds, because there

7  are competing claims against them.  So that's -- that's

8  why I addressed that possible remedy in my motion for

9  reconsideration.

10            And -- and I -- and so on that basis, I

11 don't think they're properly to be interpleaded because

12 what you have are parties, meaning Fidelity and

13 WestStar, who are not disinterested stakeholders.  In

14 fact, they have claims.

15            And I -- and I put this in our -- in our

16 motion for reconsideration.  They have claims, both

17 breach of contract and breach of warranty claims.  And

18 they say that, Well, we're entitled to this money

19 because of the contractual provision and because of the

20 warranty that was made in an affidavit.  And that may

21 well be the case when it -- when it all gets fleshed

22 out.  I don't know.

23            But simply having claims to funds in the

24 nature of the breach of contract, and -- and those

25 parties have already -- those funds have already changed

1    hands as between the contracting parties doesn't give

2    any party a right to then try to interplead monies that

3    they -- they stake a claim to, unless they're a

4    disinterested stakeholder and the nature is some kind of

5    insurance action where some kind of entity holds -- you

6    know, insurance entity holds some amount of money that

7    there are competing claims against.  And they're putting

8    them in the Court and saying, Judge, we don't know

9    exactly who is entitled to these proceeds, but there's

10   many competing claims so we're putting them into the

11   registry of the Court.  And once it's decided, then they

12   can be disbursed through the appropriate parties.

13           Now, when we filed our -- our reply, I had

14   received the response at that point, and they had

15   changed the character of the motion and said, Well,

16   these are really just -- this is a request that funds be

17   deposited into the registry.  And that's when I

18   responded in our reply that there wasn't any evidence to

19   show that these funds were about to be lost, because

20   they've been on deposit since July of 2020 and they

21   haven't changed in character or in who is holding them

22   since that date.  So it's not appropriate to plead them

23   into the registry of the Court.

24           THE COURT:  They -- they didn't change when

25   they went into the Westmount Group and when they got

1   pledged for collateral to his loan for his practice?

2                    MR. BROWN:  Well, the -- the -- the

3   monies -- the monies, when they left the Western

4   Heritage account, when they were taken out of that

5   account, they were placed in Wells Fargo accounts, and

6   they were placed in the name of Westmount Group, Inc.

7   But at that time there was no lawsuit on file.  There

8   certainly --

9                    THE COURT:  -- the -- the initial TRO.

10                   MR. BROWN:  Right.  Because the -- the

11  initial case wasn't filed until September of 2020, and I

12  attached to our motion for reconsideration the -- the

13  signature card for Mr. -- or for -- excuse me --

14  Dr. Parsa, indicating that at that time, that's when the

15  credit line was -- was opened up, on August 7th of 2020.

16  And I'd ask the Court to take judicial notice of the

17  exhibit -- the pleadings and the exhibits attached to

18  the pleadings for purposes of this hearing.

19                   But at that time, August 7th, 2020, there

20  was no lawsuit on file, and so at that point there's --

21  you know, the monies went into the -- into the accounts

22  in the Westmount Group, Inc., and that's where they've

23  remained the whole time.  So when the temporary

24  injunction -- and I wasn't involved in that process.

25  When that was put in place, the monies were in the

40

1  accounts that they were in and have remained in to this

2  day.

3          THE COURT:  Okay.  Do any of the other

4  lawyers want to be heard on -- on this issue?

5          MR. KIRK:  I do, Your Honor.

6          MR. BREWER:  Go ahead, Mr. Kirk.  We'll

7  stay in the same order.

8          THE COURT:  Mr. Kirk, you may proceed.

9          MR. KIRK:  Yes, Your Honor.

10          We know more about what Dr. Parsa didn't

11  tell us, and we've learned that since the May 18th

12  hearing when the interpleader motion was reconsidered

13  and left in place.  If interpleader was not an

14  appropriate vehicle, then this Court has power to vacate

15  the interpleader order.  And this Court also now has the

16  facts and the law that would enable it to order the

17  funds impounded into the registry anyway, because there

18  is a danger of depletion.

19          THE COURT:  Okay.  Mr. Brewer.

20          MR. BREWER:  Yes.  I did address this in

21  our response to the second motion for reconsideration

22  that was filed on June 15th.  I apologize if the Court

23  doesn't have that.

24          But, basically, in a nutshell, I would say

25  the original motion was unfortunately titled, and I can

1  say that since I signed off on it.  It was titled as an

2  interpleader and it sought -- it basically -- the

3  substance is clear.  It sought to compel the defendants,

4  not -- not WestStar and not Fidelity Title -- the

5  defendants to deposit the funds into the registry of the

6  Court.

7            And in my reply I did add some cases

8  that -- that talk about the Court's inherent authority

9  to do that, to compel a defendant to -- particularly

10  when there's a particular fund in dispute, to compel

11  that party to deposit it into the registry of the Court.

12  That was what was the substance of what was sought in

13  the original motion, and that is still what we're

14  seeking today.

15            THE COURT:  Ms. Kelley.

16            MS. KELLEY:  Your Honor, I -- sorry.  I

17  just -- I just had a -- essentially it's exactly what we

18  were just reiterating.  We -- we -- there is -- that

19  danger has not moved.  Also, I do want to address that

20  other than Mr. Parsa's testimony today, we have not seen

21  documentation from the accounts of the current status of

22  the money in the accounts.

23            I -- like the Court pointed out, it's July

24  of 2021.  And so the concern is here, if they're active

25  as they were, why hasn't there been recent documentation

1  filed with the Court, specifically after the last

2  hearing and the last Court order, within the last

3  30 days of the activity of the accounts? If there is --

4  if the -- and if the testimony in the last hearing were

5  the money was there, then there's no reason for it not

6  to be deposited into it.

7              There is multiple claims between these

8  parties to these funds. These are disputed funds that

9  were agreed to not be moved. The danger is they have

10  been moved already. They have been moved twice already,

11  and one of -- and now we are hearing that they're

12  being -- there's multiple -- I think -- I think

13  Mr. Parsa testified he cannot even identify the allotted

14  individuals that are the borrowers to the collateral for

15  this loan.

16              I mean, you know, the constant change -- I

17  don't know if he's making money off the money. We don't

18  have any of that documentation today, so that the

19  inherent risk has not changed. There has been nothing

20  new that has changed to allow Mr. Parsa to keep these

21  funds when there is -- there is no documentation in

22  evidence that they actually are still, up to today, in

23  the accounts. I mean, there's nothing provided at

24  today's hearing, Here are the statements; here is the

25  money.

1          THE COURT: Okay. Let me ask Ms. Kelley

2   and Mr. Brewer and Mr. Kirk a question, and you can

3   answer it in any order you wish to or just designate

4   one person to answer it if you wish. It sounds like I

5   am hearing that it would be impossible for Dr. Parsa to

6   go get the money and put it into the registry of the

7   Court and that if he could, he would certainly have to

8   pay 50-, 60 grand in an early withdrawal fee. And

9   notwithstanding that, it may not be his money to be able

10  to go get, if it's pledged as collateral and there's a

11  whole bunch of other people that are involved as people

12  who have loans here.

13          So is it doable for me to have an order

14  that would work and that would give you what you want to

15  have, which is, as I understand it -- there is a dispute

16  over this money, which are the proceeds of a sale, and

17  you-all want to be sure that money doesn't disappear

18  before your dispute is resolved. So I guess that's a

19  sort of complicated question, but --

20          MS. KELLEY: Judge, I'll let Mr. Brewer and

21  Mr. Kirk respond as well. I just wanted to point out I

22  don't -- we don't know if it's impossible. We haven't

23  seen any documented attempts from -- these are our

24  conversations with Wells Fargo. These are the e-mail

25  communications of what would happen if we withdrew.

1  These are the dates where I could have complied with the

2  order.  This is the amount of funds that I can at least

3  put into the account to show I attempted a compliance.

4  And as an officer of the Court, I spoke to

5  Mr. Miranda before Mr. Brown took over this case, and

6  I -- we were under the impression that he was -- they

7  were going to abide by the Court order come Friday, May

8  28th.  And then before we know it there's new counsel.

9  So none of those concerns were -- was shared to me by

10  the previous counsel.

11  And I'm not asking Mr. Parsa to divulge his

12  communications.  I'm just speaking to Mr. Miranda's

13  communications.  At no point did he say, Listen, we've

14  been contacting Wells Fargo; we've been trying to

15  wire -- get the cashier's check to deposit into the

16  Court registry; this is what we've done.  At no point

17  was that informed to us.  This is the first time we're

18  hearing of it, and, frankly, we don't have any

19  documentation to show what attempts to show that it's

20  impossible.  How do I -- there -- there's nobody here

21  from the bank.  There's no documents to show that.  And

22  I don't think that's changed.

23  THE COURT:  Okay.  Mr. Brewer, anything you

24  wish to add to that?

25  MR. BREWER:  I guess I don't have any

```
 1  brilliant ideas.  I think it is not clear what Mr. Parsa
 2  did with the rest of the sale proceeds.  It's not
 3  clear -- I believe there was -- there's been references
 4  to the loan being about $180,000.  I don't know if that
 5  can be paid off or other collateral given to secure
 6  the -- this loan instead of our proceeds.
 7            I guess I would just argue that if -- if
 8  our proceeds are needed to secure this $180,000 loan,
 9  that just makes me all the more worried that this fund
10  is not going to be there for us at the end of the day.
11            THE COURT:  Mr. Kirk.
12            MR. KIRK:  Your Honor, the funds that
13  Dr. Parsa put up to comply with the TRO and the
14  injunction were funds that were beyond his reach already
15  and, therefore, beyond our reach already.  So I think
16  the money he should put up should be out of money he can
17  reach.
18            THE COURT:  So whether it is those funds or
19  other funds, are you asking for just a sum of money to
20  be put into the registry of the Court?
21            MR. KIRK:  Well, any sum is better than no
22  sum.
23            THE COURT:  I agree with that, but let --
24  let me ask you-all a procedural question.  If I were to
25  order the money to be placed into the registry of the
```

1  Court and if that does cause some sort of early

2  withdrawal penalty, can I attach to my order a bond so

3  that if there was 40- or $50,000 that was a penalty for

4  the withdrawal, that that would be -- the plaintiffs who

5  are suing Dr. Parsa would be responsible for that cost,

6  if moving the money into the Court is what incurs that

7  cost?  Is that too confusing a question for anybody to

8  answer?

9            MR. KIRK:  It's not practical for

10  Mr. Flores, Your Honor.  He doesn't have that kind of

11  money laying around.

12            MR. BREWER:  I think there -- there might

13  be a bond that would be appropriate if the parties -- if

14  the plaintiffs were to lose the case.

15            THE COURT:  Yeah.  I mean, from --

16            MR. BREWER:  -- the fact that --

17            THE COURT:  -- you got all of it, and then,

18  you know, it would -- then the amount of that early

19  withdrawal fee would come out of the part that the

20  plaintiffs won.  And it would be -- it would mean they

21  would get 50 grand less.  If they lost, then he got all

22  the money back, it would be a loss to Dr. Parsa, and if

23  that loss was caused by improvidently depositing it, in

24  that situation he should be reimbursed for -- or

25  conceivably should be reimbursed for -- for the movement

1 | of those funds.

2 |          MR. BROWN:  Judge, may I just respond just

3 | briefly?  In fact, I provided the Court in my e-mail

4 | with a case, and that's exactly what the case speaks of,

5 | is that -- some authorities cited towards the end of the

6 | case where courts are saying there -- there needs to be

7 | evidence that they're going to be lost or depleted.  But

8 | that evidence also goes to assessing a bond as to the

9 | parties requesting that the monies be placed on deposit.

10 |          THE COURT:  So there is a procedural

11 | mechanism for me to impose a bond requirement on my

12 | order and --

13 |          MR. BROWN:  I think so.  I don't know --

14 |          THE COURT:  Yeah.  I mean, I'm -- the bond

15 | would be conditioned on they'd have to pay a certain

16 | amount.  If at the end of the day Dr. Parsa was

17 | completely exonerated of any and all claims and -- and

18 | he suffered a loss, that they would have to make that

19 | up.

20 |          MR. BREWER:  I think that would be

21 | appropriate, four and a half percent of whatever's

22 | deposited into the registry of the Court.  Is that what

23 | the Court's thinking?

24 |          THE COURT:  It is, because that's what I am

25 | told is the -- is what the penalty would be.  And I'm

1 not sure if the four and a half percent was on -- I

2 think it's, like, 1,038,000, and I don't know if the

3 four and a half percent is on all of that.  Because

4 there's two different chunks, and I'm not sure which one

5 the four and a half percent was on.

6           MR. BREWER:  I don't know which one is

7 pledged.

8           MR. BROWN:  Your Honor, I believe that --

9 that Dr. Parsa testified that it was 4.5 percent on the

10 full amount of 1,038,000, but there's also additional

11 monies that -- that represent tax consequences and other

12 penalties.

13           THE COURT:  How are tax -- how are taxes

14 flowing from a deposit into the registry of the Court?

15 That's not --

16           MR. BROWN:  No, from withdrawal of the

17 monies.  From withdrawal of the monies.

18           THE COURT:  I didn't hear what you said.

19           MR. BROWN:  From withdrawal of the monies.

20 You have to leave them in there for so long.  If you

21 take them out early then --

22           THE COURT:  Well, but if you take them out

23 early and put them into the registry of the Court,

24 you're saying that is a taxable event?  I mean, that --

25 that would not be considered income to Dr. Parsa or to

1  anybody else, would it?

2          MR. BROWN:  I think -- well, I don't

3  purport to be a tax expert, but once you remove monies

4  from an account like that, there -- I think there --

5  there are certain tax consequences, because you have to

6  move -- you move those monies initially in there for a

7  benefit that you're getting.  But I -- I'm getting out

8  of my depth.

9          THE COURT:  I don't see tax consequences.

10  I may be wrong, but I don't --

11          MR. PARSA:  Can I say something?

12          THE COURT:  And I'm not -- I'm not stopping

13  you from saying anything, but I'm suggesting you talk to

14  your lawyer before you say whatever you want to say.

15          (Discussion off the record.)

16          MR. KIRK:  Your Honor, would you ask

17  Dr. Parsa to what extent he has encumbered with loans

18  either of the accounts?

19          THE COURT:  Wait until we're finished and

20  then I'll respond to that.

21          MR. PARSA:  Can I tell you something?

22          MR. BROWN:  I guess --

23          THE COURT:  -- with your client?

24          MR. BROWN:  Yeah, I did.  And I guess I --

25  I can ask him a question about his understanding of the

1  tax consequences, and then I guess Mr. Kirk wants to ask

2  him a question about the encumbrance.

3          THE COURT:  Right.  So why don't you ask

4  him about the tax consequences first, and then we'll

5  have -- hear Mr. Kirk's question.

6                  REDIRECT EXAMINATION

7  BY MR. BROWN:

8      Q.  Dr. Parsa, have you consulted with an

9  accountant regarding withdrawal of these funds?

10     A.  Yes, and also -- yes.  And also --

11     Q.  And would you explain your understanding of the

12  tax consequences of removal of the funds?  And I'm not

13  saying you individually removing the funds but the

14  account holder removing the funds.

15     A.  Well, you know, the -- the -- I actually spoke

16  to two individuals, one with my accountant and the

17  second with the -- with the banker, and he tells me that

18  first of all --

19     Q.  Just talk about your understanding.

20     A.  Yeah.  My understanding is that if -- if we

21  close the account tomorrow, that virtually is

22  impossible, there's going to be tax consequences based

23  on the money that the account has earned so far and --

24  because the way that the account is designed, you have

25  to have it for years.  It's not just for a couple of

1  months and/or a year to just close it.  And then it's
2  going to take, too, time to liquidate the account.  It's
3  not something I can just do it overnight.
4            THE COURT:  So you are -- it is your
5  understanding there would be tax consequences on the
6  income that has been earned?
7            THE WITNESS:  Yes.  Yes, Your Honor.
8            THE COURT:  -- interest, which is rather
9  low for the last year or two.  I mean, banks aren't
10  paying high interest rates.
11            THE WITNESS:  Well, you know, this is a
12  money market account.  It could go to -- up to eight to
13  10 percent.
14            THE COURT:  Up to 10 percent?
15            THE WITNESS:  Eight to 10 percent.  It's a
16  money market.
17       Q.   (BY MR. BROWN)  Of interest or tax?
18       A.   I mean, interest eight -- from eight to 10 and
19  consequences of tax for it if you just close the
20  account.
21            MR. BROWN:  Can I ask one more question,
22  Judge?
23            THE COURT:  You may.
24       Q.   (BY MR. BROWN)  The -- you -- I think you
25  testified earlier that there's about $180,000 that was

1  borrowed on the line of credit -- not taken from the

2  accounts but on the line of credit?

3      A.   Yes.

4      Q.   Will -- if you're having -- if you remove these

5  funds, how will that affect the line of credit in terms

6  of that $180,000?

7      A.   Honestly, it's going to be very bad, because I

8  don't know even -- I cannot even imagine if I can do

9  that.

10     Q.   What I'm asking is, do you have to pay that

11 amount?

12     A.   Yes.  Absolutely.  I have to pay it overnight.

13     Q.   The 180,000?

14     A.   Yes.

15          MR. BROWN:  All right.  I'll pass the

16 witness.

17          THE COURT:  Well, just on that topic, if I

18 ordered him to --

19          MR. KIRK:  Dr. Parsa --

20          THE COURT:  -- remove -- wait.  Let me just

21 ask a question, please.

22          If I ordered him --

23          MR. KIRK:  -- is 180,000 the total?

24          THE COURT:  -- to pay into the registry of

25 the Court --

1    MR. KIRK:  Is that the total encumbrance on
2  the funds?

3    THE COURT:  -- then that -- that would
4  cover what's been pledged.  So if -- instead of a
5  million three, it would -- that would be 850,000.

6    MR. KIRK:  I wasn't able to hear what
7  people were saying.  I'm sorry.

8    THE COURT:  That's okay.  I think what I
9  heard Dr. Parsa say is that there is $180,000 that is
10  pledged.

11    THE WITNESS:  Your Honor, it's at least
12  $180,000.  I can get you that exact amount but at least
13  $180,000.

14    THE COURT:  All right.  Okay.  Anyway,
15  Mr. Kirk, let's go ahead and -- I interrupted you.  You
16  were about to ask some questions.  And I think they were
17  about how the money is encumbered, so let's go ahead
18  with that now.

19             RECROSS-EXAMINATION
20  BY MR. KIRK:

21    Q.  -- then the rest of it could come into the
22  registry with no harm to Dr. Parsa?

23    THE COURT:  What I was asking.

24    MR. BROWN:  Can you rephrase that?  I -- I
25  didn't understand that.  I didn't hear it, partly.

54

1      Q.   (BY MR. KIRK) -- the extent of the borrowing

2  that encumbers these two accounts, or one of the two

3  accounts, 180,000.  Then the rest of the account should

4  be available to come into the registry?

5            THE COURT:  Yeah.  Yeah.  So that would be

6  roughly 850.

7            MR. BROWN:  I don't -- I don't know if

8  that's correct.

9            Dr. Parsa, what's your understanding of --

10           THE WITNESS:  Well, you know, the concept

11  is that the line of the credit, the way it works, the

12  way that I was explained by the banker is that I cannot

13  break the contract with them.  It's already -- I'm

14  engaged in a contract with them.  It's not a question of

15  pay them 180,000.  If Mr. Kirk wants to pay me $180,000,

16  I can do that tomorrow.  I cannot do that.  I can't just

17  break the contract with them.  It's something that I

18  cannot do it.  It's not because I don't want to.

19           THE COURT:  Okay.  Is there anything

20  further that --

21      Q.   (BY MR. KIRK)  You're telling me you could pay

22  the loan?

23      A.   I'm sorry?

24           THE COURT:  I think he asked -- we didn't

25  quite hear, Mr. Kirk.  Could you repeat that, please?

```
 1              MR. BROWN:  I think his Internet -- oh,
 2  there it is.
 3              THE COURT:  Mr. Kirk, are you muted or did
 4  we lose you -- your audio somehow?
 5              MR. KIRK:  Everybody has gone silent on the
 6  screen and also immobile, Your Honor, so --
 7              THE COURT:  No, I --
 8              MR. KIRK:  -- see blinking eyes.
 9              THE COURT:  I'm moving my head, and it
10  looks like I'm -- I can see it on here.  Can -- can
11  you-all hear me?
12              MR. BREWER:  Yes.
13              MS. KELLEY:  Yes.
14              MR. BROWN:  Yes, Your Honor.
15              THE COURT:  Okay.  Everybody can hear me?
16              MR. KIRK:  Yes, Your Honor.
17              THE COURT:  Here is what I think we need to
18  do.  I will modify the order as follows:  And Dr. Parsa
19  will be ordered to deposit $750,000 into the registry of
20  the Court within 10 days.  And to whatever extent there
21  is an issue with the bank, in terms of doing that, all
22  counsel are going to communicate and if there is some
23  impossibility or some big penalty because that is
24  happening or because I'm ordering that, then I want to
25  immediately hear that within that 10 days.  So that
```

56

1  would be some time next week.

2        I do want to have a bond, which would be

3  contingent, which would mean that if there is that early

4  withdrawal that does kick in, there would be a bond in

5  place to cover that expense so that Dr. Parsa would not

6  be the person penalized if he ultimately prevails at the

7  end of all this litigation.

8        So, Mr. Brewer, you seem to have a good

9  amount of familiarity with this -- these sort of

10  documents.  Can you prepare or obtain that sort of a

11  bond that would cover that contingency?

12        MR. BREWER:  Sure.  Yes.

13        THE COURT:  Okay.  So 10-days from today --

14  I believe today is the 8th.  Let me look at a calendar.

15  10 days would be the 18th, which is a Sunday, so we will

16  make it the 19th.  So the funds have to be deposited on

17  or before the 19th.  If there is some sort of snag with

18  the bank, bring that to my attention and we'll reconvene

19  and discuss that and have a hearing next week.

20        Anything further from either side at this

21  time?

22        MR. BROWN:  No, Your Honor.

23        MR. KIRK:  No, Your Honor.

24        MS. KELLEY:  No, Your Honor.  Thank you.

25        THE COURT:  Okay.  Thank you.  We will be

1   adjourned.

2                    (Proceedings concluded.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

58

```
 1  STATE OF TEXAS          )

 2  COUNTY OF EL PASO       )

 3

 4      I, Maria I. Stallings, Official Court Reporter in

 5  and for the 327th District Court of El Paso County,

 6  State of Texas, do hereby certify that the above and

 7  foregoing contains a true and correct transcription of

 8  all portions of evidence and other proceedings requested

 9  in writing by counsel for the parties to be included in

10  this volume of the Reporter's Record, in the

11  above-styled and numbered cause, all of which occurred

12  in open court or in chambers and were reported by me.

13      I further certify that this Reporter's Record of

14  the proceedings truly and correctly reflects the

15  exhibits, if any, offered by the respective parties.

16      I further certify that the total cost for the

17  preparation of this Reporter's Record is $97.00 and was

18  paid by Mr. James Brewer, Esq.

19      WITNESS MY OFFICIAL HAND this the  15 th day of

20  July, 2021.

21

22                      /s/ Maria I. Stallings
                        MARIA I. STALLINGS, Texas CSR# 8229
23                      Official Court Reporter
                        327th District Court
24                      500 E. San Antonio, Rm. 606
                        El Paso, TX 79901
25                      (915) 546-2032
                        Expires May 31, 2023
```

# EXHIBIT "F"

NO. _____

---

IN THE COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

---

**In Re:**

**KEYVAN PARSA, M.D. and
MONTOYA PARK PLACE, INC.**

**Relators.**

---

Original Proceeding Arising Out of
the 327th Judicial District Court of El Paso County, Texas
No. 2020DCV2997
(Hon. Thomas Spieczny)

---

**Petition for Writ of Mandamus, and
Request for Emergency Relief**

---

Respectfully Submitted,

By: _/s/Troy C. Brown_

Troy C. Brown
Texas Bar No. 00783735
1074 Country Club Rd.
Ste. B-4
El Paso, Texas 79932
Tel. 915-543-9669
Fax 888-922-3353
troy@tcblegal.com
Attorney for Relators

# IDENTITIES OF PARTIES AND COUNSEL

**RESPONDENT (also referred to as Respondent Judge):**

Hon. Thomas Spieczny
327th Judicial District Court
El Paso County Courthouse
500 East San Antonio; Room 606
El Paso, Texas 79901
Tel. (915) 546-2032
Fax. (915) 546-2131

**RELATORS:** Keyvan Parsa, M.D. and Montoya Park Place, Inc.

**COUNSEL FOR RELATORS:**

Troy C. Brown
1074 Country Club Rd.
Ste. B-4
El Paso, Texas 79932
Tel. 915-543-9669
Fax. 888-922-3353
troy@tcblegal.com

**REAL PARTIES IN INTEREST:** Weststar Title, LLC and Fidelity National
Insurance Company

**COUNSEL FOR REAL PARTIES IN INTEREST:**

James W. Brewer
Kemp Smith LLP
221 N. Kansas, Ste. 1700
El Paso, Texas 79901
Tel. (915) 533-4424
Fax. (915) 546-5360
James.brewer@kempmith.com

S. Shakira Ali Kelley
Gregory T. Brewer
Fidelity National Law Group
6900 Dallas Parkway, Suite 610
Plano, Texas 75024
(972) 812-6407
(972) 812-9408
Shakira.Kelley@fnf.com
Gregory.brewer@fnf.com

**Additional parties in trial court
(not parties on appeal)**

Albert Flores, Plaintiff

E.P. Bud Kirk
Attorney at Law
Terrace Gardens
600 Sunland Park Dr.
Building Four, Suite 400
El Paso, Texas 79912
budkirk@aol.com

**Debra Jordan, Intervenor/Third-Party Defendant**

Richard A. Roman
1018 Brown St.
El Paso, Texas 79902
(915) 351-2679
(915) 351-6754 fax
rromanattorney@yahoo.com

# TABLE OF CONTENTS

IDENTITIES OF PARTIES AND COUNSEL ....................................................... ii

TABLE OF CONTENTS................................................................................iv

INDEX OF MANDAMUS RECORD .............................................................v

INDEX OF AUTHORITIES......................................................................... vii

REFERENCES IN THE PETITION ................................................................ viii

STATEMENT OF THE CASE......................................................................ix

ISSUES PRESENTED.................................................................................x

STATEMENT OF FACTS .............................................................................1

SUMMARY OF THE ARGUMENT ................................................................12

ARGUMENT AND AUTHORITIES...............................................................13

I. Standard of Review. ...........................................................................13

II. The trial court erred when it ordered Relators to deposit $750,000 in the registry of the court where there was no evidence the funds were in danger of being lost or depleted ..............................................................................15

PRAYER and CERTIFICATE OF SERVICE......................................................23

APPENDIX:

**Appx. Tab 1.**     **Joint Order to Compel Interpleader and Hold Funds Into Registry of Court (April 26, 2021)**

# MANDAMUS RECORD:

Suit to Appoint a Receiver for a Corporation Under Texas Business Corporations Act § 7.05.A (filed September 16, 2020) ............................................ Tab A

Defendants' Motion to Dismiss a Baseless Cause of Action (filed October 5, 2020) ...................................................................................................... Tab B

Plaintiff's Second Amended Petition (Suit for Rescission of Contract, for Fraud in a Stock Transaction, for Unjust Enrichment, for Injunctive Relief, and to Appoint a Receiver) (filed November 23, 2020) ............................................................. Tab C

Motion for Temporary Restraining Order and Injunctive Relief (filed November 25, 2020) ............................................................................................. Tab D

Agreed Temporary Restraining Order (filed January 4, 2021) and Agreed Temporary Injunction (filed January 27, 2021)................................................Tab E

Petition in Intervention of Weststar Title, LLC (filed January 6, 2021) .......... Tab F

Fidelity National Title Insurance Company's Original Petition In Intervention (filed January 22, 2021) .................................................................. Tab G

Albert Flores' Answer to the Petition In Intervention by Weststar Title, LLC (filed February 3, 2021)............................................................................... Tab H

Albert Flores' Answer to the Petition In Intervention by Fidelity National Title Insurance Company (filed February 4, 2021).....................................................Tab I

Counterclaim of Plaintiff and Third-Party Defendant Albert Flores for Comparative Negligence, Against Intervenor/Third Party Plaintiff Fidelity National Title Insurance Company (filed February 8, 2021) ...........................Tab J

Joint Motion to Compel Interpleader of Funds Into Registry of Court (filed April 21, 2021). .............................................................................................. Tab K

Joint Order to Compel Interpleader and Hold Funds Into Registry of Court (filed April 26, 2021)................................................................................................Tab L

Keyvan Parsa M.D. and Montoya Park Place, Inc.'s Response & Objection to Joint

Motion for Interpleader (filed April 26, 2021) .................................................Tab M

Keyvan Parsa M.D. and Montoya Park Place, Inc.'s Motion for Reconsideration & Abatement of Order Granting Joint Motion for Interpleader (filed April 28, 2021) .................................................................................................................... Tab N

Keyvan Parsa M.D. and Montoya Park Place, Inc.'s Motion for Reconsideration of and to Abate Joint Order to Compel Interpleader and Hold Funds Into Registry of Court (filed May 28, 2021) .............................................................................. Tab O

Motion for Contempt of Court and Request for Sanctions (filed June 7, 2021)Tab P

Westar Title, LLC's Objection to Keyvan Parsa M.D. and Montoya Park Place, Inc.'s Motion for Reconsideration of and to Abate Joint Order to Compel Interpleader (filed June 15, 2021)................................................................... Tab Q

Defendants' Response to Motion for Contempt of Court and Request for Sanctions (filed July 5, 2021).......................................................................................... Tab R

Keyvan Parsa and Montoya Park Place, Inc.'s Amended Reply to Albert Flores' Weststar Title, LLC's Response to Defendants' Motion for Reconsideration and to Abate Joint Order to Compel Interpleader (filed July 8, 2021)........................Tab S

Transcript of Motions Hearing, dated July 8, 2021 (filed July 8, 2021) ..........Tab T

Defendants' Exhibit 1, Hearing July 14, 2021 (filed July 14, 2021)............... Tab U

# INDEX OF AUTHORITIES

## Cases

*Castilleja v. Camero,* 414 S.W.2d 431, 433 (Tex.1967) ..........................................14

*In re Prudential Ins. Co. of Am.,* 148 S.W.3d 124, 135-36 (Tex.2004) (orig. proceeding) ................................................................................................13

*In re Reveille Resources (Texas), Inc.,* 347 S.W.3d 301, 304 (Tex.App.–San Antonio 2011, orig. proceeding) .............................................................14

*N. Cypress Med. Ctr. v. St. Laurent,* 296 S.W.3d 171, 178-79 (Tex.App.—Houston [14th Dist.] 2009, orig. proceeding) ....................................................... 13, 14, 18

*Walker v. Packer,* 827 S.W.2d 833, 839-40 (Tex. 1992) (orig. proceeding) ..........13

*Zhao v. XO Energy LLC,* 493 S.W.3d 725, 736 (Tex.App.—Houston [1st Dist.] 2016, no pet.) ..................................................................................................14

## Statutes

TEX. GOV'T CODE § 22.221(b) ..............................................................................3

# REFERENCES IN THE PETITION

Keyvan Parsa, M.D. and Montoya Park Place, Inc. are the Relators in this matter (Defendants and Intervenor-Defendants in the proceedings below) originally filed by Plaintiff Albert Flores ("Flores").

For convenience, Keyvan Parsa, M.D. and Montoya Park Place, Inc. are referred to as "Relators," "Parsa" or "Montoya."

For convenience, the real parties in interest are referred to in this petition for writ of mandamus as "RPI," "Weststar" or "Fidelity."

The reference to "Respondent" in this petition for writ of mandamus is a reference to the Honorable Thomas Spieczny.

References to the Mandamus Record are abbreviated as "(MR)." Specific citation to an exhibit is by tab to a corresponding letter. For example, the citation to the Mandamus Record at Tab A is "(MR, Tab A)" and to Tab B as "(MR, Tab B)."

Certain documents in the Mandamus Record are also attached as an Appendix to the Petition. They are cited by the abbreviation "(Appx., Tab)." To avoid confusion, the Appendix tabs are assigned a number.

## STATEMENT OF THE CASE

### A.   Nature of the Underlying Proceeding

The proceeding below involves claims by the Plaintiff and RPI to portions of the sales proceeds, including $700,000, received by Relator Montoya Park Place, Inc. following the sale of real property described as Tract 3, Johannsen Subdivision in the City of El Paso, Texas (the "Property"). Both Plaintiff and RPI assert $700,000 was owed and payable from the proceeds to Right IMMIX Capital, Inc. ("RIC") at the time of the closing of the sale. It is undisputed RPI Weststar's title search failed to discover a lien of record in favor of RIC which its insurer, RPI Fidelity, was forced to pay to RIC to satisfy the lien. RPI, despite Weststar's mistake, nonetheless assert that Relator wrongly received the $700,000 and filed a Joint Motion requesting that certain funds in the sum of $1,038,000 (the "Deposited Funds") be paid into the registry of the court.

Relators who entered into an agreed injunction which by its terms prohibits them from spending or transferring proceeds of the sale (i.e., the Deposited Funds) assert deposit into the registry is improper because there is no evidence the Deposited Funds are in danger of loss or depletion.

Nevertheless, the trial court issued on order on April 26, 2021, which requires deposit of $750,000 into the court registry **on or before July 19, 2021**. Relators face contempt if they do not.

ix

**B.**    <u>**Respondent**</u>

Respondent is the Honorable Thomas Spieczny, presiding judge of the 327th Judicial District Court of El Paso County, Texas.

**C.**    <u>**Respondent's Action**</u>

Respondent improperly ordered the deposit of the Deposited Funds into the registry of the Court.

## STATEMENT OF JURISDICTION

The Court has jurisdiction over this matter pursuant to section 22.221(b) of the Texas Government Code.  TEX. GOV'T CODE ANN § 22.221(b).

## ISSUES PRESENTED

Did the trial court err by ordering Relators to deposit $750,000 into the registry of the court where there is no evidence that the funds are in danger of loss or depletion?

x

## PETITION FOR WRIT OF MANDAMUS

Keyvan Parsa, M.D. and Montoya Park Place, Inc., Relators, file this Petition for Writ of Mandamus and, as grounds therefore, would show as follows:

## STATEMENT OF FACTS

On July 1st and 2nd, 2020, Montoya sold real property described as "Tract 3, JOHANNSEN SUBDIVISION an Addition to The City of El Paso," Texas (the "Property"). The closing took place at Weststar Title. (MR, Tab C[1] ¶¶ 5, 8, 14 & Ex. B).

On September 16, 2020, Flores filed suit claiming that i) $700,000 was due and payable out of the sale proceeds of the Property to Right IMMIX Capital, Inc. ("RIC"), ii) because RIC lent this sum to Montoya's predecessor Johannsen Development Group, Inc. (which Parsa and Debra Jordan guaranteed (the "Guaranty")), iii) but which amount was not paid at the closing. (MR, Tab A[2] ¶¶ 8, 9, 14, 15). In addition, Flores alleged Montoya Park Place was deadlocked (as between he and Parsa) and sought appointment of a receiver. (MR, Tab A ¶ 22).

Parsa and Montoya responded that Flores had transferred his fifty percent (50%) of the stock of Montoya to Parsa on July 1, 2020, and, thus, had no

---

[1] "Plaintiff's Second Amended Petition (Suit for Recission of Contract, for Fraud in a Stock Transaction, for Unjust Enrichment, for Injunctive Relief, and to Appoint a Receiver)" filed on November 23, 2020.
[2] "Suit to Appoint a Receiver for a Corporation Under Texas Business Corporations Act § 7.05.A" filed on September 16, 2020.

1

ownership interest to justify appointment of a receiver or to maintain the suit. (MR, Tab B[3] & Ex. A ("Stock Purchase Agreement")).

In his most recent pleading, despite having received $280,000 from the sales proceeds on or about July 2, 2020 (and releasing any interest in Montoya), Flores seeks to rescind the Stock Purchase Agreement, asserting, among other things, fraud by Parsa. However, Flores acknowledges i) that prior to the sale (on February 4, 2020), he foreclosed on a deed of trust note for a lien he had held on the Property since September 2017, ii) that Montoya paid Weststar Title $10,000 for a title policy, iii) that Weststar issued a title commitment reflecting "the Right IMMIX Capital lien had been 'cut off' by [Flores'] foreclosure," and, finally, iv) that he signed the closing documents knowing the HUD-1 did not include any payment to RIC. (MR, Tab C ¶ 8, 14, 15, 17, 18 & Ex.D; Tab B, Ex. B). Flores additionally seeks $338,000 for "his share" of the settlement proceeds and that a receiver be appointed to recover the $700,000.[4] (MR, Tab C ¶ 17, 18, 34).

Flores then sought a temporary restraining order and temporary injunction, (MR, Tab D[5]), and on December 14, 2020, and January 15, 2021, respectively, Flores, Parsa and Montoya entered into an Agreed Temporary Restraining Order and Agreed Temporary Injunction (the "Injunction"). The Injunction, filed of

---

[3] "Defendants' Motion to Dismiss a Baseless Cause of Action" filed on October 5, 2020.
[4] To date, Flores has neither set a hearing on nor otherwise sought appointment by the trial court of a receiver.

record on January 27, 2021, restrained Parsa and Montoya from spending, transferring or alienating the proceeds of the sale of the Property. (MR, Tab E[6]).

On January 6th and 22nd, 2021, respectively, Weststar (as to Montoya) and its insurer, Fidelity (as to Parsa, Montoya Park Place, Flores, and Deborah Jordan), intervened in the lawsuit alleging generally, among other claims, that Montoya, Parsa and Flores had breached their obligations and warranties under one "Commercial Affidavit as to Debts and Liens" ("Debts and Liens Affidavit"), dated July 1, 2020, and signed at the closing, and that Parsa and Jordan had breached the Guaranty. (MR, Tab F[7] ¶¶ 10-11; Tab G[8] ¶¶ 34, 49-52, 53-58). Weststar sought injunctive relief, Fidelity did not, and, although counsel for Parsa and Montoya kept counsel for Weststar and Fidelity apprised of negotiations with Flores as to the proposed injunction (as well as where the funds were on deposit), neither chose to be a party to the Injunction. (MR, Tab F ¶15; Tab G; Tab P & Ex. B p. 8-9).

Flores answered the Weststar and Fidelity petitions in intervention and filed a counterclaim against Fidelity. Notably, Flores alleges the failure to identify the

---

[5] "Motion for Temporary Restraining Order and Injunctive Relief" filed on November 25, 2020.

[6] "Agreed Temporary Restraining Order" filed January 6, 2021 and "Agreed Temporary Injunction" filed January 27, 2021.

[7] "Petition of Intervention of Weststar Title, LLC."

[8] "Fidelity National Title Insurance Company's Original Petition in Intervention."

3

RIC lien and to include payment to it from the sales proceeds was due to Weststar's own negligence:

> Texas is a comparative negligence state, and clearly, the greater negligence is overwhelmingly on the part of WESTSTAR (as authorized agent of FIDELITY NATIONAL TITLE INSURANCE COMPANY). The standard of care, is far greater for the title company, because it is a professional, of whom skill and expertise is expected. There is no good excuse for failing to detect (or failure to understand?) the recorded subordination agreement; it was blatant and gross error to have missed it, and WESTSTAR TITLE as agent and FIDELITY NATIONAL TITLE INSURANCE COMPANY as authorizing principal should have to answer for all the harm proximately caused by their negligence.

(MR, Tab H,[9] Tab I,[10] & J[11] ¶ 7).

On April 21, 2021, Fidelity and Weststar filed their "Joint Motion to Compel Interpleader of Funds into Registry of Court" ("Joint Motion") in which they acknowledged that 1) the sums of $338,000 and $700,000 were on deposit in two (2) Wells Fargo Bank accounts (the "Deposited Funds"), 2) Parsa and Montoya had consented to the Injunction, and 3) the Injunction restrained them from spending, transferring or alienating the Deposited Funds. Nevertheless, Fidelity and Weststar alleged "[t]he Parties have asserted competing claims to the Deposited Funds" and Fidelity and Weststar "object to the monies remaining

---

[9] "Albert Flores' Answer to the Petition in Intervention by Weststar Title, LLC" filed on February 3, 2021.
[10] "Albert Flores Answer to the Petition in Intervention by Fidelity National Title Insurance Company" filed on February 4, 2021.

4

*outside of the security* of the Court Registry" and "requests [sic] that the Court enter an order compelling Intervenor Defendants to interplead the Deposited Funds into the registry of the Court *where it will remain until the Court determines to whom the Deposited Funds should be awarded*." (MR, Tab K & Ex. B (emphasis added)).

On April 26, 2021, believing the Joint Motion was joint as to *all parties*, and without a hearing, Judged Spieczny entered an order granting it. (MR, Tab L; Tab P, Ex. 2, p. 5, 7, 30, 31). On the same day, Parsa and Montoya filed a response and objection to the Joint Motion,[12] and on April 28, 2021, their first Motion to Reconsider[13] the order. (MR, Tab M & N). In the Motion to Reconsider, Parsa and Montoya noted that the case was recently mediated (on April 19, 2021) and that there were no claims at mediation that either defendant had "violated or breached the terms of the Temporary Injunction." Furthermore, then-counsel for Parsa and Montoya posited that the motion was "retributory by [Fidelity] for not being able to resolve this matter at mediation." (MR, Tab N ¶ 7).

On May 18, 2021, Judge Spieczny held a hearing on the Motion to Reconsider. He first heard argument from counsel. Counsel for Parsa and

---

[11] "Counterclaim of Plaintiff and Third-Party Defendant Albert Flores for Comparative Negligence, Against Intervenor/Third Party Plaintiff Fidelity National Title Insurance Company" filed on February 8, 2021.
[12] "Keyvan Parsa M.D. and Montoya Park Place, Inc.'s Response and Objection to Joint Motion for Interpleader."

Montoya explained that 1) the Temporary Injunction had maintained the status quo as to the Deposited Funds 2) in January of 2021, he had discussions with counsel for Weststar and Flores and provided them with "evidence of where the money was ... in a Wells Fargo account" and 3) "on May 17th [he] provided [counsel for Weststar and Fidelity] an updated letter from Wells Fargo Bank confirming that the funds are still there." (MR, Tab P, Ex. B, p. 8-9). Counsel for defendants further confirmed in response to inquiry from Judge Spieczny that despite Flores' pleadings to the contrary, the money was never transferred to Mexico. (MR, Tab P, Ex. B, p. 10). Notably, counsel for Flores spoke next, and he made no mention of his pleadings about the money being transferred to Mexico, only voicing concern about having seen just one letter from Wells Fargo evidencing the one account containing $700,000. Counsel for Weststar pointed only to Flores' affidavit purporting to assert that the money had been transferred to Mexico but acknowledged that Parsa "may have a different position." (MR, Tab P, Ex. B, p. 11-13). Last, counsel for Fidelity admitted the Joint Motion was filed for security and not because of any evidence the Deposited Funds were in any danger:

> MR. WILLEY [Counsel for Fidelity]: We do it for security and also for - - you know, just to ensure that, you know all the parties' interest in the matter is addressed.

---

[13] "Keyvan Parsa M.D. and Montoya Park Place, Inc.'s Motion for Reconsideration & Abatement of Order Granting Joint Motion for Interpleader."

So, you know, I know Mr. Parsa hasn't done anything to date to raise concerns, but, you know, in - - in fact, if, you know, the - - the relief that we were requesting is not granted, you know, there's no assurances, Your Honor, that, you know - -

THE COURT: I understand.

MR. WILLEY: Yeah. So - -

THE COURT: He could do something tomorrow.

MR. WILLEY: Exactly. And so in that regards, I don't think saying that he hasn't done anything to date is grounds to vacate that order...

(MR, Tab P, Ex. B, p. 15-16).

Counsel for defendants then called Parsa to testify. Parsa confirmed 1) knowledge of the Injunction and its terms, 2) he had followed the terms "One hundred percent," 3) the money had never been transferred to Mexico (or anywhere else outside the country), 4) was always in Wells Fargo Bank, 5) that all the money was still in the Wells Fargo accounts (but that he had only obtained a letter as to one account due to short notice), 6) he was willing to share "all that information with [the other parties]," 7) he had never transferred any of the money out of the accounts since the injunction was entered, and 8) $1,038,000 remained in the accounts. (MR, Tab P, Ex. B, p. 17-21). During cross examination, counsel failed to illicit any evidence Parsa had acted in any way violative of the Injunction or that the Deposited Funds were otherwise at risk of loss or depletion. (MR, Tab P, Ex. B, p. 23-26). Moreover, Exhibit B to the Joint Motion clearly evidences the

7

sums of $700,000 and $338,000, respectively, were deposited into two accounts at Wells Fargo **on July 20, 2020**, well before the filing of the lawsuit on September 16, 2020 and remained on account as of the date of the letters, January 14, 2021— and before the Injunction was rendered on January 20, 2021 (and filed of record on January 27, 2021). (MR, Tab K, Ex. B).

Finally, despite conceding there was no risk of loss or depletion of the funds, Judge Spieczny concluded there was no prejudice in placing the monies in the registry:

> THE COURT: ... And, Doctor, I – here is how I think I should rule, and I want to explain this to you. I do not have a basis for thinking that you're going to move that money, and I do not have any basis to think you're going to do anything devious or that you're going to do anything sneaky or inappropriate. And I take and give full credibility to everything you have said, that you are honoring the injunction and that you intend to continue to honor the injunction.

> But I do understand the apprehension and the fear of these - - these other lawyers and their clients who don't know you and, you know, their interest in wanting to get just some more security just in case you were to do something with that money.

> And so I'm going to deny the motion to abate that order. I don't know if I need to do another order confirming that. I think the order was originally in place. And I will accept full responsibility for the confusion that has occurred here.

> ...But I think at this stage of the proceedings, what we are going to do is leave the original order to deposit the money into the registry of the Court in place.

> That order will allow the doctor and Mr. Miranda to ask for access to it at any time. And, you know, you would be free, if there

8

was a need that arose, for - - to come in and say, We need relief from this order, and we'd have a hearing and I'd rule on it at that time. But right now I think the most cautious thing to do is to go ahead and just leave the order in place.

(MR, Tab P, Ex. B, 29-31). The court further orally ordered the Deposited Funds

be deposited into the registry of the court no later than ten (10) days from the date

of the hearing (i.e., by May 28, 2021). (MR, Tab P, Ex. B, p.31).

On May 28, 2021, Parsa and Montoya filed a second Motion to Reconsider

specifically addressing the requirements of a petition for interpleader under Rule of

Civil Procedure 43—which were not present or met in this case—and urging that

withdrawal of the Deposited Funds would i) result in a 4.5% penalty (as the monies

were in money market accounts), ii) would result in loss of a credit line (as the

monies had been pledged to open the credit), iii) require immediate payment of the

monies borrowed (of $180,000), and iv) that the present injunction was sufficient

protection.[14]  (MR, Tab O).

In response, Fidelity filed its Motion for Contempt[15] and Weststar its

Objection[16] to the second Motion for Reconsideration now asserting as the basis

for deposit into the registry the court's inherent authority "if there is evidence that

---

[14] The second Motion to Reconsider was filed prior to receipt of the Transcript of the May 18, 2021, Motions Hearing.

[15] "Motion for Contempt of Court and for Sanctions" filed on June 7, 2021. Parsa and Montoya filed their "Defendants' Response to Motion for Contempt of Court and Request for Sanctions" on July 5, 2021. (MR, Tab R).

9

the funds are in danger of being lost or depleted." (MR, Tab P & Tab Q). Weststar argued that the Deposited Funds were in danger of being lost or depleted because "[t]he Defendants have apparently already transferred the funds that are the subject of the Injunction Orders," i.e., the funds are pledged as security for a Priority Credit Line Agreement in the name of Westmount Group which is not a party to the suit. The Objection goes on to allege pledge of the funds constituted a transfer as it created a lien. (MR, Tab Q). However, the credit line was created on August 8, 2020 (MR, Tab O, Ex. A), again, well before the filing of the lawsuit and the date of the Injunction; and as Exhibit B to the Joint Motion evidences, the Deposited Funds were placed on deposit on July 20, 2020 in the name of Westmount Group, Inc.[17], a non-party—which facts were made known to Fidelity and Weststar in January 2021—and in which accounts the funds *remain on deposit*. (MR, Tab K, Ex. B; Tab P, Ex. B p. 17-21). In addition, the Joint Motion and Order specifically reference as the "Deposited Funds" to be deposited into the registry "the two (2) separate Treasury Money Market Funds with Wells Fargo Bank, N.A., in amounts of at least $338,000 and $700,000, respectively (the

---

[16] "Weststar Title, LLC's Objection to Keyvan Parsa M.D. and Montoya Park Place, Inc.'s Motion for Reconsideration and to Abate Joint Order to Compel Interpleader" filed on June 15, 2021.

[17] The true and correct name of the entity holding the credit line is Westmount Group, Inc. not Westmount Group, LLC as the latter entity does not exist. (MR, Tab S, "Keyvan Parsa and Montoya Park Place, Inc.'s Amended Reply to Albert Flores' and Weststar Title, LLC's Response to Defendants' Motion for Reconsideration and to Abate Joint Order to Compel Interpleader" at n. 7; Tab T, p. 18).

"Deposited Funds")." (MR, Tab L). In other words, the funds identified, and the subject of the letters/accounts contained, in Exhibit B to the Joint Motion. (MR, Tab K, Ex. B).

On July 8, 2021, the trial court held a hearing on the *second* Motion to Reconsider (and Fidelity's Motion for Contempt).[18] The only evidence presented at the hearing was Parsa's testimony.[19] Parsa testified that the Deposited Funds i) were originally deposited on July 20, 2020, in the name of Westmount Group, Inc., ii) pledged to the line of credit in August of 2020, iii) remained on deposit as of July 8, 2021 in the same accounts as reflected in Exhibit B to the Joint Motion, and, iv) since issuance of the Injunction, there had likewise been no change "in where these monies [were] deposited [or] in what name." In addition, Parsa testified that withdrawing the funds from the accounts would incur a 4.5% penalty, tax consequences, and would be in breach of the credit line agreement causing the additional expense of immediate payment of the funds borrowed against the credit line (approximately $180,000). (MR, Tab T, p. 18-21, 50-54). Cross-examination did not illicit contrary evidence. (MR, Tab T, p. 22-35). Ultimately, the court ordered $750,000 be deposited into the registry of the court within ten (10) days— **on or before July 19, 2021**—with a contingent bond equal to the early withdrawal

---

[18] Transcript of Motions Hearing, dated July 8, 2021 (the Transcript incorrectly states that the date of the hearing was *June* 8, 2021). (MR, Tab T).

penalty (4.5%), if applicable, on the total funds on deposit. (MR, Tab T, p. 50-57). Finally, the court asked that the parties bring any issues before it prior to July 19th. Thereafter, on July 14, 2021, the court held a hearing where the issue of redeeming the shares in the accounts presented a potential delay in the eventual withdrawal of the funds—which could take 10-15 days.

Judge Spieczny left the prior order in place but modified it i) to allow counsel for Parsa and Montoya to alert the court and the parties about the maturity date (in the event it was July 20, 2021) and whether waiting to withdraw the funds on that date might avoid penalty, ii) order defendants to initiate the process to redeem/withdraw the funds, and iii) reserved any contempt until July 19, 2021. Finally, Judge Spieczny admitted defendants' Exhibit 1, updated statements/letters from Wells Fargo Bank, evidencing the Deposited Funds remained on account as of July 14, 2021 (in the sums of $338,000 and $700,000, respectively). (MR, Tab U).

It is about the Joint Order which Relators complain and from which they seek relief.

## SUMMARY OF THE ARGUMENT

A trial court may order deposit of funds into the registry of the court in certain limited circumstances one being where there is a danger of loss or depletion

---

[19] Additionally, undersigned counsel asked that the court take judicial notice of the

12

of specific funds which are in dispute. The only evidence before the trial court showed that Relators had at all times—and consistent with the agreed Injunction—safeguarded the disputed funds and the funds were in no danger of being lost or depleted. Nevertheless, the trial court issued an order requiring deposit of the funds into the registry to provide security for the opposing parties' claims. While this action may be laudable, because there is no evidence of risk of loss or depletion, the trial court's actions were in error constituting an abuse of discretion. The trial court's order should be vacated and mandamus issue.

## ARGUMENT AND AUTHORITIES

### I. Standard of review.

"Mandamus relief may be available if the relator establishes a clear abuse of discretion for which there is no adequate appellate remedy." *N. Cypress Med. Ctr. v. St. Laurent*, 296 S.W.3d 171, 178-79 (Tex.App.—Houston [14th Dist.] 2009, orig. proceeding) (citing *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135-36 (Tex.2004) (orig. proceeding). The court of appeals will not disturb a trial court's resolution of disputed fact matters, but the trial court has no discretion in determining what the law is or in applying the law to the facts. *Id.* (citing *Walker v. Packer*, 827 S.W.2d 833, 839-40 (Tex. 1992) (orig. proceeding).

Unless a party is seeking issuance of writ of attachment, a trial court has the

---

pleadings on file as well as the exhibits thereto. (MR, Tab T, p. 39).

power to order deposit in the court registry of specific funds *only when* such funds
are in danger of being lost or depleted:

> A trial court has two routes of authority to order money to be
> deposited in the registry of the court. The court may, in compliance
> with section 61.001 of the Texas Civil Practice and Remedies Code,
> issue a writ of attachment. The court may also, in exercise of its
> inherent authority "order a party to pay disputed funds into the court's
> registry if there is evidence the funds are in danger of being 'lost or
> depleted.'" *In re Reveille Resources (Texas), Inc.,* 347 S.W.3d 301,
> 304 (Tex.App.–San Antonio 2011, orig. proceeding) (citing *Castilleja
> v. Camero,* 414 S.W.2d 431, 433 (Tex.1967)).

*Zhao v. XO Energy LLC,* 493 S.W.3d 725, 736 (Tex.App.—Houston [1st Dist.]

2016, no pet.). "When there is insufficient evidence presented that the 'funds are

in danger of being 'lost or depleted,'" however, the trial court abuses its discretion

by ordering funds deposited in the registry of the court and mandamus relief from

such an order is appropriate. *Id.* (citing *In re Reveille Resources (Texas), Inc.,* 347

S.W.3d at 304 (trial court abused its discretion when there was no evidence of

possible depletion of funds and trial court based injunction solely on statement by

counsel during hearing rather than evidence)). *See also N. Cypress Med. Ctr.,* 296

S.W.3d at 178-79. (trial court abused its discretion when there was no evidence

that funds at issue were at risk of being lost or depleted, but only that disputed

partnership funds were in same bank account that partnership actively used to fund

several business activities.).

14

**II.      The trial court erred when it ordered Relators to deposit $750,000 in the registry of the court where there was no evidence the funds were in danger of being lost or depleted**

The trial court's order i) fails for lack of any evidence the funds at issue were in danger of being lost or depleted, ii) was based on providing security to the other parties in the nature of pre-judgment writ of attachment, iii) requires a non-party to deposit the disputed funds, and iv) fails to recognize the Relators initially consented to, and have since complied with, the Injunction which has proven sufficient to protect the parties.

### No Evidence Funds in Danger of Being Lost or Depleted

In the Joint Motion, RPI identify and request certain funds, the "Deposited Funds," be placed in the registry. More specifically, Weststar and Fidelity identify the funds as those on deposit in the accounts at Wells Fargo Bank and depicted in the statements/letters attached as Exhibit B to the Joint Motion. (MR, Tab K & Ex. B). Furthermore, the Joint Order similarly identifies the Deposited Funds as those on deposit in "the two (2) separate Treasury Money Market Funds with Wells Fargo Bank, N.A., in amounts of at least $338,000 and $700,000, respectively (the "Deposited Funds")." (MR, Tab L).

Therefore, as to the Deposited Funds, the evidence before the court establishes:

i)   The Deposited Funds (as a portion of the sales proceeds) were originally deposited in Montoya Park Place, Inc.'s account at Western Heritage Bank on or about July 2, 2020 (MR, Tab C ¶ 16);

ii)  On July 20, 2020, Parsa deposited the Deposited Funds into the Wells Fargo Bank accounts in the name of Westmount Group, Inc. (MR, Tab T, p. 18-21);

iii) The Deposited Funds were never transferred to Mexico or anywhere else outside of the United States (MR, Tab P, Ex. B, p. 19);

iv)  Parsa/Montoya's counsel apprised Weststar and Fidelity of the negotiations with Flores' counsel in January 2021 resulting in the Restraining Order and Injunction, including where the funds were on deposit (MR, Tab P & Ex. B, p. 8-9; MR, Tab K, Ex. B);

v)   On April 19, 2021, the parties mediated the case, and there were no claims/concerns raised as to any breach or violation of the Injunction (MR, Tab N ¶ 7);

vi)  The Joint Motion (of April 21, 2021) attached Exhibit B, the letters/statements of the Wells Fargo Bank accounts, evidencing the Deposited Funds were deposited on July 20, 2020, and remained in the accounts on January 14, 2021 (before the Injunction was rendered on January 20, 2021) (MR, Tab K, Ex. B.)

vii) On May 17, 2021, counsel for defendants provided counsel for Weststar and Fidelity with an updated letter from Wells Fargo Bank confirming the Deposited Funds were still on deposit (MR, Tab P, Ex. B, p. 8-9);

viii) The Deposited Funds remained in the accounts as of May 18, 2021, in the sum of $1,038,000 (MR, Tab P, Ex. B, p. 19-21);

ix)  Parsa had "[o]ne hundred percent" complied with the Injunction as of May 18, 2021 and no monies had been transferred from the accounts since the injunction was entered (MR, Tab P, Ex. B, p. 20);

x)   Counsel for Fidelity admitted as of May 18, 2021, "Parsa hasn't done anything to date to raise concerns" (MR, Tab P, Ex. B, p. 15-16);

16

xi) Judge Spieczny acknowledged there was no evidence the Deposited Funds were in danger of being lost or depleted (MR, Tab P, Ex. B, p. 29-31);

xii) On July 8, 2021, Parsa confirmed the Deposited Funds were originally deposited on July 20, 2020, in the name of Westmount Group, Inc., pledged to the credit line in August of 2020, and remained on deposit in the same accounts as reflected in Exhibit B to the Joint Motion (MR Tab T, p. 18-21,50-54); and

xiii) Letters/statements from Wells Fargo Bank updated as of July 14, 2021 confirm $1,038,000 remain on deposit (MR, Tab U).

It cannot be disputed that the funds sought by RPI to be deposited into the registry—the Deposited Funds—were made known to them by counsel for Relators in January of 2021, in conjunction with preparation of the Injunction by the letters/statements dated January 14, 2021, and attached to the Joint Motion at Exhibit B. In addition, that counsel for Weststar and Fidelity felt comfortable that the Deposited Funds remained on account is evident in that they asked the court to enter the Joint Order which of course also described the Deposited Funds as those on account at Wells Fargo Bank in the name of Westmount Group, Inc. And, at the hearing on May 18, 2021, they were unable to point to any evidence the funds were in danger of being lost or depleted. Judge Spieczny too acknowledged there was no evidence Parsa had violated the terms of the Injunction or that he intended to move the money or to otherwise engage in any wrongdoing. Rather, he and counsel for Fidelity desired to provide security for the parties' claims. Finally,

since May 18, 2021, it is undisputed the funds remain on account—and have remained so since July 20, 2020, before the lawsuit was filed. Quite simply, there is no evidence the Deposited Funds are in danger of being lost or depleted.

Moreover, recent claims by RPI that the monies were "transferred" to Westmount Group, Inc. indicating a violation of the injunction (MR, Tab Q ¶ 9) are belied by the fact RPI knew as of January 14, 2021, that the monies were on deposit in the name of Westmount, and had been since July 20, 2020, and yet still they requested these funds be placed in the court registry. Weststar and Fidelity were under no misimpression, nor have they been, about the whereabouts and character of the Deposited Funds. Likewise, to assert that the pledge of the funds to the credit line in August 2020 constitutes a transfer by creation of "lein" (MR, Tab Q ¶ 10) again ignores that the Deposited Funds remain in the same form they did in August 2020, January 2021 (at the time of the Temporary Injunction), and, most recently, as of July 14, 2021.

This case is analogous to *North Cypress Medical Center v. St. Laurent*, where St. Laurent, a doctor, attempted to prevent the sale of his profits-only ownership interest in a hospital's limited partnership. St. Laurent was subject to an agreement that provided the partnership, "at its sole option," could sell his shares for several and various reasons, including breach of the agreement. The partnership later notified him that he had breached a non-competition clause and

18

that it intended to sell his shares. In response, he filed suit seeking an injunction preventing the sale. The trial court granted the injunction and ordered North Cypress "to pay into the registry St Laurent's portion of any future partnership distributions." 296 S.W.3d at 174. Despite that the undisputed evidence suggested that the funds at issue were on deposit in a bank account that the partnership could use to fund several activities, including reinvestment of funds into the hospital's physical plant, i.e., from "Available Cash," (the same source used to pay partner distributions); the Court found 1) the funds were not shown to be in danger of being lost or depleted (because the funds were being reinvested) and 2) there was no showing of "the extent, if any, to which the available cash may be dwindling because of the capital improvements." *Id.* at 179.

Here, assuming *arguendo* that the Deposited Funds are "encumbered" by having been pledged to secure the credit line, there is no evidence of the extent, if any, that the amount borrowed ($180,000) has compromised the Deposited Funds in any way,[20] that the credit line is in default (or in danger of default), or that there is any intent or need to withdraw the funds. In fact, as set forth above *ad nauseum*, the Deposited Funds have remained on deposit in the Wells Fargo accounts during

---

[20] In fact, the trial court reduced the amount to be deposited to $750,000 to accommodate the prospect of the need to immediately pay the $180,000 to satisfy the amounts borrowed on the credit line once the funds were withdrawn and the terms of the credit line breached. (MR, Tab T, p. 51-56). RPI cannot have it both ways. If payment of $180,000 upon withdrawal is not a risk to the Deposited Funds, then leaving the funds on deposit, even encumbered to $180,000,

19

the entire pendency of the case and up until as recently as July 14, 2021.

Moreover, the trial court found Parsa credible in his testimony that he had always

complied with the injunction and intended to. (MR, Tab P, Ex. B, 29-31).

### The Trial Court's Order was an Impermissible Attempt to Provide Security for the claims of RPI

Counsel for Fidelity urged the trial court to order the funds be deposited not

because of any danger of loss or depletion but as security for any eventual

judgment:

> MR. WILLEY [Counsel for Fidelity]: We do it for security and
> also for - - you know, just to ensure that, you know all the parties'
> interest in the matter is addressed.

(MR, Tab P, Ex. B, p. 15-16). And, in announcing his decision, Judge Spieczny

transparently provided security, not risk, as his rationale:

> THE COURT:

> But I do understand the apprehension and the fear of these - - these
> other lawyers and their clients who don't know you and, you know,
> their interest in wanting to get just some more security just in case you
> were to do something with that money.

(MR, Tab P, Ex. B, 29-31).   However, the laudable goal of providing security is

not a substitute for the lack of evidence of the risk of loss or depletion of the funds

and amounts to an improper prejudgment writ of attachment leaving Relators with

no adequate remedy at law or by appeal. *See Noteboom v. Gray*, 111 S.W.3d 794,

---

prevents no present risk, especially given that there is no evidence of any default as to the credit

20

798 (Tex.App—Fort Worth 2003, orig. proceeding) ("[T]he record reflects the trial court was attempting the admirable goal of safeguarding sufficient assets necessary to satisfy any future money award on final judgment of the case; however, by refusing to permit Noteboom the opportunity to introduce evidence concerning the merits of the claims prior to the trial court's setting of the bond amount, the trial court failed to afford Noteboom the procedural due process to which he was entitled"). Here, as in *Noteboom*, Relators here have no adequate remedy by appeal with respect to the loss of the funds required at the time of withdrawal of the Deposited Funds—and the contingent bond offers no protection for this loss which amounts to a prejudgment attachment—such that mandamus is appropriate. *Id.* (citing *See S.R.S. World Wheels, Inc. v. Enlow*, 946 S.W.2d 574, 575 (Tex.App-Fort Worth 1997, orig. proceeding) (granting mandamus relief in connection with a prejudgment writ of attachment under which relator had no adequate remedy at law by which to obtain possession of its property).

### The Order Requires Relators to Deposit Funds which are in Possession of a Non-party

Relators agreed to and have complied with the Injunction, but it is undisputed the Deposited Funds are in possession of Westmount Group, Inc. and always have been. (MR, Tab T, p. 29). RPI were provided the opportunity to be party to the Injunction and were provided copies of the statements/letters from

line.

21

Well Fargo identifying the accounts and account holder of the Deposited Funds. Nevertheless, RPI chose not to join the Injunction or add Westmount Group, Inc. as a party to the lawsuit. Furthermore, the Joint Order purports to order payment into the registry of funds which Relators do not presently possess. Putting aside for the moment the infirmities addressed above, the Joint Order cannot require Relators to perform an act for which they neither have the ability nor the authority. And, Westmount Group, Inc. cannot be compelled to turn over funds without due process.

### The Temporary Injunction Provides Sufficient Protection of the Deposited Funds

Parsa and Montoya are parties, and in fact agreed, to the Temporary Injunction. More importantly, there is no evidence of any actual or perceived breach of the terms of the Injunction, and the trial court was convinced Parsa had no intention to violate its terms. Therefore, although Westmount Group, Inc. is not a party to the Injunction, given Relators' consent to its terms, the Deposited Funds are protected even though held by Westmount Group, Inc. because if Relators withdrew the funds, they would be violation of the Injunction. Moreover, Relators agreed to terms in the Injunction which would arguably be an abuse of discretion for a trial court to order be enjoined. *See N. Cypress Med. Ctr.*, 296 S.W.3d at 178 (granting relief from mandamus requiring deposit in the court registry funds representing shares *and injunction* prohibiting sale or transfer of shares);

22

*Noteboom*, 111 S.W.3d at 798. Therefore, Relators, by their agreement, have provided the parties with more protection than they would otherwise be entitled by injunction, and by their performance, Relators have complied with the Injunction—providing actual protection of the parties', including RPI's, claims to the disputed funds.

## Conclusion

There is no evidence that the Deposited Funds are in danger of being lost or depleted, the Joint Order was entered in error, and was an abuse of discretion. In addition, Relators and/or Westmount Group, Inc. face tens, perhaps hundreds of thousands, of dollars in financial losses, if they are required to withdraw the Deposited Funds and pay them into the registry of the court—for which they have no adequate remedy by appeal. Furthermore, despite that the Deposited Funds are in possession of non-party Westmount Group, Inc., Relators, in addition to losses to the corpus of the funds, face the imminent consequence of being held in contempt.

The issuance of the Joint Order was in error and constitutes an abuse of discretion. Thus, the Joint Order should be vacated and mandamus granted.

## PRAYER

For these reasons, Relators respectfully request that the trial court's order ordering deposit of the disputed funds into the court registry be vacated, that same

23

be stayed pending this Court's decision on this petition and the case be remanded to the trial court for further proceedings and that Relators be awarded its costs of court.

TROY C. BROWN
Attorney at Law
1074 Country Club Dr., Ste. B-4
El Paso, Texas 79932
Phone: (915) 543-9669
Fax: (888) 922-3353
E-mail: troy@tcblegal.com

/s/*Troy C. Brown*
TROY C. BROWN
State Bar Number 00783735
Attorney for Relators

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on the 17th day of July 2021 pursuant to the Court's Notice of Electronic Procedures established for the El Paso County Courts via e-mail:

James W. Brewer
Kemp Smith LLP
221 N. Kansas, Ste. 1700
El Paso, Texas 79901
Tel. (915) 533-4424
Fax. (915) 546-5360
James.brewer@kempmith.com

S. Shakira Ali Kelley
Gregory T. Brewer
Fidelity National Law Group
6900 Dallas Parkway, Suite 610
Plano, Texas 75024
(972) 812-6407
(972) 812-9408
Shakira.Kelley@fnf.com
Gregory.brewer@fnf.com

24

E.P. Bud Kirk
Attorney at Law
Terrace Gardens
600 Sunland Park Dr.
Building Four, Suite 400
El Paso, Texas 79912
budkirk@aol.com

Richard A. Roman
1018 Brown St.
El Paso, Texas 79902
(915) 351-2679
(915) 351-6754 fax
rromanattorney@yahoo.com

/s/*Troy C. Brown*
Troy C. Brown

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Petition for Writ of Mandamus complies with the type-volume limitations of TRAP Rule 9.4. The petition contains 5,658 words, excluding the parts of the petition exempted by 9.4(1); and this petition complies with the typeface requirements of 9.4(e) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14-point.

/s/*Troy C. Brown*
TROY C. BROWN

25

<u>VERIFICATION</u>

STATE OF TEXAS         )
COUNTY OF EL PASO    )

      Before me, the undersigned notary, on this day personally appeared Troy C. Brown, who after being duly sworn, stated:

      "My name is TROY C. BROWN, I am over the age of 18 of sound mind, and I am fully competent to testify to the matters set forth herein.  I have read the foregoing, including the Mandamus Record and Appendix referenced herein, and the documents attached hereto at the Appendix and attached as the Mandamus Record are true and correct copies of documents of record in the case and are what they purport to be."

_____
Troy C. Brown

      SUBSCRIBED AND SWORN TO BEFORE ME, a Notary Public, on this the 17th day of July 2021.

GENA OLNEY
Notary Public, State of Texas
Comm. Expires 05-09-2024
Notary ID 8807776

Notary Public in and for the State of Texas

My commission expires May 9, 2024

26

## **CERTIFICATION**

I hereby certify that the foregoing Petition for Writ of Mandamus complies with TRAP Rule 52.3(j).  I hereby certify that I have reviewed the petition and concluded that every factual statement in the petition is supported by competent evidence included in the appendix or record.

/s/*Troy C. Brown*
TROY C. BROWN

27

NO. _____

---

IN THE COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

---

In Re:

**KEYVAN PARSA, M.D. and
MONTOYA PARK PLACE, INC.**

**Relators.**

---

Original Proceeding Arising Out of
the 327th Judicial District Court of El Paso County, Texas
No. 2020DCV2997
(Hon. Thomas Spieczny)

---

**Appendix**

---

**APPENDIX:**

**Appx. Tab 1.**    **Joint Order to Compel Interpleader and Hold Funds into
Registry of Court (April 26, 2021)**

# TAB 1

Filed 4/26/2021 3:23 PM
Norma Favela Barceleau
District Clerk
El Paso County
2020DCV2997

CAUSE NO. <u>2020DCV2997</u>

| | | |
|---|---|---|
| **ALBERT FLORES** | § | **IN THE DISTRICT COURT OF** |
| Plaintiff, | § | |
| **and** | § | |
| **FIDELITY NATIONAL TITLE INSURANCE COMPANY** | § | |
| Intervenor-Plaintiff, | § | |
| **v.** | § | **EL PASO COUNTY, TEXAS** |
| **KEYVAN PARSA, M.D, AND MONTOYA PARK PLACE, INC.,** | § | |
| Defendants. | § | |
| **and** | § | |
| **KEYVAN PARSA, M.D., MONTOYA PARK PLACE, INC., ALBERT FLORES, and DEBORAH JORDAN,** | § | |
| Intervenor-Defendants. | § | **327TH JUDICIAL DISTRICT** |

## <u>JOINT ORDER TO COMPEL INTERPLEADER AND HOLD FUNDS INTO REGISTRY OF COURT</u>

On this day came to be heard the Joint Motion to Compel Interpleader and Hold Funds into Registry of Court of Intervenor-Plaintiffs, Fidelity National Title Insurance Company and WestStar Title, LLC. The Court having considered the Joint Motion, finds as follows:

IT IS ORDERED that Defendants, Keyvan Parsa, M.D. and Montoya Park Place, Inc., shall within ten (10) days from the day of this order, interplead into the El Paso Country Clerk

*Agreed Order to Interplead Funds*
R002498

Page 1 of 3

Registry the two (2) separate Treasury Money Market Funds with Wells Fargo Bank, N.A., in amounts of at least $338,000.00 and $700,000.00, respectively (the "Deposited Funds").

IT IS FURTHER ORDERED that all monies deposited by Defendants, Keyvan Parsa, M.D. and Montoya Park Place, Inc, into the Court's Registry and shall remain in the Court's Registry, and the Court shall not release the monies until a resolution is reached between the parties or thirty (30) days after a final, non-appealable Order has been entered in this suit.

IT IS FURTHER ORDERED that this Order is without prejudice to Plaintiff, Albert Flores, Intervenor-Plaintiff Fidelity National Title Insurance Company, Intervenor-Plaintiff WestStar Title, LLC and Defendants, Defendants, Keyvan Parsa, M.D. and Montoya Park Place, Inc., and Intervenor-Defendants, Keyvan Parsa, M.D. and Montoya Park Place, Inc, Albert Flores, and Deborah Jordan (collectively hereinafter referred to as the "Parties"), in recovering any and all funds deposited into the Court's Registry and any judgment against the Parties, claims and causes of action asserted or which could be asserted by the Parties in this suit.

IT IS FURTHER ORDERED that the Parties do not waive or release and are not estopped or otherwise prevented from recovering their claims and causes of action asserted or which could be asserted in this suit from all or any part of the funds held in the Court's Registry and any judgment.

SIGNED this 26 day of April , 2021.

PRESIDING JUDGE

*Agreed Order to Interplead Funds*
R002498

Page 2 of 3

**SUBMITTED BY AND AGREED AS TO FORM AND SUBSTANCE:**

*//s// Michael J. Willey*
**MICHAEL J. WILLEY**
State Bar No. 24115952
willey.michael@fnf.com
**GREGORY T. BREWER**
State Bar No. 00792370
Gregory.brewer@fnf.com
**FIDELITY NATIONAL LAW GROUP**
41785 Preston Road, Suite 1150
Dallas, Texas  75254-8046
Tel.: 972-812-6478
Fax.: 972-812-9408
*ATTORNEYS FOR INTERVENOR-PLAITNIFF*
*Fidelity National Title Insurance Company*

~And~

*//s// James W. Brewer*
**JAMES W. BREWER**
State Bar No. 02965200
James.brewer@kempsmith.com
**KEMP SMITH, LLP**
221 North Kansas, Suite 1700
El Paso, Texas 79901-1401
Tel.: 915-553-4424
Fax.: 915-546-5360
*ATTORNEYS FOR INTERVENOR-PLAITNIFF*
*WestStar Title, LLC*

**EXHIBIT "G"**



### COURT OF APPEALS
### EIGHTH DISTRICT OF TEXAS
### EL PASO, TEXAS

| | | |
|---|---|---|
| IN RE:  KEYVAN PARSA, M.D. AND MONTOYA PARK PLACE, INC., | §<br>§<br>§ | No. 08-21-00125-CV<br><br>AN ORIGINAL PROCEEDING |
| Relators. | §<br>§<br>§ | IN MANDAMUS |

## J U D G M E N T

The Court has considered this cause on the Relators' petition for writ of mandamus against the Honorable Thomas Spieczny, visiting judge of the 327th District Court of El Paso County, and concludes that Relators' petition for writ of mandamus should be denied. We therefore deny the petition for writ of mandamus, in accordance with the opinion of this Court.

IT IS SO ORDERED THIS 4TH DAY OF AUGUST, 2021.

GINA M. PALAFOX, Justice

Before Rodriguez, C.J., Palafox, and Alley, JJ.



COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| IN RE: KEYVAN PARSA, M.D. AND MONTOYA PARK PLACE, INC., | § § § | No. 08-21-00125-CV<br><br>AN ORIGINAL PROCEEDING |
| Relators. | § § § | IN MANDAMUS |

## <u>MEMORANDUM OPINION</u>

Relators Keyvan Parsa, M.D., and Montoya Park Place, Inc. have filed a petition for a writ of mandamus asking this Court to overturn an order issued by the Hon. Thomas Spieczny, visiting judge of the 327th District Court, impounding certain funds in the court's registry pending resolution of a lawsuit. Relators also filed a motion for emergency relief from the order pending resolution of the mandamus petition on the merits. The motion for emergency relief and petition for writ of mandamus are denied.

To be entitled to mandamus relief, a relator generally must meet two requirements. First, the relator must show that the trial court clearly abused its discretion. *In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding). Second, the relator must demonstrate

1

that there is no adequate remedy by appeal. *Id.* at 135-36. The burden is on the relator to show he is entitled to mandamus relief. *See In re Ford Motor Co.*, 165 S.W.3d 315, 317 (Tex. 2005) (orig. proceeding).

After reviewing the mandamus petition and record, we conclude that Relators have failed to show entitlement to mandamus relief on this record. Accordingly, we deny the emergency motion and the petition for writ of mandamus.

GINA M. PALAFOX, Justice

August 4, 2021

Before Rodriguez, C.J., Palafox, and Alley, JJ.

2

**EXHIBIT "H"**

about:blank

**From:** ssather@bn-lawyers.com,
**To:** budkirk@aol.com,
**Subject:** RE: Westmount Group, Inc., Case No. 21-30633-HCM-11
**Date:** Tue, Sep 21, 2021 5:00 pm

I did not leave anything out. If you will notice, the debtor listed various notes receivable. Those assets take the place of the prior money market certificates.

**From:** E.P. Bud Kirk <budkirk@aol.com>
**Sent:** Monday, September 20, 2021 6:13 PM
**To:** Steve Sather <ssather@bn-lawyers.com>
**Subject:** Westmount Group, Inc., Case No. 21-30633-HCM-11

Dear Steve,

After reading the Schedules and Statement of Affairs in Westmount Group, Inc., I am just astounded.

Did you mean to leave the money market certificates out?

Is there any intention by PARSA to satisfy the claims of FLORES, FIDELITY, and WESTSTAR?

R.S.V.P.,

E.P. BUD KIRK

(915) 584-3773

The information in this electronic message is privileged and confidential information intended only for the use of the individual or entity addressee. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by telephone and return the original message to Terrace Gardens, 600 Sunland Park Drive, Building Four, Suite 400, El Paso, Texas 79912 VIA the U.S. Postal Service.

Thank you.